UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

MAXLITE, INC., a New Jersey Corporation, f/k/a SK AMERICA, INC., d/b/a MAXLITE,

                    *Plaintiff*,

          v.

ATG ELECTRONICS, INC., JAMES D. STEEDLY, SOPHIA C. GALLEHER, and MATTHEW KIM,

                    *Defendants*.

---

Civil Action No. 15-1116

**OPINION FOR PUBLICATION**

---

**John Michael Vazquez, U.S.D.J.**

        This matter comes before the Court on Defendant ATG Electronics, Incorporated's ("ATG") supplemental motion to dismiss for lack of personal jurisdiction or, alternatively, to transfer.[1] This case concerns allegations that ATG improperly interfered with the contractual relationship between Plaintiff MaxLite, Incorporated ("Plaintiff" or "MaxLite") and three of its employees, when ATG hired the employees and used them to compete with MaxLite. ATG and MaxLite are business competitors. All three employees had agreements with MaxLite, which contained non-competition, non-disclosure, and non-solicitation provisions. The agreements also provided that disputes would be resolved in New Jersey. ATG was aware of the agreements and their key components before hiring the employees. For the reasons stated below, the motion is denied.

---

[1] Defendant's Brief in support of its Supplemental Motion to Dismiss or Transfer will be referred to hereinafter as "Def. Br." (D.E. 138), Plaintiff's Opposition to Defendant's brief will be referred to hereinafter as "Pl. Opp." (D.E. 141), and Defendant's Reply Brief in support of its Supplemental Motion to Dismiss or Transfer will be referred to hereinafter as "Def. Reply" (D.E. 145).

## I.  BACKGROUND

### A.  Procedural Background

On February 12, 2015, MaxLite filed the initial Complaint in this matter against Defendants Sophia C. Galleher ("Galleher"), Matthew Kim ("Kim"), James D. Steedly ("Steedly") (together, "Employee Defendants"), and ATG.  D.E. 1.[2]  On June 23, 2015, MaxLite filed an Amended Complaint.  D.E. 87.[3]  The eight-count Amended Complaint asserts the following causes of action: Count I – Breach of Contract, Count II – Breach of Implied Covenant of Good Faith and Fair Dealing, Count III – Conversion and Misappropriation, Count IV – Unfair Competition/ Breach of Duty of Loyalty, Count V – Tortious Interference of Contractual Relationships, Count VI – Tortious Interference of Present and Prospective Business Advantage, Count VII – Civil Conspiracy, and Count VIII – Unjust Enrichment.  AC ¶¶ 91-129.  The current motion concerns only those counts brought against ATG:  Counts V, VI, VII and VIII.

On March 12, 2015, prior to the filing of the Amended Complaint, ATG and the Employee Defendants moved to dismiss the Complaint for lack of personal jurisdiction or, in the alternative, to transfer the case to the Central District of California.  D.E. 17.  Oral argument was held on April 21, 2015 before Judge Wigenton.  D.E. 56.  Judge Wigenton denied the motion as to the Employee Defendants, finding their contacts with the State of New Jersey sufficient to allow the court to exercise *in personam* jurisdiction over them.  D.E. 63 ¶ 1.  However, Judge Wigenton found that MaxLite had not presented sufficient evidence to meet its burden of showing that ATG had

---

[2] One day later, on February 13, 2015, ATG and the Employee Defendants filed suit against MaxLite in the Superior Court of California.  *See* Def. Br. at 11 (*ATG Electronics, Inc., et al. v. MaxLite, Inc., et al.*, Case No. 30-2015-00771894-CU-OE-CJC).  This action was subsequently removed to the Central District of California (Case No. 8:15-cv-00365).

[3] Plaintiff's First Amended Complaint will be referred to hereinafter as "AC" (D.E. 87).

sufficient contacts for purposes of personal jurisdiction. *Id.* ¶ 2. Yet, the Court permitted Plaintiff to conduct limited jurisdictional discovery on the issue. *Id.*[4] Judge Wigenton denied the motion to transfer as to the Employee Defendants and held in abeyance her ruling as to ATG pending the outcome of the discovery. D.E. 56.[5]

ATG's primary argument is that it does not have sufficient contacts with New Jersey to subject it to either specific or general personal jurisdiction. ATG contends that even if it was subject to the Court's jurisdiction, it would be unreasonable to require ATG to defend itself in New Jersey and asks the Court to transfer this case to the Central District of California. Plaintiff responds that the jurisdictional discovery demonstrates that ATG does, in fact, have sufficient contacts with this forum, subjecting it to both specific and general jurisdiction here. Plaintiff further urges this Court to reject ATG's motion to transfer venue due to, among other things, Judge Wigenton's prior ruling denying transfer.

---

[4] The jurisdictional discovery included: Galleher's Deposition ("Gal. Tr."), Nick Ni's (the President of ATG) Deposition ("Ni Tr."), Defendant's Responses to Plaintiff's Interrogatories ("Def. Interrog. Resp."), and emails, which were later attached to Plaintiff's pending Order to Show Cause (D.E. 109-4).

[5] While the jurisdictional discovery was ongoing, ATG ended its relationship with the three Employee Defendants. MaxLite claims that the three were fired because of the current matter. Pl. Opp. at 10-11.

### B. Factual Background[6]

<u>The Parties</u>

MaxLite is a New Jersey corporation engaged in the business of designing, engineering, developing, manufacturing, and distributing energy efficient lighting products.  AC ¶¶ 1, 10. MaxLite's headquarters are located in West Caldwell, New Jersey.  *Id.* ¶ 1.  MaxLite specializes in the conversion of traditional light sources to light emitting diode ("LED") products, including compact fluorescent lamps.  *Id.* ¶ 10.

The President and CEO of MaxLite, Yon W. Sung ("Sung") described its business activities in New Jersey as follows:

> MaxLite is a New Jersey company: one hundred percent (100%) of MaxLite's corporate decisions are made in New Jersey; sixty-five percent (65%) of its shipping and assembly work is performed in New Jersey; ninety percent (90%) of its Product Management and Product Engineering work is performed in New Jersey; one hundred percent (100%) of its Marketing is performed in New Jersey; one hundred percent (100%) of its IT work is performed in NJ; ninety percent (90%) of its customer service work is performed in New Jersey; ninety-five percent (95%) of its warrant service work is performed in New Jersey; one hundred percent (100%) of its accounting and financing work is performed in New Jersey; and seventy-three (73) employees work at its headquarters in New Jersey.

---

[6] The factual background is taken from Plaintiff's First Amended Complaint and the exhibits attached thereto, the submitted declarations, and the jurisdictional discovery provided.  When reviewing a motion for lack of personal jurisdiction, "a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003).

Sung Decl. ¶ 9.[7]  While MaxLite maintains an office in California, the office is "responsible for less than ten percent (10%) of product development, testing, and certification, and less than sixteen percent (16%) of total company sales." *Id.* ¶ 23.

ATG is incorporated and headquartered in California, and is a direct competitor of MaxLite. *Id.* ¶ 6. Since at least 2013, ATG has "sought to gain a competitive advantage in the niche LED lighting marketplace." *Id.* ¶ 79.

Defendant Steedly was hired by MaxLite on or about September 25, 2009 as its Director of Engineering. AC ¶ 15. Steedly's employment was conditioned on his entering into a written Proprietary Information Agreement (the "Agreement").[8] *Id.* ¶ 18. Initially, Steedly worked for MaxLite at its headquarters in New Jersey. *Id.* ¶ 16. As Director of Engineering, Steedly helped transition customers from their use of traditional light sources, including researching and designing products to fit the customers' needs. *Id.* ¶ 15. At Steedly's request, he was relocated to MaxLite's office in Anaheim, California. *Id.* ¶ 16. Steedly remained a MaxLite employee until his resignation on October 20, 2014, thereafter joining ATG. *Id.* ¶ 21. Plaintiff alleges that Steedly violated the Agreement when he stole and destroyed confidential information, worked for ATG, and solicited other MaxLite employees to work for ATG. *Id.* ¶¶ 22-39.

---

[7] The declarations in support of Defendants' First Motion to Dismiss include: Sophia C. Galleher's Declaration ("Gal. Decl."), James D. Steedly's Declaration ("Steedly Decl."), Matthew Kim's Declaration ("Kim Decl."), and Eric Cai's (the Executive Director of U.S. Operations for ATG) Declaration ("Cai Decl."). The declarations in support of MaxLite's Opposition to Defendants' Motion to Dismiss include: Kelly Purcaro's (MaxLite's attorney) Declaration ("Purcaro Decl."), Kevin R. McGroarty (independent sales representative) Declaration ("McGroarty Decl."), and Yon W. Sung's (President and CEO of MaxLite) Declaration ("Sung Decl.").

[8] The employment agreements signed by Galleher and Kim were the same in all material respects as the one signed by Steedly. As a result, the Court refers all three agreements singularly as the "Agreement," or collectively as the "Agreements." The Agreements are attached as exhibits to Plaintiff's First Amended Complaint. *See* AC Ex. A, Ex. B & Ex. C.

Defendant Galleher was hired by MaxLite on or about May 22, 2012 as its Strategic Marketing and Business Development Analyst. *Id.* ¶ 40. Like Steedly, Galleher's employment was conditioned on her signing the Agreement. *Id.* ¶ 45. Galleher was primarily responsible for coordinating and updating LED market trends, product development, and marketing strategies. She was also involved with installation, rebate, and incentive programs. *Id.* ¶ 42. Galleher worked in MaxLite's New Jersey office until July 2014 when, at her request, she was transferred to MaxLite's office in California and promoted to Product Research and Development Associate. *Id.* ¶¶ 41, 43. Galleher remained a MaxLite employee until her resignation on October 24, 2014, just four days after Steedly's resignation, and thereafter joined ATG. *Id.* ¶ 48. Plaintiff alleges Galleher stole confidential information from MaxLite, worked directly for ATG, and solicited MaxLite employees to leave MaxLite, all in violation of the Agreement. *Id.* ¶¶ 49-60.

Defendant Kim was hired by MaxLite on or about July 5, 2013 as its National Project Sales Manager. *Id.* ¶ 61. Kim also signed the Agreement with MaxLite. *Id.* ¶ 65. During his employment with MaxLite, Kim worked both remotely, from his home in Georgia, and occasionally from MaxLite's headquarters in New Jersey. *Id.* ¶ 62. In his position as National Project Sales Manager, Kim was responsible for developing national accounts and other projects. *Id.* ¶ 63. Kim remained at MaxLite until resigning in December 2014. *Id.* ¶ 68. Kim commenced employment with ATG on January 5, 2015, less than a week after his final day at MaxLite. *Id.* ¶ 69. Plaintiff alleges that Kim stole confidential information acquired during his employment with MaxLite, solicited business from MaxLite customers, and worked for ATG, all in violation of the Agreement. *Id.* ¶¶ 69-78.

Plaintiff alleges that ATG tortiously interfered with MaxLite's business through the theft of confidential and proprietary information, obtained by hiring the Employee Defendants in

violation of their Agreements. *Id.* ¶¶ 79-80. Plaintiff further alleges that ATG "conspired with" the Employee Defendants, and after impermissibly gaining access to confidential information, used that information to gain an unfair advantage over MaxLite. *Id.* ¶¶ 81-84. As a result of this alleged improper activity, ATG gained inside knowledge of MaxLite's product research and development, as well as illicit access to MaxLite's customers, vendors, distributors and suppliers. *Id.* ¶¶ 85-86. Plaintiff concludes that "ATG has systematically targeted MaxLite's top sales agents and employees, using unlawfully obtained confidential, proprietary information, as part of its overall scheme to engage in unfair business practices to the detriment of MaxLite." *Id.* ¶ 87.

The Agreement

As discussed, each of the three Employee Defendants signed an Agreement when they began employment at MaxLite. *Id.* ¶¶ 18, 45, 65. Relevant to the present dispute, the Agreement contains a confidentiality clause (Section 1.1), a non-compete section (Section 3.2), a non-solicitation provision (Section 3.3) and a choice of law and forum selection provision (Article VII).

Article I relates to confidential information. *Id.* Ex. A, Art. 1. Section 1.1 prohibits the employees from using or disclosing, either during or after employment, any "trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental business plans, financial information, or other subject matter pertaining to any business of [MaxLite], its affiliates or any of their customers, suppliers, or service providers." *Id.* All three Employee Defendants reportedly had access to confidential information covered by Section 1.1. *Id.* ¶¶ 20, 47, 67.

Article III pertains to "Conflicting Activities and Non-Solicitation." Section 3.2 contains a non-competition clause, with an applicable period of one year following employment with MaxLite. All three of the Employee Defendants began employment at ATG within twelve months of leaving MaxLite, placing them within the time constraints of Section 3.2. *Id.* ¶ 69; Gal. Decl.

7

¶¶ 10, 12; Steedly Decl. ¶ 17.  Section 3.3, entitled "Non-solicitation," prevents employees from recruiting other employees or seeking the business of MaxLite's customers. AC Ex. A, § 3.3.  The clause is effective for eighteen months after employment.  The activity at issue is within the requisite eighteen-month time-frame.

Lastly, the Agreement provides for the "Governing Law, Jurisdiction, and Venue" in Article 7, Section 7.1.  *Id.* § 7.1.  This Section provides that the Agreement "shall be governed and construed according to the laws of the State of New Jersey" and the parties agree that it further indicates that venue will lie in New Jersey.  *See* Def. Reply at 9 ("It is undisputed that [the] Employee Agreements with Maxlite had a forum selection clause selecting New Jersey for their disputes with MaxLite.").  Judge Wigenton, in her opinion on April 21, 2015, found that the Agreement "succinctly and clearly stated that New Jersey is the appropriate jurisdiction for the matter." Pl. Opp. Ex. E, at Tr. 79:05-06.

### The Recruitment of the Employee Defendants

As noted, Steedly worked for MaxLite from September 2009 through October 2014.  AC ¶¶ 15, 21.  Steedly lived and worked in New Jersey at MaxLite's headquarters until he was permitted to relocate to California "with the understanding that he was to remain in constant daily contact with headquarters in New Jersey." Sung Decl. ¶ 14.  ATG initiated contact with Steedly in 2013 while he was employed by MaxLite.  *See* Def. Interrog. Resp. No. 2 ("The first communication that ATG had with Mr. Steedly was through an ATG employee, Art Tapia, in 2013"); *see also* Ni. Tr. 200:20-24 (noting that ATG's first contact with Steedly and Galleher was while they were employed by MaxLite).  Plaintiff alleges that the initial recruitment of Steedly occurred "while Steedly was living and working in New Jersey for MaxLite." Pl. Opp. at 2.  Once he relocated to California, Steedly returned to New Jersey on at least nine occasions for work with

MaxLite, sometimes staying for over a month.  Sung Decl. ¶ 15.[9]  In fact, Steedly spent over 140 days working in New Jersey during this time.  *Id.*

Galleher relocated to MaxLite's California office in July 2014.  *Id.* ¶ 41.  The facts are ambiguous as to where Galleher was located when she was initially contacted by ATG.  *Compare* Ni. Tr. 199:11-16 (recollecting that Ni first spoke to Galleher in "June or July," but stating that she called him "*from* California") (emphasis added) *with* Pl. Opp. at 2 (ATG's initial contact with Galleher was "while Galleher was living and working in New Jersey for MaxLite").  What is clear, however, is that Art Tapia, an ATG employee, was the first to initiate contact with Galleher.  *See* Ni. Tr. 200:13-19.  Moreover, this initial contact occurred while Galleher was still a MaxLite employee.  *See* Ni. Tr. 200:20-24 (noting that ATG's first contact with Steedly and Galleher was while they were employed by MaxLite).

While with MaxLite, Kim worked remotely from his home office in Georgia.  *See* Kim Decl. ¶ 6.  Nevertheless, Kim "was in daily communications with MaxLite's headquarters in West Caldwell, New Jersey."  Sung Decl. ¶ 11.  Kim also had a "dedicated inside staff that was employed full-time at MaxLite's headquarters in New Jersey."  *Id.* ¶ 10.  During the course of his eighteen months of employment with MaxLite, Kim traveled to and worked in New Jersey at least six times.  *Id.* ¶ 11.  Although the timing of Kim's recruitment by ATG is unclear, in December 2014, Galleher put Kim in touch with Ni.  Ni. Tr. 202:18-21.  Since Galleher was an ATG employee at the time, her actions are attributed to ATG.[10]

---

[9] Steedly acknowledges that during the four years he worked for MaxLite in California, he traveled to New Jersey "on occasion."  Steedly Decl. ¶¶ 10-11.  To the extent ATG is asserting that Steedly's admission does not comport with MaxLite's evidence, the Court must resolve all factual discrepancies in favor of the Plaintiff at this stage.  *See Toys "R" Us, Inc.*, 318 F.3d at 457.

[10] "'[A] corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while

While being recruited by ATG, each of the Employee Defendants discussed their respective Agreements with Ni.  Gal. Tr. 108:01-07 (Galleher spoke to Ni regarding her Agreement, and specifically discussed the non-compete, before being hired); Ni. Tr. 196:25-197:02 (explaining that Ni first learned of Steedly's Agreement sometime during discussions with Steedly in the summer of 2013); *id*. at 203:07-11 (describing Ni's first meeting with Kim in which they discussed Kim's Agreement with MaxLite).   Upon learning of the Agreements, Ni requested that the Employee Defendants send their Agreements to him for ATG evaluation and, in one case, paid for review by a New Jersey attorney.  *See* Ni. Tr. 197:04-10 (explaining that an attorney reviewed Steedly's Employment Agreement)[11]; *see also* Ni. Tr. 203:07-12 (recalling that Ni "think[s]" Kim forwarded him the Agreement); D.E. 109-4 Ex. 8 (email from Kim to Ni with his Employment Agreement attached).   Once Ni had an Agreement reviewed by a New Jersey attorney, he determined that he did not need any further legal analysis of the additional Agreements since all were the same.  *See* Gal. Tr. 115:15-116:02 (explaining that Ni had already seen Steedly's Agreement, and since it was the same as Galleher's, he did not need her to send him a copy).  ATG reimbursed the MaxLite employees for the legal fees paid in conjunction with the attorney review. *See* Ni. Tr. 198:01-24; D.E. 109.4, Ex. 4 (email from Ni to Steedly and Wyatt stating "I am having a check mailed to your address today, lets [sic] get the opinion from the New Jersey lawyers first").

---

transacting corporate business.'"  *In re Cendant Corp. Litig.*, 264 F.3d 201, 238 (3d Cir. 2001) (quoting *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir. 1975)).

[11] An email obtained during jurisdictional discovery clarifies that David Wyatt ("Wyatt"), another MaxLite Employee recruited by ATG but not involved in the present litigation, sent Ni his Agreement with MaxLite in August 2013, when Ni was in communication with Steedly and Wyatt. *See* 109-4 Ex. 4 (Ni confirming receipt of the Agreement to Wyatt and Steedly).   Wyatt's Agreement was apparently the same as the other Agreements in this matter, so it does not change the Court's analysis.

<u>ATG's Business in New Jersey</u>

ATG claims that it "does not have any sales representation and it does not do business in the state of New Jersey." Cai Decl. ¶ 9. The facts, considered at this stage, suggest otherwise. ATG had $146,041 in total sales to New Jersey customers over the last four years. Def. Br. at 8; Def. Interrog. Resp. No. 3; *see also* Pl. Opp. at 13-14 (listing over thirty alleged New Jersey customers of ATG). Plaintiff cites to numerous New Jersey customers, and provides email documentation of Galleher, from her ATG account, planning projects with these customers. *See e.g.*, Pl. Opp. Ex. R (emails inferring Galleher had Highbays, a New Jersey company, as a customer); *id*. Ex. T (email from Kim to Galleher discussing the New Jersey "Toys R Us High Bay Project" and stating that "1 sample will ship directly to Toys R Us"); *id*. Ex. Z (ATG employee stating that he is holding a shipment that "was supposed to go to New Jersey")[12]; Gal. Tr. 43:21-23 (admitting ATG's southern New Jersey representative sold to GreenTech, a New Jersey Company).

In addition, ATG sent representatives to Globalcon Conference and Expo, a large trade show held in Atlantic City, New Jersey from April 9 to 10, 2014. *See* Sung Decl. ¶ 35 & Ex. B. ATG also was an exhibitor at the Lightfair Trade Show in May 2015 in New York City, where Plaintiff indicates that ATG targeted New Jersey customers. *See* Pl. Opp. at 26-27.

Plaintiff has further alleged that MaxLite employees were recruited to grow business in New Jersey. Both Galleher's deposition and Plaintiff's proffered evidence support these claims. *See generally* Gal. Tr. 36:25-45:23. Galleher admitted that it was part of her responsibility to

---

[12] MaxLite claims that, in an effort to escape personal jurisdiction in New Jersey, ATG had products bound for New Jersey re-routed through New York after the litigation commenced. ATG admits that it "affirmatively stopped selling products to customers in New Jersey as a result of this Lawsuit." Def. Br. at 8.

increase ATG's business in the northeast, including in New Jersey. Gal Tr. 36:25-38:09; *see also* Pl. Opp. Ex. S (Galleher emailing an independent sales representative in the northeast, stating, "We are prepared to be aggressive to gain market share in your area" and offering to "provide whatever marketing or product support you may need" to accomplish this goal).[13] In fact, Galleher explicitly stated that New Jersey was part of ATG's marketing campaign. Gal. Tr. 40:22-41:06. Additionally, in reference to two of ATG's independent sales representatives, Galleher indicated that their "territories" were northern and southern New Jersey, respectively. *Id.* at 43:02-44:20. Galleher herself was involved in the hiring of the northern New Jersey representative, and explicitly told the other representative to "[g]row business in Southern Jersey." *Id.* at 44:21-45:23. This statement is confirmed by a southern New Jersey representative, Kevin R. McGroarty, who was told to "expand ATG sales in [his] territory, specifically PA [Pennsylvania], DE [Delaware], and Southern Jersey." McGroarty Decl. ¶¶ 12, 13.[14] This evidence, when read together, supports MaxLite's claim that "ATG used Galleher to develop an aggressive marketing strategy and campaign to exploit and target New Jersey's lighting industry in competition with MaxLite." Pl. Opp. at 2.[15]

---

[13] This email contradicts the claims of Ni in his deposition, who testified independent sales representatives did not, and do not, have any "clear division of territory." *See* Ni. Tr. 84:12-85:08. Moreover, Galleher's deposition states that she was responsible for reorganizing the sales people in New Jersey to work through a single point-person. *See* Gal. Tr. 47-48 (naming Matt Hodge as the New Jersey point person); *see also* Pl. Opp. Ex. LL (email from Galleher to other ATG employees attaching a "sales territory" list and naming Matt Hodge as the sales manager in charge of New Jersey).

[14] Additional support for ATG's business effort in New Jersey can be found in an email to RA Energy, an independent sales agency, in northern New Jersey. In an email dated April 15, 2015, Galleher sent William Thomas of RA Sales Energy a quote request from a potential New Jersey customer. Pl. Opp. Ex. FF.

[15] Galleher's Declaration tends to contradict that she worked with New Jersey customers once employed at ATG. *See* Gal. Decl. ¶ at 12 ("All of my work is based out of California"). However,

## II. <u>LEGAL STANDARD</u>

In a motion to dismiss for lack of personal jurisdiction, the plaintiff "bears the burden of demonstrating the facts that establish personal jurisdiction." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Initially, a court "take[s] the allegations of the complaint as true." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). However, once a defendant raises a jurisdictional defense, "a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Id.*; *see also Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984). Yet, in reviewing the evidence, a court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992); *see also Metcalfe v. Renaissance Marine, Inc.* 566 F.3d 324, 330 (3d Cir. 2009) ("[I]t is well established that in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed factors in favor of the plaintiff") (internal quotation marks omitted); *Toys "R" Us, Inc.*, 318 F.3d at 457 ("[A] court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff [when deciding a motion regarding personal jurisdiction.]"). Therefore, in determining whether personal jurisdiction exists, the Court looks beyond the pleadings to all relevant evidence and construes all disputed facts in favor of the plaintiff.

---

her deposition testimony and email evidence support the conclusion that Galleher did business with and targeted New Jersey clients while working for ATG in California. Even if this fact is disputed by ATG, it is nonetheless resolved in Plaintiff's favor at this stage of the proceedings. *See Toys "R" Us, Inc.*, 318 F.3d at 457.

### III. DISCUSSION

#### A.  Personal Jurisdiction

"[A] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state" so long as the jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.  *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (internal quotation marks omitted).  The inquiry thus involves a two-step process, first looking to the state requirements and then to the constitutional requirements. *IMO Indus., Inc. v. Kiekart AG*, 155 F.3d 254, 259 (3d Cir. 1998).   New Jersey's long-arm jurisdiction law provides that courts may "exercise jurisdiction over a non-resident defendant to the uttermost limits permitted by the United States Constitution."  *Nicastro v. McIntyre Mach. Am., Ltd.*, 201 N.J. 48, 72 (2010) (internal quotation marks omitted), *rev'd on other grounds sub nom., J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011).  Accordingly, the two steps are collapsed into one and "we ask whether, under the Due Process Clause, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (internal quotation marks omitted).  In other words, to establish personal jurisdiction, the Due Process Clause requires (1) minimum contacts between the defendant and the forum; and (2) that jurisdiction over the defendant comports with "'fair play and substantial justice.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

The "constitutional touchstone remains whether the defendant purposefully established 'minimum' contacts in the forum State."  *Id.* at 474 (citing *Int'l Shoe Co.*, 326 U.S. at 316).  A defendant must have "fair warning" that its conduct will subject it to the jurisdiction of a foreign

court. *Id.* at 472. A defendant's conduct and connection with the forum state must be such that the defendant should reasonably anticipate being haled into court there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Once a plaintiff demonstrates a *prima facie* case of personal jurisdiction by establishing minimum contacts, the burden shifts to the defendant. In fact, once minimum contacts have been shown, jurisdiction is "presumptively constitutional." *O'Connor*, 496 F.3d at 324. A defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477.

Personal jurisdiction may be established by means of general jurisdiction or specific jurisdiction over a defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). If a company is subject to a forum's general jurisdiction, it can be sued there on any matter. *Id*. If, however, an entity is solely subject to specific jurisdiction, it may only face suit in the forum if its activities concerning the forum are related to the claims in the suit. *Id*.

### B. General Jurisdiction

General jurisdiction, also called all-purpose jurisdiction, may be asserted over an out-of-state corporation "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id*. For an entity, its "place of incorporation and principal place of business are paradigm bases for general jurisdiction[.]" *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (internal quotation marks omitted). Once general jurisdiction is established, a court may hear *any and all claims* against the corporation. *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919.

Here, Plaintiff argues that the Court has general jurisdiction over ATG. The Court disagrees. The "paradigm bases" are not present. ATG is an entity that is incorporated and has its

principal place of business in California. While it does some business in New Jersey, ATG has no

New Jersey offices and conducts the majority of its business from California. Cai Decl. ¶¶ 3-9.

These contacts are not so substantial, or continuous and systematic, to render ATG "at home" in

New Jersey. *See Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877, 890 n.2

(3d Cir. 1981) (finding that general jurisdiction requires "a very high threshold of business

activity"). Therefore, the sole question is whether this Court has specific personal jurisdiction

over ATG.

### C. Specific Jurisdiction

Specific jurisdiction requires that the defendant "purposefully directed his activities at

residents of the forum and the litigation results from alleged injuries that arise out of or relate to

those activities." *Burger King Corp.*, 471 U.S. at 472 (internal citations and quotation marks

omitted). The minimum contacts analysis depends upon "the relationship among the defendant,

the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). However, actual

"[p]hysical presence within the forum is not required to establish personal jurisdiction over a

nonresident defendant." *IMO Indus., Inc.*, 155 F.3d at 259.

The Third Circuit has laid out a three-part test to determine whether specific jurisdiction

exists as to a particular defendant. *O'Connor*, 496 F.3d at 317. First, the defendant must have

"purposefully directed [its] activities at the forum." *Id.* (internal quotation marks omitted).[16]

---

[16] This factor has also been characterized as "purposeful availment." *Burger King*, 471 U.S. at
475. The factor focuses on contact that the defendant itself created with the forum State. *Id.* The
"purposefully directed" or "purposeful availment" requirement is designed to prevent a person
from being haled into a jurisdiction "solely as the result of random, fortuitous, or attenuated
contacts" or due to the "unilateral activity of another party or third person." *Id.* (internal quotation
marks omitted) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)); *World-Wide
Volkswagen Corp.*, 44 U.S. at 299; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.
408, 417 (1984)).

Second, the litigation must "arise out of or relate to at least one of those activities." *Id.* (internal quotation marks omitted). Third, if the first two requirements are met, the exercise of jurisdiction must "otherwise comport with fair play and substantial justice." *Id.* (internal quotation marks omitted).

When an intentional tort is alleged, a slight variation from the *O'Connor* three-part test applies, known as the *Calder* effects test, *O'Connor*, 496 F.3d at 317 n.2, stemming from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). The *Calder* effects test "can demonstrate a court's jurisdiction over a defendant even when the defendant's contacts with the forum alone [] are far too small to comport with the requirements of due process under our traditional analysis." *Marten*, 499 F.3d at 297 (internal quotation marks omitted). Under *Calder*, "an intentional tort directed at the plaintiff and having sufficient impact upon [the plaintiff] in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *IMO Indus., Inc.*, 155 F.3d at 260. In *IMO Industries*, The Third Circuit held that the *Calder* effects test requires a plaintiff to show that:

> (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity[.]

155 F.3d at 265-66 (footnote omitted). The *Calder* effects test, as interpreted by the Third Circuit, requires that a defendant's "'conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there.'" *Marten*, 499 F.3d at 297 (quoting *World-Wide Volkswagen Corp.,* 444 U.S. at 297).

17

In *IMO Industries*, the plaintiff was a multi-national corporation with its headquarters in New Jersey. 155 F.3d at 257. The defendant was incorporated and had its principal place of business in Germany. *Id.* The plaintiff sued in the District of New Jersey and alleged that the defendant tortiously interfered with the plaintiff's attempt to sell its wholly-owned Italian subsidiary to a French company. *Id.* at 256. In doing so, the defendant sent a letter to the plaintiff's investment firm in New York. *Id.* at 256-57. The only New Jersey contacts consisted of two telephone calls between representatives of the plaintiff and the defendant, which were initiated by the plaintiff. *Id.* at 258. Only the plaintiff's representatives were in New Jersey during the calls. *Id.* In upholding the trial court's determination that it lacked personal jurisdiction over the defendant, the Third Circuit observed that the letter to the investment firm was sent to New York, not New Jersey. *Id.* at 267. In addition, the court in *IMO Industries* reasoned that the two telephone calls originated with the plaintiff so it could not be said the defendant targeted New Jersey by participating in the communications. *Id.*

Two cases have analyzed facts similar to those in the current matter: *Astro-Med v. Nihon Kohden, American, Incorporated*, 591 F.3d 1 (1st Cir. 2009), and *Radian Guaranty Incorporated v. Bolen*, 18 F. Supp. 3d 635 (E.D. Pa. 2014). In *Astro-Med*, the defendant and the plaintiff were competitors in the life sciences equipment field. 591 F.3d at 5. The plaintiff was a Rhode Island corporation while defendant was incorporated in California. *Id.* at 6-7. The plaintiff hired an employee, who signed an employment agreement that included a non-competition clause, a non-disclosure provision, and Rhode Island choice of law and forum selection provisions. *Id.* at 6. Subsequently, the employee relocated to Florida while continuing to work for the plaintiff. *Id.* Thereafter, the defendant hired the employee, who sold products in competition with the plaintiff but did so from Florida. *Id.* at 7. Before hiring the employee, the defendant became aware of his

employment agreement with the plaintiff and had an attorney review the contract. *Id.* The plaintiff

sued the defendant in Rhode Island federal court, alleging unfair competition, tortious interference,

and misappropriation of trade secrets. *Id.* at 5. Following a jury verdict in favor of the plaintiff,

the defendant appealed and argued (among other things) that the trial court erred in finding

personal jurisdiction over the defendant in Rhode Island. *Id.* at 5.

The First Circuit affirmed the District Court's finding that the court had personal

jurisdiction. *Id.* at 5. The defendant argued that it did not have minimum contacts with Rhode

Island since it was a California corporation and all of its direct dealings with the employee took

place in either California or Florida. In rejecting the defendant's arguments, the court in *Astro-*

*Med* observed:

> Before Nihon Kohden[, the defendant] hired Plant[, the employee],
> it knew that Astro–Med[, the plaintiff] was located in Rhode Island,
> that Plant had entered into the Employee Agreement in Rhode
> Island, that the contract specified it would be governed by Rhode
> Island law, that the contract contained non-competition and non-
> disclosure provisions, and that by virtue of the contract, Plant had
> consented to the exclusive jurisdiction of the courts of Rhode Island
> over any disputes related to the contract. Further, Nihon Kohden
> had sought and obtained legal advice that by hiring Plant, it was
> exposing itself to some legal risk. Thus, Nihon Kohden knew that
> by employing Plant, it was running the risk that Plant would thereby
> have breached his Rhode Island contract with a Rhode Island
> company and any ensuing suit would be initiated in Rhode Island
> and interpreted under Rhode Island law.

*Id.* at 10. The First Circuit also noted that the defendant's actual conduct did not have to be in the

forum, as long as the injury was felt there. *Id.*

The *Astro-Med* court further determined that the defendant had purposefully availed itself

of the forum state since its actions were voluntary and the results were foreseeable. *Id.*

Specifically, the defendant was aware of the employment agreement and its Rhode Island forum

provision but nevertheless persisted in hiring the employee even after it had received legal advice

regarding the employment agreement.  The court additionally noted that since the plaintiff was also suing the employee in Rhode Island, any Florida and California witnesses were going to be called in Rhode Island regardless of where the defendant's suit was litigated.  *Id.*

There were two concurrences in *Astro-Med.*  Judge Howard indicated his concern that the opinion may be interpreted as conflating the separate inquiries of "relatedness" and "purposeful availment" in the specific jurisdiction analysis.  *Id.* at 21-22.  Yet, Judge Howard found no error in the decision because the defendant "had commercial contacts in Rhode Island, it knew full-well that it was tangling with an employment relationship formed in Rhode Island, and the purposeful availment and reasonableness requirements are easily satisfied in this case."  *Id.* at 22.  Also concurring, Judge Lipez indicated that the "effects test" should be part of the court's reasonableness inquiry, thus taking a broader view than Judge Howard's concurrence.  *Id.* at 22-23.

The second case, *Radian Guaranty*, concerned competitors in the mortgage insurance industry.  18 F. Supp. 3d at 639-40.  There, the plaintiff hired the employee to serve as regional account manager in its southern division.  *Id.* at 639.  The employee had entered into a stock grant agreement with the plaintiff.  *Id.*  The agreement contained a non-compete provision, a confidentiality requirement, and a forum selection clause designating the Eastern District of Pennsylvania as the applicable court.  *Id.*  Thereafter, the employee resigned and began working for the defendants.[17]  *Id.*  The defendants knew of the employee's agreement but nevertheless encouraged her to violate the non-competition and confidentiality clauses of the agreement.  *Id.* at

_____

[17] The defendants in *Radian Guaranty* were a group of related entities:  Arch Capital Group Ltd., Arch Capital Group U.S. Inc., Arch U.S. MI Services Inc., and Arch U.S. MI. Holdings Inc.  *Id.* at 638.  The employee was also a defendant, but is only referred to as the employee to avoid confusion.

640. The plaintiff sued, alleging that the defendants induced the employee to violate the agreement with the intent of benefitting from the plaintiff's trade secret and confidential information held by the employee. *Id.* at 638. The defendants argued that the court lacked personal jurisdiction over them. *Id.* at 643.

The *Radian Guaranty* court first analyzed specific jurisdiction pursuant to the *Calder* effects test since the plaintiff alleged an intentional tort. *Id.* at 644. The district judge determined that the third prong of the test, requiring that the defendant expressly aim his tortious conduct at the forum, had not been met. *Id.* First, the court reasoned, knowledge of a forum selection clause alone is not enough to confer jurisdiction. *Id.* Moreover, the district judge continued, the plaintiff failed to allege that the defendants met with or recruited the employee in Pennsylvania and did not allege that the employee was hired by defendants to work in Pennsylvania or to serve customers there. *Id.* To the contrary, the court observed, the employee worked exclusively from Texas while serving customers located in the southern United States. *Id.*

Nonetheless, the judge in *Radian Guaranty* found that certain defendants were subject to personal jurisdiction in Pennsylvania. *Id.* at 645-47. The court focused on the forum selection clause in the employee's agreement and determined that certain defendants were bound by it, even though they were non-signatories. *Id.* The *Radian Guaranty* court ruled that non-signatories could be bound so long as they are "closely related to the contractual relationship or dispute such that it is foreseeable that the part[ies] will be bound." *Id.* at 645 (citations omitted). The court determined that certain defendants were "sufficiently closely related" to the employee because (1) the employee interviewed and emailed with the defendants while employed with the plaintiff, (2) the defendants knew of the non-competition provision before the employee started with them, (3) the employee excised language, which indicated that she was not subject to a restrictive covenant,

from her job application with the defendants, (4) the defendants recognized the risk of hiring the employee due to the non-competition agreement, and (5) the defendants consulted with an attorney regarding the non-competition provision. *Id.* at 646-47.

Both the court in *Astro-Med* and the court in *Radian Guaranty* reached the same result, albeit with slightly different reasoning. Importantly, however, both courts focused on foreseeability such that the defendants were aware that their conduct could subject them to the jurisdiction of the foreign court. There are many factual similarities between these two cases and the present matter. ATG competes directly with Plaintiff. ATG recruited the Employee Defendants while they were working for Plaintiff. ATG was aware of the Agreements of the Employee Defendants. The Agreements contained non-competition, non-solicitation, confidentiality, and forum selection clauses. Moreover, ATG paid for New Jersey counsel to review the Agreements ahead of time. These facts mirror those in both *Astro-Med* and *Radian Guaranty*.

Moreover, in this matter, the contacts with the forum are more significant than the contacts in either *Astro-Med* or *Radian*. In *Astro-Med*, there was no finding that the employee worked with Rhode Island customers, and the court explicitly noted that the employee was hired by the plaintiff to cover sales territory in Florida. 591 F.3d at 7. Similarly, in *Radian*, the court found that the employee performed no work in Pennsylvania; to the contrary, she worked "exclusively from Texas serving customers in the southern United States." 18 F. Supp. 3d at 644. By comparison, ATG had business in New Jersey, which is discussed further below. Critically, the Employee Defendants streamlined ATG's internal operations so that New Jersey customers dealt with a single point person. Galleher's marketing campaign for ATG included New Jersey. Galleher hired an independent sales representative who targeted northern New Jersey. As to another existing

sales representative, Galleher instructed him to grow ATG's business in southern New Jersey. The non-solicitation provision in the Agreements applied to both current employees and customers of MaxLite, and the Employee Defendants engaged in both forms of solicitation after joining ATG.

In Count V, Plaintiff alleges tortious interference of contractual relationships[18] so it will be analyzed pursuant to the *Calder* effect test. The first prong of the test requires that "the defendant committed an intentional tort." *IMO Indus., Inc.*, 155 F.3d at 265. The Third Circuit has recognized tortious interference as an intentional tort sufficient to satisfy the first prong of *Calder*. *See Remick v. Manfredy*, 238 F.3d 248, 260 (3d Cir. 2001). Therefore, the first prong is met.

In regard to the second element, the Third Circuit has held that when a plaintiff is a resident of the forum state and the victim of an alleged tortious interference of contract, "the brunt of the harm caused by the alleged intentional tort must necessarily have been felt by [the plaintiff] in [the forum], as [the plaintiff's] business practice is based in [the forum]." *Id*. at 260. Here, the facts alleged demonstrate that the "brunt of the harm" is felt in New Jersey. MaxLite is headquartered in New Jersey, hired the Employee Defendants in New Jersey, and signed the Agreements in New Jersey. MaxLite further states that ATG targeted its business and customers in New Jersey. At this stage "the Court assumes that . . . because [plaintiff] is a New Jersey company," it "likely felt the brunt of the harm in New Jersey." *Display Works, LLC v. Bartley*, – F. Supp. 3d. –, 2016 WL 1644451, at *11 (D.N.J. Apr. 25, 2016). Therefore, the second *Calder* element has been met.

---

[18] "To establish this tort [under New Jersey Law], a plaintiff must prove: (1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751-52 (1989)).

The third *Calder* element requires that "the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *IMO Indus., Inc.*, 155 F.3d at 266. This factor requires that a plaintiff: (1) "show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum," and (2) "point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id*; *see also Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 632 (E.D. Pa. 2015) (finding the third prong met when "defendants not only knew that their conduct would cause harm to an entity located in [the forum], but also engaged in that conduct intentionally, with the goal of causing said harm").

The facts concerning the Agreements were discussed above. In short, ATG knew of the Agreements, knew of their key provisions (non-competition, non-solicitation, confidentiality, choice of law, and forum selection), and paid for attorney review. ATG also solicited the Employee Defendants while they were working for Plaintiff. MaxLite has further indicated that the Employee Defendants used its confidential and proprietary information to benefit ATG.

As to ATG's other contacts with New Jersey, in April 2014, it sent representatives to a trade show held in Atlantic City. *See Toys "R" Us, Inc.*, 318 F.3d at 453 (identifying "a number of non-internet contacts between the defendant and Illinois," including defendant's "attendance at trade shows in Illinois"). ATG also solicited New Jersey customers at a New York trade expo the following year. Moreover, ATG had $146,041 total sales within New Jersey, including sales to at least twelve New Jersey customers over the last four years. ATG points out that this amount of sales constitutes less than 1% of their total sales in the United States. Def. Br. at 8. *Calder* concerned an allegedly libelous story in a national magazine headquartered in Florida. 465 U.S. at 784-86. The Supreme Court in *Calder* considered the fact that the magazine distributed

24

substantial copies of its magazine in California, the forum state, as to the defendant's minimum contacts with the state. *Id.* at 789-90. In addition to considering the overall number of magazines distributed in California, the *Calder* Court also noted that California was the magazine's largest area of circulation. *Calder*, 465 U.S. at 790.

Later cases, however, have not relied upon the comparative analysis performed in *Calder*. For example, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 772 (1984), involved a libel case brought in New Hampshire by a New York resident against a magazine company incorporated in Ohio and headquartered in California. In *Keeton*, the Supreme Court found that defendant's distribution of 10,000 to 15,000 copies per month in New Hampshire established sufficient contacts to subject the defendant to personal jurisdiction in New Hampshire. *Id.* at 772. The Supreme Court found that the "sales of thousands of magazines cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Id.* at 774. Importantly, the Court in *Keeton* performed no comparative analysis as to how many copies were distributed in other states when compared to New Hampshire. The Court safely assumes that the adult magazine in question did not have a comparatively large circulation in New Hampshire, but this was of no moment to the Court. *Id.*; *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1127 (W.D. Pa. 1997) (finding minimum contacts based, in part, on defendant having contracts with 3,000 individuals in the forum despite the fact that this amount represented approximately 2% of all defendant's subscribers).

Here, like *Keeton*, the Court determines that total sales of more than $145,000 over a four-year period cannot be characterized as "random, isolated, or fortuitous." Critically, the evidence demonstrates that ATG recruited the Employee Defendants to, at least in part, increase its business in New Jersey. Galleher testified to the following:

- Galleher was tasked with the duty to do business in New Jersey. Gal Tr. 36:25-38:09.

- In her role at ATG, Galleher streamlined the sales process in New Jersey to work through one point-person. *Id*. at 47-48.

- Galleher was instrumental in hiring a sales representative to increase sales in northern New Jersey. *Id*. at 44:21-45:23.

- While another sales representative was hired before Galleher began at ATG, Galleher gave the representative explicit instructions to "[g]row business in Southern Jersey." *Id*. at 44:21-45:23.

ATG argues that the Employee Defendants did not work from New Jersey while with ATG. Yet, this is not the determinative factor, for it is clear that actual "[p]hysical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant." *IMO Indus., Inc.*, 155 F.3d at 259. Instead, the critical question is whether the Employee Defendants' work for ATG was aimed at New Jersey (regardless of where the Employee Defendants were physically located at the time). In light of Galleher's testimony, it is clear that an increase in New Jersey business was a goal of ATG.

In light of the foregoing, the Court concludes that the third element of *Calder* effects test, as interpreted by the Third Circuit in *IMO Industries*, is met here. *Cf. Remick*, 238 F.3d at 260 (finding the third element in a tortious interference claim). ATG aimed its tortious conduct at New Jersey. ATG knew of the Agreements and the key provisions (including the forum selection clause), and paid for legal review of the Agreements in New Jersey. ATG was well aware of the risk it was taking but proceeded nonetheless to hire the Employee Defendants. As discussed, the facts in this matter concerning the Agreements are very similar to those in both *Astro-Med* and *Radian Guaranty*. Also, as noted, the facts here more strongly support a finding of specific personal jurisdiction. ATG competes with MaxLite in New Jersey and knows that MaxLite is headquartered in New Jersey. The Employee Defendants, after they joined ATG, solicited

26

MaxLite employees to do the same. Critically, ATG used the Employee Defendants in an effort to increase its sales in New Jersey, allegedly utilizing MaxLite's confidential information in the process. It was certainly foreseeable that such conduct would subject ATG to suit in New Jersey. In sum, ATG's conduct and connection with New Jersey is such that ATG should have reasonably anticipated being haled into court here.

The same result is reached as to Count VII, which charges civil conspiracy.[19]  As an intentional tort, the claim is also subject to analysis pursuant to the *Calder* effects test.  Here, MaxLite alleges that one object of the civil conspiracy was to commit tortious interference with contractual relations. Since Count V, which alleges the same tortious interference, subjects ATG to personal jurisdiction in New Jersey, the civil conspiracy claim necessarily leads to the same result.

Once the Court finds personal jurisdiction on these two counts, it can exercise pendant jurisdiction over the remaining counts as long as all claims "arise from the same nucleus of material fact[s]." *Apostolou v. Mann Bracken, LLC*, No. 07-4950, 2009 WL 1312927, at *9 (D.N.J. May 1, 2009) (internal quotation marks omitted) ("Once a district court has jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same nucleus of material fact."). The Third Circuit takes a liberal interpretation in considering the scope of a "common nucleus of operative fact[s]." *See Children's Vill. v. Sec'y of Pub. Welfare of the Commonwealth of Pa.*, No. 90-7390, 1992 WL 99587, at *3 (E.D. Pa. Apr. 30, 1992) (citing *Skevofilax v. Quigley*, 810 F.2d

---

[19] In New Jersey, civil conspiracy is a tort comprised of four elements: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003).

378, 385 (3d Cir. 1987)). In determining how close the factual overlap must be, "mere tangential overlap of facts is insufficient, but total congruity between operative facts of the two cases is unnecessary." *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 105 (3d Cir. 1988). Thus, where "critical background fact[s]" are "common to all claims," then the claims emerge from the same nucleus of operative facts. *Id.*

Here, all claims stem from the same core facts. The remaining Counts are Count VI – Tortious Interference of Present and Prospective Business Advantage, and Count VIII – Unjust Enrichment. Plaintiff incorporates each and every allegation in the SAC into each of these Counts. SAC ¶¶ 115, 126. In Plaintiff's Tortious Interference of Present and Prospective Business Advantage claim, it alleges that "ATG and the Employee Defendants have improperly and unlawfully, and deviously lured away MaxLite's customers, vendors, suppliers, manufacturers and distributors." *Id.* ¶ 117. To prove this cause of action, Plaintiff will rely on many of the same facts previously addressed with Counts V and VII, including: ATG's interactions and conspiring with the Employee Defendants and ATG's tactics in attracting New Jersey customers. These facts constitute significantly more than a "tangential overlap" between the claims. MaxLite's Unjust Enrichment claim alleges that "ATG has received the benefit of MaxLite's years of experience, knowledge, and research, by and through its hiring of Employee Defendants and use of MaxLite's confidential, proprietary information." *Id.* ¶ 127. Here, the foundational facts include the information passed between the Employee Defendants and ATG, as well as the benefit gained by such information (including its targeting of New Jersey). Again, these facts overlap and stem from a "common nucleus." Therefore, the Court will exercise pendent jurisdiction over Counts V and VII.

Having determined that minimum contacts exist, the Court next considers whether exercising jurisdiction over ATG would otherwise comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (internal quotation marks omitted). In doing so, the Court notes that the existence of minimum contacts "makes jurisdiction presumptively constitutional, and the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *O'Connor*, 496 F.3d at 324 (internal quotation marks omitted); *see also Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 207 (3d Cir. 1998) (noting that if minimum contacts are present, then jurisdiction will be unreasonable only in "rare cases"). In determining reasonableness, a court considers the following factors: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering substantive social policies. *World-Wide Volkswagen Corp.*, 444 U.S. at 292.

Several of these factors weigh in favor of litigating this dispute in New Jersey. First, ATG contends that it would face an unfair burden if it had to defend this suit in New Jersey. ATG contends that it operates entirely from California, and that it would be far more burdensome for ATG to defend itself in New Jersey than for MaxLite, which maintains a "bi-coastal presence," to defend itself in California. Def. Br. at 30. While the Court acknowledges the difficulty to any party in defending itself away from its "home," it does not appear that MaxLite has nearly the West Coast presence that ATG suggests. *See* Sung Decl. ¶ 23. (citing the relatively minor amount of MaxLite's operations that occur in California). MaxLite's California office is "responsible for less than ten percent (10%) of product development, testing, and certification, and less than sixteen

29

percent (16%) of total company sales." *Id*. Thus, ATG has not satisfied its burden of showing

that it would be more burdensome for ATG to litigate in New Jersey than it would be for MaxLite

to litigate in California. Therefore, in weighing ATG's burden (first factor) with the Plaintiff's

right to convenient relief (third factor), the balance favors Plaintiff.

Second, the forum state has a "manifest interest in providing effective means of redress"

when a foreign corporation reaches into a state and solicits its citizens and corporations. *McGee

v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957). This is what MaxLite alleges here. Thus, the

second factor weighs in favor of jurisdiction in New Jersey.

ATG fails to address the fourth and fifth (public) factors thereby failing to meet its burden

of proof. In light of these factors, the Court concludes that the balance tips towards litigating this

dispute in New Jersey. This is not the type of "rare" and "compelling" case where jurisdiction

would be unreasonable despite the presence of minimum contacts. Therefore, the Court finds that

jurisdiction in New Jersey "comport[s] with fair play and substantial justice." *Burger King*, 471

U.S. at 476.

### D. Venue

ATG contends that even if it is subject to personal jurisdiction in New Jersey, this case

should be transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a).[20] *See*

Def. Br. at 31. Section 1404(a) permits a district court to transfer a civil action "[f]or the

convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Any transfer

pursuant to 1404(a) is restricted to "any other district or division where [the case] might have been

---

[20] ATG also cites 28 U.S.C. § 1406(a), which states that: "The district court of a district in which
a case is filed laying venue in the wrong division or district shall dismiss, or if it be in the interest
of justice, transfer such case to any district or division in which it could have been brought." 28
U.S.C. § 1406(a). The Court does not find that this case was brought in the wrong venue and thus
this section is inapplicable.

brought." *Id.* The Third Circuit has enumerated private and public factors that courts should consider when deciding a motion to transfer:

> The private factors include: (1) Plaintiffs choice of forum; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial conditions; (5) the convenience of witnesses, only to the extent that they may be unavailable for trial in one of the fora; and (6) the location of books and records, again only to the extent that they could not be produced in one of the fora. The public interests include: (1) enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) relative administrative difficulties in the two fora resulting from court congestion; (4) local interests in deciding local controversies at home; (5) public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

*Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (hereinafter the "*Jumara* factors"). In reviewing the factors, a court must conduct an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 23 (1988). In a motion to transfer, "the burden is on the moving party to show the proposed forum is not only adequate, but also more convenient than the present forum." *Rappoport v. Steven Spielberg, Inc.*, 16 F. Supp. 2d 481, 499 (D.N.J. 1998).

At the outset this Court notes that the Central District of California is a venue in which this case "could have been brought." 28 U.S.C. § 1404(a). Since ATG is a California Corporation, the Central District of California would have personal jurisdiction over ATG. ATG's principal place of business is located in the Central District of California's jurisdiction, as is MaxLite's West Coast office. Additionally, the Employee Defendants have all provided sworn declarations

conceding to jurisdiction in California. *See* Kim Decl. ¶ 19; Gal. Decl. ¶ 15; Steedly Decl. ¶ 21. Thus, the Central District of California is also the proper venue for this case.[21]

    <u>Private Factors</u>

    The private factors tip heavily towards the District of New Jersey. The Third Circuit gives great weight to a plaintiff's choice of forum. *See Ricoch Co., Ltd. v. Honeywell, Inc.*, 817 F. Supp. 473, 480 (D.N.J. 1993) (noting that plaintiff's choice of forum is a "paramount concern" in deciding a motion to transfer venue). Thus, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). A plaintiff's interest in a choice of forum only decreases where "the central facts of a lawsuit occur outside of the chosen forum." *NCR Credit Corp. v. Ye Seekers Horizon, Inc.*, 17 F. Supp. 2d 317, 321 (D.N.J. 1998).

    Here, MaxLite's headquarters are in New Jersey. *See* AC ¶ 1. As noted above, the facts indicate that the Employee Defendants were recruited while working for MaxLite, signed their Agreements in New Jersey, ATG was aware of the Agreements, and the Employee Defendants looked to increase ATG's business in New Jersey. ATG points out that a plaintiff's forum deference is "curbed" if the forum has "little connection with the operative facts of the lawsuit." Def. Br. at 34. However, as discussed, many critical facts in this case occurred in New Jersey. Therefore, Plaintiff's choice of forum is given deference, and this factor disfavors transfer.

---

[21] Pursuant to 28 U.S.C. § 1391(a), venue is proper "in a civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(a).

ATG's main argument as to the private factors centers on the convenience of witnesses (private factor five) and the location of documents (private factor six), arguing that these factors strongly weigh in favor of transfer. *Id.* at 35. To that end, ATG alleges that ATG and "its principals are all located in California, Steedly and Galleher were California residents; and Kim has asserted that California is the appropriate forum to resolve this dispute." *Id.* at 35. Further, ATG claims that transfer would not be "an undue burden for any potential witness of MaxLite's New Jersey employees as each of them regularly travels to MaxLite's West Coast office as part of the ordinary course and scope of their employment." *Id.* at 35-36.

Plaintiff counters, arguing that "the majority of non-party witnesses that will be expected to testify in this case are not located in or near California." Sung Decl. ¶ 31. Instead, MaxLite alleges that many key witnesses are in New Jersey as well as in states other than California. *See* Pl. Opp. at 18-19. Additionally, MaxLite notes, at least two of the three Employee Defendants currently reside outside of California. Gal. Tr. 5:01-02.[22]

In addition, ATG has not shown the unavailability of these witnesses in New Jersey. There is no indication that "any witnesses would be unable or unwilling to travel to [this District], which is the sole relevant consideration for this factor under *Jumara*, 55 F.3d at 879." *SI Power LLC v. Pathway Holdings Mgmt., LLC*, No. 15-6101, 2016 WL 1260484, at *9 (D.N.J. Mar. 31, 2016). Based on this evidence, the Court cannot conclude that the convenience of witnesses favors litigating this case in California.

---

[22] Galleher currently resides in Denver, Colorado. Gal. Tr. 05:01-02. As noted, ATG terminated the Employee Defendants sometime after the onset of this litigation. D.E. 109-4, Ex. 29. There is no indication in the record that Kim has moved from Georgia and thus it is solely Steedly who appears to remain in California.

Similarly, the location of documents should only be considered to the extent that they "could not be produced in the alternative forum." *Jumara*, 55 F.3d at 879. MaxLite argues that the majority of relevant documents "are likely either in possession of ATG in California or the Individual Defendants in California or Georgia." Def. Br. at 36. Neither party alleges that the records could not be produced in New Jersey. Indeed, in the age of electronic discovery, it is hard to imagine that ATG cannot produce relevant documentary evidence in New Jersey, and it certainly has not claimed (much less shown) that it cannot do so. This factor is therefore neutral. *See Telebrands Corp v. martFIVE, LLC*, No. 13-3374, 2013 WL 4675558, at *9 (D.N.J. Aug. 30, 2013).

The last argument raised by ATG is that there is "relative disparity between the parties that cannot be ignored." Def. Br. at 38. While ATG erroneously raises this as a public interest factor, the Court must consider "the convenience of the parties as indicated by their relative physical and financial conditions" within the private factor analysis. *Jumara*, 55 F.3d at 879. The Court has already rejected ATG's assertion that MaxLite's business operations are comparable in both California and New Jersey. Def. Br. at 39; *see* Sung Decl. ¶ 23. As to financial disparity, ATG argues that "[t]he individual Defendants are individuals that are currently being forced to defend themselves from their former employer, a large, bi-coastal corporation, in the employer's state of incorporation." Def. Br. at 38. Since Judge Wigenton already rejected the transfer of venue as to the Employee Defendants, this argument is moot. The relevant inquiry is between MaxLite and ATG's financial conditions, which ATG fails to address. As a result, this factor weighs against transfer. *See Czajkowski v. Peal*, No. 14-3803, 2015 WL 1914605, at *7 (D.N.J. April 27, 2015) (finding no financial disparity between the parties when plaintiff failed to "provide[] the Court

with any exhibit, affidavit, certification, or other documentation" to support an undue financial burden on plaintiff).

Thus, the private factors, and in particular the "paramount concern" of Plaintiff's choice of forum, weigh in favor of litigating this case in New Jersey.

Public Factors

The public factors also weigh against transfer. ATG states that "California has a strong interest in protecting its citizens from restrictive covenants," such as the non-compete provisions in the Agreements that MaxLite is attempting to enforce. Def. Br. at 38. ATG goes on to state that the "California legislature has found that this type of contractual restriction on California residents is of great importance to California, not equally matched by New Jersey." *Id.* However, ATG gives no support to this assertion. *Id.* Instead, it states that because California has a strong interest in these types of suits, this contributes to the public interest factor of having the case tried before judges familiar with the applicable law. *Id.* (citing *Hudson United Bank v. Chase Manhattan Bank, NA*, 832 F. Supp. 881, 888 (D.N.J. 1993)). ATG fails to show that New Jersey does *not* have an equal interest in this resolution, or that New Jersey judges are not well versed in laws relating to restrictive covenants.[23] Even if there was evidence that California judges were more familiar with this type of law, "federal district courts are regularly called upon to interpret laws of jurisdictions outside the states in which they sit." *Yocham v. Novartis Pharm. Corp.*, 565 F. Supp. 2d 554, 560 (D.N.J. 2008) (finding that a plaintiff's choice of forum should not be disturbed in order to spare a New Jersey court from interpreting Texas law). ATG has not

---

[23] The Court is not indicating that California law applies to any aspect of this case. ATG has not raised a choice of law argument. If and when it does, the Court will perform the appropriate analysis. The Court is merely responding to the contentions of ATG concerning California law vis-à-vis the public interest factors.

convinced this Court that the public policies of the fora and the relative familiarity of the trial judges with applicable state law support transfer.

The remaining public interest factors are not addressed by either party, and therefore these factors are neutral to the Court's analysis. Therefore, the public factors also weigh against transfer.

### The *Jumara* Factors Do Not Weigh in Favor of Transfer

After considering both public and private factors, the Court finds that transfer is not appropriate under 28 U.S.C. § 1404(a). In Judge Wigenton's opinion on April 21, 2015, she laid out her rationale for why transfer was not appropriate in this case. *See* Pl. Opp. Ex. E, at 79. While this ruling bound only the Employee Defendants, nearly all the same factors exist as to ATG's present motion to transfer. This Court therefore denies ATG's motion to transfer venue, and the matter will remain in the District of New Jersey.

### IV.    **CONCLUSION**

In sum, this Court finds that ATG has minimum contacts with New Jersey, and that litigating this case in New Jersey would not be unreasonable. In addition, transferring this case pursuant to Section 1404(a) is not appropriate. Thus, ATG's Supplemental Motion to Dismiss for Lack of Personal Jurisdiction, or in the alternative, Motion to Transfer, is denied. An appropriate order accompanies this opinion.

**Date:** June 24, 2016

**JOHN MICHAEL VAZQUEZ**
**UNITED STATES DISTRICT JUDGE**