## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MAXLITE, INC.,

      Plaintiff,

v.

ATG ELECTRONICS, INC., et al.,

      Defendants.

Civil Action No. 15-1116 (JMV)

REPORT & RECOMMENDATION

**CLARK, U.S.M.J.**

**THIS MATTER** comes before the Court on an application by way of order to show cause by Defendants James D. Steedly, Sophia D. Galleher, and Matthew Kim (collectively the "Employee Defendants") requesting: (1) leave to file a verified crossclaim seeking a declaratory judgment that Defendant ATG Electronics, Inc. ("ATG") is responsible for all past and future legal costs incurred by the Employee Defendants in connection with this litigation; and (2) the entry of a preliminary injunction compelling ATG to continue payment of the Employee Defendants' legal fees and costs until they are relieved of their obligation to pay by the Court (the "Application") [Dkt. No. 109]. ATG opposes the Employee Defendants' Application [Dkt. No. 111]. The parties appeared before the Court for oral argument on the Application on November 23, 2015 and May 3, 2017. Neither party sought an evidentiary hearing. Pursuant to Local Civil Rule 72.1(a)(2), the Honorable John Michael Vazquez, U.S.D.J., referred the Application to the undersigned for Report and Recommendation. Having heard the parties' oral arguments and considered the parties' written submissions pursuant to Federal Rule of Civil Procedure 78,[1] for good cause shown and for the reasons set forth herein, it is respectfully recommended

---

[1] In this Report & Recommendation, Plaintiff's Amended Complaint will be referred to as "Am. Compl." [Dkt. No. 87], the Employee Defendants' proposed crossclaim will be referred to as the "Crossclaim" [Dkt. No. 109-4], the Employee Defendants' Brief in support of the Application will be referred to as "Emp. Def. Br." [Dkt. No. 109], ATG's Brief in

that the Employee Defendants' Application for leave to file their Crossclaim be **GRANTED** and the Employee Defendants' Application for the entry of a preliminary injunction be **DENIED**

## I.    BACKGROUND[2]

This case arises out of allegations that ATG improperly interfered with the contractual relationship between Plaintiff MaxLite, Inc. ("MaxLite" or "Plaintiff") and three of its employees, the Employee Defendants, when ATG hired the Employee Defendants and used them to compete with MaxLite. The present Application relates to a dispute between ATG and the Employee Defendants regarding ATG's purported commitment to pay the legal fees and costs of the Employee Defendants in this matter.

MaxLite is a New Jersey corporation engaged in the business of designing, engineering, and distributing energy efficient lighting products. Am. Compl. at ¶¶ 1, 10. ATG is incorporated and headquartered in California and is a direct competitor of MaxLite. *Id.* at ¶ 6. Defendant Steedly was hired by MaxLite in September 2009 as its Director of Engineering. *Id.* at ¶ 15. Steedly initially worked for MaxLite at its headquarters in New Jersey, and at Steedly's request, he was relocated to MaxLite's office in Anaheim, California. *Id.* at ¶ 16. Defendant Galleher was hired by MaxLite in May 2012 as its Strategic Marketing and Business Development Analyst. *Id.* at ¶ 40. Galleher also initially worked for MaxLite at its New Jersey headquarters and was transferred to MaxLite's Anaheim, California office at her request. *Id.* at ¶¶ 41, 43. Defendant Kim was hired by MaxLite in July 2013 at its National Project Sales Manager. *Id.* at ¶ 61. Kim worked remotely from his home in Georgia and occasionally worked from MaxLite's New Jersey headquarters. *Id.* at ¶ 62.

---

opposition to the Employee Defendants' Application will be referred to as "ATG Opp. Br." [Dkt. No. 111], the Employee Defendants' Reply Brief will be referred to as "Emp. Def. R. Br." [Dkt. No. 113], ATG's supplemental Brief will be referred to as "ATG Supp. Br." [Dkt. No. 174], and the Employee Defendants' supplemental Brief will be referred to as "Emp. Def. Supp. Br." [Dkt. No. 175].

[2] This Report & Recommendation includes only the background relevant to the present Application. A full recitation of the background of this matter can be found in the Court's June 24, 2016 Opinion [Dkt. No. 147].

As part of their employment with MaxLite, the Employee Defendants entered into a written Proprietary Information Agreement with MaxLite (the "Agreement").[3]  The Agreement contains a non-compete section, which states an applicable period of one year following employment with MaxLite, and a non-solicitation provision. Agreement at Articles 3.2 & 3.3. The Agreement also contains a choice of law provision, which provides that the Agreement shall be governed and construed according to the laws of the State of New Jersey, and a forum selection provision, which selects New Jersey as the venue for the resolution of any disputes arising therefrom. *Id.* at Article 7.1.

Steedly and Galleher were first contacted by ATG through an ATG employee, Art Tapia, while they were still employed by MaxLite. Crossclaim at ¶ 14. Steedly and Galleher resigned from MaxLite in October 2014 and thereafter went to work for ATG. Am. Compl. at ¶¶ 21, 48. In November 2014, ATG's president and majority shareholder, Yaxi Ni, began to "heavily solicit" Kim to leave MaxLite for ATG. Crossclaim at ¶¶ 24-25. Kim resigned from MaxLite in December 2014 and began his employment with ATG in January 2015. *Id.* at ¶¶ 26-27.

Plaintiff initiated this action on February 12, 2015. *See* Dkt. No. 1. Plaintiff filed its Amended Complaint on June 23, 2015, which is Plaintiff's operative pleading in this matter. *See* Dkt. No. 87. In the Amended Complaint, Plaintiff alleges that the Employee Defendants stole confidential information acquired during their employment with MaxLite, solicited business from MaxLite's customers, and worked for ATG, all in violation of their Agreements with MaxLite. *See* Am. Compl. As to ATG, MaxLite alleges that ATG tortiously interfered with its business through the theft of confidential and proprietary information which was obtained when ATG hired the Employee Defendants. MaxLite further alleges that ATG conspired with the Employee Defendants to gain access to confidential information

---

[3] The employment agreements signed by the Employee Defendants were the same in all material respects. Accordingly, the Court refers to all three agreements singularly as the "Agreement" or collectively as the "Agreements." *See* Am. Compl. Ex. A, Ex. B, Ex. C.

and used that information to gain unfair advantage over MaxLite. According to Plaintiff, ATG has systematically targeted MaxLite's top sales agents and employees in order to obtain inside knowledge of MaxLite's product research and development as well as access to MaxLite's customers, vendors, distributors and suppliers, and ATG has used this information to engage in unfair business practices to the detriment of MaxLite.

As noted, the present Application relates to ATG's purported commitment to pay the legal fees of the Employee Defendants incurred in this matter.[4] During ATG's recruitment of the Employee Defendants, ATG was made aware of the Agreements through discussions between Ni and the Employee Defendants. Crossclaim at ¶¶ 15, 23, 25. Upon learning of the Agreements, Ni requested that the Employee Defendants forward the Agreements to him for review by ATG. After receiving the Agreements, ATG paid for a review of the Agreements by a New Jersey attorney.[5] *Id.* at ¶¶ 15, 23, 26. The Employee Defendants did not receive a copy of the review provided to ATG, but Ni informed Steedly that "the [non-compete] would be difficult to enforce, and it should not be an issue." *Id.* at ¶ 15.

Prior to accepting ATG's offers of employment, the Employee Defendants expressed to Ni their concerns regarding the possibility of legal action which could be taken by MaxLite if they left MaxLite and joined ATG in violation of their Agreements. *Id.* at ¶¶ 18, 23, 25. In response to their concerns, the Employee Defendants claim that they were promised by Ni that ATG would "provide full legal protection" and "cover all defense costs" in the event of any dispute with MaxLite. *Id.* at ¶¶ 19, 23, 25. The Employee Defendants assert that they would not have left MaxLite and accepted ATG's employment offers but for Ni's promises that ATG would "cover and defend" them in the event of a legal dispute with MaxLite. *Id.*

---

[4] For the background of the events giving rise to the present dispute, the Court relies largely on the Crossclaim. ATG does not dispute the facts set forth by the Employee Defendants in their Crossclaim.

[5] Because all three Agreements were the same, ATG only conducted a review of one of the Agreements.

After leaving MaxLite and joining ATG, the Employee Defendants received "Cease and Desist" letters from MaxLite requesting that they terminate their employment with ATG. *Id.* at ¶ 29. When the Employee Defendants notified Ni of their receipt of the letters, Ni directed the Employee Defendants to contact James "Jim" Mulcahy, Esq., an attorney for ATG, to review the letters and obtain a recommendation from Mr. Mulcahy for a response. *Id.* at ¶ 30. Ni was copied on the communications between the Employee Defendants and Mr. Mulcahy related to the letters. *Id.* at ¶ 30 & Ex. 10. Mr. Mulcahy recommended to the Employee Defendants that they file a lawsuit in California. *Id.* at ¶ 31. Upon receiving Mr. Mulcahy's suggestion to file a lawsuit, Galleger spoke with Ni regarding that recommendation. *Id.* at ¶ 32. According to Galleher, during their conversation, Ni stated that he agreed with Mr. Mulcahy's recommendation, and instructed Galleher to file the recommended suit against MaxLite. *Id.* In addition, Galleher claims that during that conversation, she specifically expressed her concerns over the cost of the contemplated litigation, and in response, Ni "told [Galleher] not to worry and that ATG had money and money was not an issue and that ATG would take care of the legal fees." *Id.* at ¶ 32. After their conversation, Ni sent Galleher a "confirming" email, which copied Steedly, Kim, and ATG's Director of Operations, Mr. Eric Cai, and stated "[P]lease go ahead and work with Jim [Mulcahy], I am sure he can get this handled properly for us, this kind of thing happens a lot." *Id.* at ¶ 32 & Ex. 11.

On February 12, 2015, Ni and the Employee Defendants received an engagement agreement (the "Engagement Agreement") and a representation conflict waiver from Mr. Mulcahy regarding Mr. Mulcahy's representation in connection with the anticipated suit to be filed against MaxLite in California. *Id.* at Ex. 12, Ex. 13. The Engagement Agreement was addressed to Ni, on behalf of ATG, and each of the Employee Defendants, and was signed by Ni on behalf of ATG and by each of the Employee Defendants. *Id.* at Ex. 12. The Engagement Agreement refers to ATG and the Employee

Defendants collectively and does not identify any specific individual or entity ultimately responsible for the payment of fees and costs incurred and provides that any disputes arising under the Engagement Agreement shall be resolved through binding arbitration in California. *Id.* According to the Employee Defendants, after executing the Engagement Agreement, Ni "again confirmed . . . that ATG would absorb the cost of the legal fees." *Id.* at ¶ 33.

Unaware that MaxLite had filed its Complaint in this matter on February 12, 2015, Mr. Mulcahy filed a Complaint against MaxLite on behalf of ATG and the Employee Defendants on February 13, 2015. *Id.* at ¶¶ 34-35. On February 17, 2015, Mr. Mulcahy informed the Employee Defendants of MaxLite's Complaint before this Court. *Id.* at ¶ 35. Galleher then contacted Ni to inform him of MaxLite's Complaint, and Ni responded by email stating "[l]et's work with Jim [Mulcahy] to get this handled. I will talk to you on this later today." *Id.* at Ex. 14. Subsequently, Galleher again spoke with Ni and Ni informed Galleher that Mr. Mulcahy would represent ATG and the Employee Defendants in the matter pending before this Court, in addition to the matter initiated by ATG and the Employee Defendants in California, and reiterated that ATG would cover the cost of both suits. *Id.* at ¶ 36. Steedly also spoke with Ni regarding MaxLite's Complaint before this Court. *Id.* at ¶ 37. During their conversation, Steedly claims that Ni assured him that ATG would protect the Employee Defendants in both lawsuits and instructed Steedly to "let the lawyers 'handle it'" so the Employee Defendants could focus on their work. *Id.* Ni also had a similar conversation with Kim. *Id.* at ¶ 38. On February 19, 2015, Mr. Ni sent an email to the Employee Defendants stating:

> Please don't worry about this lawsuit thing, this kind of thing happens every day, MaxLite just wants to make it difficult for you, they know they will not get anywhere the laws are just not on their side. Jim Mulcahy will have this handled for us, no big deal, we should not be distracted from what we do.

*Id.* at Ex. 15.

On February 20, 2015, Ni sent Galleher an email instructing her to obtain a check from ATG's accounting department for Mr. Mulcahy's retainer. *Id.* at Ex. 18. Based upon a purported desire to prevent the pending lawsuits from becoming a distraction to Steedly and Kim, Ni requested that Galleher handle all communications with Mr. Mulcahy. *Id.* at ¶ 43. Pursuant to this request, although the invoices from Mr. Mulcahy were sent to the attention of Ni, they were initially emailed to Galleher. *Id.* Upon receipt, Galleher forwarded all invoices received from Mr. Mulcahy to ATG's accounting department for payment, and ATG remitted checks for the payment of the invoices to Mr. Mulcahy's firm. *Id.* at ¶ 43, Ex. 19, Ex. 20. Beginning in April 2015, pursuant to discussions between Galleher, Ni and the ATG accounting department, the invoices from Mr. Mulcahy were sent directly to ATG for payment. *Id.* at ¶ 44.

On April 21, 2015, Galleher received an email from Mr. Ni stating:

> Do you have an update for the lawsuit? Jim [Mulcahy]'s bill is over $70k now? Please tell him we will pay early next month. We are working with a bank to finance our new building, and need to show them a balance as high as possible, like over a million dollars.

*Id.* at Ex. 21. Following receipt of Ni's email, Galleher updated Ni on the status of the pending lawsuits and Ni purportedly again reassured Galleher that he was not concerned about the litigation. *Id.* at ¶ 49. On May 9, 2015, Ni spoke separately with both Steedly and Kim and reassured them both that ATG was not concerned about the pending lawsuits and praised Steedly's job performance. *Id.* at ¶ 50.

On May 10, 2015, Ni sent an email to Galleher stating:

> Tomorrow, Monday, I would like to get together with you for an update on the lawsuit with MaxLite, and I need to talk to Jim [Mulcahy] on our strategy moving forward. I understand Jim [Mulcahy]'s bill is bigger than we expected and it is beoming [sic] a substantial investment on ATG's part, we need to evaulate [sic] our options before we go on. I have talked to James [Steedly] and Matt [Kim] over the weekend, I assured them as long as you guys are productive, the lawsuit is nothing, we will fight it.

*Id.* at Ex. 22. On May 13, 2015, Ni and Galleher met with Mr. Mulcahy, who gave them a review of MaxLite's lawsuit and stated his confidence that ATG and the Employee Defendants would prevail. *Id.* at ¶ 53. After meeting with Mr. Mulcahy, Ni and Galleher had a discussion and Ni again stated that the lawsuit was not a large concern and that ATG and Ni had anticipated MaxLite's lawsuit when it hired the Employee Defendants. *Id.* Ni reiterated his position that ATG would continue to cover the legal fees and costs associated with MaxLite's suit. *Id.*

On May 18, 2015, Ni emailed Galleher and stated:

> Please help Mark out, the banks want to know what is ATG's worst exposure. I met with Jim [Mulcahy] this moring [sic] in his office for this and our plan moving forward, we pretty much confirmed what we have always believed, MaxLite has no case, we will prevail, Jim [Mulcahy] and I will work together on the legal bills as they come, but eventually we will make MaxLite pay, at least a good part of it.

*Id.* at Ex. 23. Thereafter, on June 10, 2015, Ni met with Galleher and Steedly and praised their job performance. *Id.* at ¶ 55. Ni also stated during that meeting that he believed MaxLite's lawsuit "was not going anywhere" and that although the litigation had become a substantial investment for ATG, ATG was in it for the "long-haul" and was committed to continuing to fund the Employee Defendants' defense against MaxLite's claims. *Id.*

On June 18, 2015, Ni again met with Steedly and Galleher. *Id.* at ¶ 58. Kim was not present at the meeting because he was working remotely from his home in Georgia. *Id.* During the meeting, Ni informed Steedly and Galleher that the expense of MaxLite's lawsuit had prevented ATG from receiving approval for a credit increase and had become a concern for ATG's investors. *Id.* Accordingly, Ni notified Steedly and Galleher that they, along with Kim, were being terminated, effective June 19, 2015. *Id.* Ni stated that he had been advised that MaxLite's claims against ATG would be resolved more easily if ATG terminated the Employee Defendants and expressed his belief that ATG would be dismissed from MaxLite's case before this Court based upon this Court's lack of personal jurisdiction over ATG.

*Id.* Also during that meeting, Ni stated that while ATG would no longer be paying the Employee Defendants' legal expenses, Ni would personally pay Mr. Mulcahy's outstanding invoices, along with the invoices of the attorneys who had been retained as local counsel in MaxLite's case before this Court. *Id.* at ¶ 59. Ni expressed a desire to continue to work with the Employee Defendants after the litigation was resolved and never expressed any dissatisfaction with their job performance. *Id.*

Ni subsequently agreed to extend the Employee Defendants' termination date from June 19, 2015 to June 30, 2015 to allow the Employee Defendants to explore any possible settlement with MaxLite before their termination became effective. *Id.* at ¶ 53. After no settlement was reached, Ni met with Galleher and Steedly on June 29, 2015, and stated that while he would not reconsider his decision to terminate them, he would personally pay up to $40,000 in legal fees for the Employee Defendants to continue to work to negotiate a settlement with MaxLite. *Id.* at ¶ 63. Although Ni stated a commitment to pay up to $40,000 on behalf of the Employee Defendants and agreed to continue to cover Mr. Mulcahy's fees "within reason" for purposes of settlement discussions and to devise a strategy moving forward, Ni informed the Employee Defendants that he "would not make an open-ended commitment to pay attorney fees and costs beyond that amount." *Id.* ¶ 63.

During the June 29, 2015 meeting between Ni, Galleher and Steedly, Ni presented Galleher and Steedly with severance agreements (the "Severance Agreements"). *Id.* at Ex. 24, Ex. 25. The Severance Agreements set forth, in part, that the Employee Defendants were resigning, rather than being terminated, and required that they release all claims against ATG. *Id.* The Employee Defendants claim that at no time were they given the impression that Ni's offer to continue to cover their legal costs was conditioned upon signing the Severance Agreements.

On July 6, 2015, new counsel representing only ATG substituted into this matter for Mr. Mulcahy. *See* Dkt. No. 89. On July 17, 2015, Steedly and Galleher contacted Ni to inform him that they

had decided to retain attorney Michael Stein of Pashman Stein, P.C. ("Pashman Stein") as counsel to assist in settlement negotiations with MaxLite. Steedly and Galleher requested that Ni provide funding for Pashman Stein's representation pursuant to their prior conversations in which Mr. Ni purportedly committed to provide such funding. Crossclaim at ¶ 70. In response, Ni stated that he would not cover any of the Employee Defendants' legal costs unless they signed the Severance Agreements. *Id.*

Although it appears that the Employee Defendants decided to retain Pashman Stein sometime in July 2015, prior to the filing of Mr. Mulcahy's motion to withdraw, Pashman Stein did not enter an appearance in this matter until the filing of the present Application on September 16, 2015. In connection with the Application, Pashman Stein filed a "Notice of Limited Appearance" on behalf of the Employee Defendants. *See* Dkt. No. 109-2. The Notice of Limited Appearance states that Pashman Stein's appearance extends solely to the "filing and arguing" of the Application. *Id.* In addition to appearing on behalf of the Employee Defendants in connection with the present motion, Pashman Stein represented the Employee Defendants during settlement negotiations with MaxLite. Crossclaim at ¶ 80. Each of the Employee Defendants paid an initial retainer of $3500.00 to Pashman Stein and have since each agreed to pay an additional $3500.00 in fees and costs that have been incurred. *Id.* at ¶¶ 80, 82. The Employee Defendants claim that as a result of the non-compete clauses in their Agreements with MaxLite, they have been unable to find employment and do not have sufficient resources to retain counsel. *Id.* at ¶ 84. During the oral argument held on the Application, counsel for the Employee Defendants stated that the Employee Defendants are "more than $200,000 in debt to [Pashman Stein]." Dkt. No. 179 at 12:12-13.

As a result of ATG's termination of the Employee Defendants, Mr. Mulcahy and his local counsel sought to withdraw as counsel for ATG and the Employee Defendants on July 22, 2015.[6] In support of his motion to withdraw, Mr. Mulcahy cited both the "serious conflict" that had arisen between ATG and

---

[6] Mr. Mulcahy and his local counsel filed their initial motion to withdraw on July 22, 2015. *See* Dkt. No. 97. At the Court's direction, Mr. Mulcahy filed an amended motion to withdraw on August 14, 2015. *See* Dkt. No. 104.

the Employee Defendants as a result of ATG's termination of the Employee Defendants, which precluded his continued representation of both ATG and the Employee Defendants, and the failure of the Defendants to fulfil their payment obligations to Mr. Mulcahy. Dkt. *See* No. 106, Mulcahy Decl.

On August 17, 2015, while Mr. Mulcahy's motion to withdraw was still pending, Mr. Mulcahy sent an email to Ni and Galleher with attached invoices for the months of May and June of 2015. Crossclaim at Ex. 27, Ex. 28. The invoices were addressed only to ATG, to the attention of Ni, and reflected payments from May 20, 2015 to July 22, 2015 totaling $57,500.00 and stated a remaining balance of $105,945.72. *Id.* Upon receiving Mr. Mulcahy's email, Galleher emailed Ni requesting that he pay the outstanding legal fees. *Id.* at Ex. 29. In response, Ni contacted Galleher by telephone and advised her that he would not pay any legal fees on behalf of the Employee Defendants unless they signed the Severance Agreements. *Id.* at ¶ 75. Steedly also contacted Ni regarding the outstanding legal fees and was similarly informed that the only means by which the Employee Defendants would receive any funding from ATG was in exchange for signing the Severance Agreements. *Id.* at ¶ 76. Mr. Mulcahy, again by email to Galleher and Ni, sent the July 2015 invoice addressed to ATG to the attention of Ni, reflecting an outstanding balance of $103,612.62. *Id.* at Ex. 30. Steedly and Kim did not receive copies of any of the invoices sent by Mr. Mulcahy and the invoices were addressed solely to ATG.

Mr. Mulcahy has stated, both in connection with the present application and in his motion to withdraw, that although there was no formal agreement between himself and the parties that ATG would be responsible for the Defendants' legal costs, his "understanding ha[d] always been that ATG had agreed it 'would be subsidizing the legal fees and costs of this litigation for itself and the [Employee] Defendants.'" Dkt. No. 113-3, Mulcahy Cert. at ¶ 4 (citing Dkt. No. 104, Mulcahy Cert. at ¶ 5). Based upon this understanding, all invoices generated in connection with this litigation were sent to ATG, and pursuant to those invoices, ATG made monthly payments to Mr. Mulcahy's firm from April 2015

through September 2015. Dkt. No. 113-3, Mulcahy Cert. at ¶ 5. In addition, Mr. Mulcahy states that his representation of the Defendants was not limited geographically to California or to jurisdictional arguments in this matter. *Id.* at ¶ 6.

Based upon ATG's refusal to pay the legal fees of the Employee Defendants, the Employee Defendants, represented by Pashman Stein, filed the present Application by way of order to show cause on September 16, 2015. *See* Dkt. No. 109. ATG filed its opposition to the Employee Defendants' Application on October 16, 2015. *See* Dkt. No. 111. The Honorable Steven C. Mannion, U.S.M.J. heard oral argument on the Application on November 13, 2015. On November 4, 2015, the Court entered an Order granting Mr. Mulcahy's motion to withdraw and staying discovery for a period of thirty days to allow the Employee Defendants to retain new counsel. *See* Dkt. No. 114.

On February 29, 2016, prior to the issuance of a decision on the Application, this case was transferred from the Honorable Susan D. Wigenton, U.S.D.J. and Judge Mannion to the Honorable John Michael Vazquez, U.S.D.J. and the undersigned. On April 8, 2016, the Court entered an Order, which: (1) granted ATG leave to file a motion to dismiss this matter on personal jurisdiction grounds, or, in the alternative, to transfer this matter to the United States District Court for the Central District of California; and (2) stayed the Employee Defendants' Application and all other discovery pending disposition of ATG's forthcoming motion. *See* Dkt. No. 139. ATG filed its motion that day. *See* Dkt. No. 138. ATG's motion was denied on June 24, 2016. *See* Dkt. No. 148. On July 15, 2016, ATG filed a motion seeking an interlocutory appeal of the Court's June 24, 2016 Opinion and Order. *See* Dkt. No. 150. ATG's motion for interlocutory appeal was denied on January 17, 2017. *See* Dkt. No. 163.

On February 16, 2017, the Court entered an Order scheduling oral argument on the Application for March 30, 2017 and continuing the stay of formal discovery. *See* Dkt. No. 167. On March 20, 2017, David F. Jasinski, Esq., of Jasinski, P.C., substituted as counsel for ATG. *See* Dkt. No. 168. Based upon

the recent substitution, ATG's newly retained counsel requested an adjournment of the March 30, 2017 oral argument and leave to file a supplemental opposition brief in response to the Application. *See* Dkt. No. 169. On March 21, 2017, the Court entered an Order adjourning the oral argument to April 17, 2017 and permitting both ATG and the Employee Defendants to file short supplemental briefs related to the Application. *See* Dkt. No. 170. ATG filed its supplemental brief on March 31, 2017. *See* Dkt. No. 174. The Employee Defendants filed their response on April 13, 2017. *See* Dkt. No. 175. At the request of counsel for the Employee Defendants, the oral argument was subsequently adjourned to, and held on, May 3, 2017. *See* Dkt. No. 179.

As a result of various factors, including the transfer of this case during the pendency of the Application and the stay of the Application pending resolution of Defendants' personal jurisdiction arguments, the resolution of the Application is regrettably long overdue.

## II.    DISCUSSION

## A.    The Employee Defendants' Proposed Crossclaim[7]

The basis for the relief sought by the Employee Defendants in their Crossclaim is grounded in the New Jersey Supreme Court's decision in *In re State Grand Jury Investigation* ("*Grand Jury*"), 200 N.J. 481 (2009). In *Grand Jury*, an employer agreed to provide and pay for counsel for its employees who had been called to testify before a grand jury investigating the employer. The court, observing the conflicts which arise under the New Jersey Rules of Professional Conduct in situations where a party other than the client being represented by the attorney is responsible for payment to that attorney, set

---

[7] Although styled as a request to file a crossclaim, ATG is correct in its observation that a free-standing crossclaim is not a permissible pleading under Federal Rule of Civil Procedure 7. However, to deny the Employee Defendants' request on that basis would place form over substance and would delay this matter even further. Accordingly, the Court will allow the Employee Defendants to proceed on their request to file a crossclaim and address this request as one to amend their Answer to assert a crossclaim, which appears to be the correct approach under the Federal Rules of Civil Procedure.

forth six conditions which must be met in order for a lawyer to "represent a client but accept payment, directly or indirectly, from a third party . . . ." *Grand Jury*, 200 N.J. at 495. The conditions are:

(1) The informed consent of the client is secured;

(2) The third-party payer is prohibited from, in any way, directing, regulating, or interfering with the lawyer's professional judgment in representing his client;

(3) There cannot be any current attorney-client relationship between the lawyer and the third-party payer;

(4) The lawyer is prohibited from communicating with the third-party payer concerning the substance of the representation of his client;

(5) The third-party payer shall process and pay all such invoices within the regular course of its business, consistent with manner, speed and frequency it pays its own counsel; and

(6) Once a third-party payer commits to pay for the representation of another, the third-party payer shall not be relieved of its continuing obligations to pay without leave of court brought on prior written notice to the lawyer and the client.

*Id.* at 495-97.

In a continuation of the sixth condition, which largely forms the basis of the Employee Defendants' Application, the court set forth the burden which a third-party payer must meet in order to be allowed to discontinue payment and outlined the remedy available to the party receiving the representation should a third-party payer cease payments without satisfying that burden. *Id.* at 496-97. As to a third-party payer seeking to discontinue payments, the court stated that in making such an application, "the third-party payer shall bear the burden of proving that its obligation to continue to pay for the representation should cease . . . ." *Id.* at 496. The court further noted that "the fact that the lawyer and the client have elected to pursue a course of conduct deemed in the client's best interests but disadvantageous to the third-party payer, shall not be sufficient reason to discontinue the third-party payer's continuing obligation of payment." *Id.* at 496-97. Turning to the remedy available to a client in the event that a third-party payer impermissibly ceases payment, the court instructed that "[i]f a third-

14

party payer fails to pay an employee's legal fees and expenses when due, the employee shall have a right, via a summary action, for an order to show cause why the third-party payer should not be ordered to pay those fees and expenses." *Id*. at 497.

Pursuant to *Grand Jury*, the Employee Defendants' Crossclaim states a single cause of action for declaratory judgment seeking:

> (a) A temporary order enjoining and restraining Defendant ATG from unilaterally terminating its obligation to pay the Employee Defendants' reasonable legal fees and costs . . . until and unless [ATG] obtains the Court's permission to be relieved of its obligation by demonstrating sufficient "good cause" as required by New Jersey law; and

> (b) A permanent order compelling Defendant ATG to fulfill its obligation by continuing to pay Pashman Stein P.C. its legal fees and costs in connection with representing the Employee Defendants for the duration of the litigation; and

> (c) For such other and further relief as the Court deems just and proper.

Crossclaim at Count 1.

The Employee Defendants' Application presents a procedural wrinkle. Under *Grand Jury*, "questions concerning the propriety of a third-party continuing to pay for the representation of another party [are to] be determined 'via a summary action.'" *Stein v. Nostrum Labs., Inc.*, 2014 WL 5312535, at *6 (N.J. Super. Ct. App. Div. Oct. 20, 2014) (citing *Grand Jury*, 200 N.J. at 497). The procedure for summary actions is prescribed by New Jersey Court Rule 4:67-1(a). Proceedings under N.J. Ct. R. 4:67 are "commenced by the filing of an order to show cause supported by a verified complaint." *Stein*, 2014 WL 5312535, at *6 (citing N.J. Ct. R. 4:67-2(a)). Thereafter, the court "conducts an initial hearing and, 'if satisfied with the sufficiency of the application, [it] shall order the defendant to show cause why final judgment should not be rendered for the relief sought.'" *Id.* Although summary actions are "a highly efficient procedure by which cases involving only minor factual disputes and largely turning on questions of law can be decided promptly, expeditiously and inexpensively . . . [t]here is no parallel procedure in

federal courts." *Watson v. Manhattan & Bronx Surface Transit Operating Auth.*, 487 F. Supp. 1273, 1275 (D.N.J. 1980).

Accordingly, because there is no equivalent federal procedure to that of a summary action in New Jersey state courts as set forth in *Grand Jury*, the Court will address the Employee Defendants' request for injunctive relief and then allow the Employee Defendants' Crossclaim to proceed in the normal course of a declaratory judgment action. Based upon the foregoing, the Employee Defendants' request for leave to amend their Answer to assert their Crossclaim against ATG seeking declaratory relief under *Grand Jury* should be **GRANTED**.[8] The Court now turns to the Employee Defendants' request for injunctive relief.

## B. The Employee Defendants' Request for the Entry of a Preliminary Injunction

The Employee Defendants seek the entry of a preliminary injunction requiring ATG to continue to pay the Employee Defendants' legal costs in connection with this action until ATG has requested and received the Court's leave to discontinue its asserted indemnification obligation under *Grand Jury*.

Federal Rule of Civil Procedure 65 authorizes courts to issue preliminary injunctions. Injunctive relief is "an extraordinary remedy," which the Court may grant only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of the preliminary injunction; (3) "that the balance of equities tips in [their] favor"; and (4) that an injunction is in the public interest. *Id.* at 20; *see also Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). The movant bears the burden of proving each of these elements,

---

[8] Although ATG's brief in opposition to the Application states that the Court should "deny leave to amend altogether," ATG does not include any reference to Federal Rule of Civil Procedure 15 or any discussion of the relevant factors thereunder.

*Ferring Pharms.*, 765 F.3d at 210 (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)), and the "failure to establish any element renders a preliminary injunction inappropriate." *Id.* (quoting *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)). Although the plaintiff need not prove their case with "airtight certainty," the moving party nevertheless "bears a heavy burden on a motion for a preliminary injunction." *Punnett v. Carter*, 621 F.2d 578, 588 (3d Cir. 1980). When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is "particularly heavy." *Id.* at 582.

### *i. Likelihood of Success on the Merits*

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." *Bennington Foods LLC v. St. Croix Renaissance, Group, LLP,* 528 F.3d 176, 179 (3d Cir. 2008). In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir. 1975).

In considering the Employee Defendants' request for the entry of a preliminary injunction, the Court must first determine whether the Employee Defendants are likely to succeed on the merits of their Crossclaim seeking relief under *Grand Jury*, and not whether they are likely to prevail on the underlying litigation arising from Plaintiff's Complaint in this matter. *See Ridder v. CityFed Fin. Corp.,* 47 F.3d 85, 87 (3d Cir. 1995) (regarding advancement of fees, the issue was not whether movants were likely to prevail in the underlying litigation, but whether they were likely to prevail on the advancement claim itself).

In its opposition to the present Application, ATG asserts that the Employee Defendants are not entitled to relief under *Grand Jury*, injunctive or otherwise, because: (1) the Employee Defendants' Crossclaim is an action for breach of contract, and is therefore a substantive question of law which is governed by California law; and (2) there is no written agreement between the Employee Defendants and ATG under which ATG agreed to indemnify the Employee Defendants for their legal fees and costs in connection with this action, and any purported agreement for the payment of the Employee Defendants' attorneys' fees by ATG does not meet the requirements for relief under *Grand Jury*.[9]

### a. Choice of Law

"When a district court's jurisdiction is predicated on diversity of the parties . . . the court must [first] determine whether, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 (1938), a matter is substantive or procedural." *Chin v. Chrysler LLC,* 538 F.3d 272, 278 (3d Cir. 2008) (citing *Simmons v. City of Phila.,* 947 F.2d 1042, 1085 (3d Cir. 1991)). "If the matter is procedural, and an applicable federal statute, rule, or policy exists, then federal procedural law applies; if the matter is substantive, the court must apply the substantive law of the forum state." *Chin*, 538 F.3d at 278 (citing *Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1223 (3d Cir. 1995)).

"If the court determines that it must apply the law of the forum state, and a choice-of-law question exists, the court must, at the second step, apply the choice-of-law rules of the forum state to determine which state's law applies." *Chin*, 538 F.3d at 278 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941)). "A district court may find a particular state law to be substantive for *Erie* purposes but procedural for purposes of a choice-of-law analysis." *Chin*, 538 F.3d at 278 (citing *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency,* 174 F.3d 1115, 1118 (10th Cir. 1999)).

---

[9] ATG's initial Brief in opposition to the present Application primarily relied upon the assertion that the Application could not be granted because this Court lacks personal jurisdiction over ATG. *See* ATG Opp. Br. The Court denied ATG's motion to dismiss for lack of personal jurisdiction on June 24, 2016. *See* Dkt. No. 148.

Turning to the first step in the *Erie* analysis, the Court must determine whether the Employee Defendants' claims under *Grand Jury* are substantive for *Erie* purposes. Although the Employee Defendants' cause of action under *Grand Jury* is not directly equivalent to a claim for attorneys' fees, the United States Court of Appeals for the Third Circuit has held that "for *Erie* purposes, a party's asserted right to attorneys' fees is a matter of substantive state law." *Chin*, 538 F.3d at 279 (citing *Abrams*, 50 F.3d at 1223). Accordingly, and in light of the parties' apparent agreement that the Employee Defendants' claim under *Grand Jury* is substantive for *Erie* purposes, the Court finds that this matter is indeed substantive as to the first question under *Erie* and that this Court therefore must apply the substantive law of New Jersey, the forum state.

Next, because New Jersey substantive law applies to this matter as to the first question under *Erie*, and because a choice-of-law question exists, the Court must move to the second step under *Erie* and apply the choice-of-law rules of New Jersey, the forum state, to determine whether New Jersey or California law applies to this matter. *Klaxon*, 313 U.S. at 496. The parties differ as to whether, for purposes of New Jersey's choice-of-law rules, this matter is substantive or procedural. If it is substantive, as ATG asserts, the Court must proceed to an analysis of whether New Jersey or California law applies to the present dispute. The first step in this analysis considers whether an actual conflict exists, which is determined by "examining the substance of the potentially applicable law to determine whether there is a distinction between them." *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008) (citations omitted). If it is procedural, as asserted by the Employee Defendants, then under New Jersey's choice-of-law rules, a court sitting in New Jersey is required to apply New Jersey law to procedural matters "even when a different state's substantive law must govern." *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., a Div. of Keller Sys.*, 158 N.J. 561, 569 (1999).

19

According to ATG, the cause of action asserted by the Employee Defendants in the Crossclaim is an action for breach of contract, and actions for breach of contract, ATG claims, "are substantive questions of law that are typically governed by the law of (i) the state that the parties specifically select for the resolution of their dispute or (ii) the state in which the parties entered into their agreement." ATG Opp. Br. at p. 23 (citing *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 104 (1993); *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 208 N.J. Super. 666, 669 (App. Div. 1986)). Based upon this analysis, and citing the undisputed facts that the Engagement Agreement contains California choice-of-law and venue provisions and that any alleged agreement for the payment of attorneys' fees was entered into in California, ATG argues that under New Jersey choice-of-law principles, the Employee Defendants' cause of action is governed by California law, which does not provide the requested relief.

In contrast, the Employee Defendants assert that their cause of action is procedural for purposes of the choice-of-law analysis, and therefore governed by New Jersey law. The Employee Defendants' assertion in this regard is based upon the New Jersey Supreme Court's ruling that an award of attorneys' fees is a procedural matter to which New Jersey court rules apply. Emp. Def. R. Br. at p. 6 (citing *Chin*, 538 F.3d at 279; *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., a Div. of Keller Sys.*, 158 N.J. 561, 569 (1999)).

Upon review of *Grand Jury*, it appears to the Court that the cause of action asserted by the Employee Defendants thereunder, at least in the context of a choice-of-law analysis, is not directly analogous to either an action for breach of contract or one for an award of attorneys' fees. Rather, it appears that the cause of action set forth by the New Jersey Supreme Court in *Grand Jury* arises out of the interests of New Jersey courts in avoiding conflicts of interest and governing the conduct of attorneys who practice before the courts of this State. Such "questions involving who can practice before the New

Jersey courts involve matters of sound judicial administration and hence are matters of practice rather than questions of substantive law." *Kramer v. Ciba-Geigy Corp.*, 371 N.J. Super. 580, 601 (App. Div. 2004). Accordingly, because the Crossclaim arises out of issues regarding the appearance of attorneys before this Court, and because "New Jersey law must control with respect to a question of practice before the courts of this state," the Court finds that under New Jersey's choice-of-law rules, this matter is procedural and, therefore, governed by New Jersey law. *Id.* at 598.

The Court's finding that this matter is procedural, and therefore governed by New Jersey law, is unaffected by the existence of the choice of law provision in the Engagement Agreement which designates the governance of California law over any dispute arising therefrom. Although the Engagement Agreement does indeed select California law, New Jersey courts have "recognize[d] that [a New Jersey court] maintains an independent interest in assuring that conflict-free representation occurs, since the existence of conflict undermines the integrity of the court." *State v. Davis*, 366 N.J. Super. 30, 38 (App. Div. 2004). Based upon this interest, "even when the parties have adopted an otherwise valid choice of law provision in an agreement, that provision will not govern when an issue is procedural." *Kramer*, 371 N.J. Super. at 601. Accordingly, despite the California choice of law provision in the Engagement Agreement, it is clear that this matter primarily involves "a question of practice before the courts of this state . . . [and] New Jersey law must control . . . ." *Id.* at 598.

### b. Applicability of *Grand Jury* to the Present Matter

Having found that New Jersey law applies to this matter, the Court now turns to the Employee Defendants' likelihood of success on the merits on their cause of action under *Grand Jury*. ATG argues that the Employee Defendants cannot obtain the relief provided for in *Grand Jury* because: (1) *Grand Jury* does not govern ATG's conduct in this matter; and (2) even if ATG is bound by *Grand Jury*, there

is no formal agreement between ATG and the Employee Defendants pursuant to which ATG agreed to undertake the asserted payment obligation.

As an initial matter, the Court acknowledges the difficulty in applying *Grand Jury* to the present situation to determine whether the Employee Defendants have demonstrated a likelihood of success on their claims thereunder. The six conditions set forth in *Grand Jury* provide the criteria which must be met in order for a lawyer to properly represent a client "but accept payment, directly or indirectly, from a third party . . . ." *Grand Jury*, 200 N.J. at 495. Because *Grand Jury* is focused largely on determining the propriety of an attorney's representation of a client while accepting payment for that representation from a third party, the Court is left with little direction regarding the application of *Grand Jury* to a situation, such as the present, where the question is not the prospective appropriateness of an attorneys' undertaking of such an arrangement, but rather a retrospective determination of the requirements which must be met for a third-party payer to be bound by such an arrangement.

The Court agrees with ATG that the Employee Defendants have failed to demonstrate the existence of a formal agreement for ATG's payment of the Employee Defendants' attorneys' fees in this matter which is in precise compliance with the six *Grand Jury* factors. However, because of the focus of the first four *Grand Jury* factors on the conduct of attorneys in third-party payer situations, it appears to the Court that a strict application of the six *Grand Jury* conditions to the facts of the present dispute is unlikely to be particularly illuminating in determining whether the Employee Defendants are entitled to the relief they seek. Thus, the Court must move beyond a literal application of the six *Grand Jury* factors to assess the merits of the Employee Defendants' claims against ATG.

Moving beyond ATG's assertions regarding the technical compliance of the Employee Defendants' claims with *Grand Jury*, the Court now addresses ATG's arguments regarding its overall contentions that the Employee Defendants are not entitled to the relief they seek. In addressing ATG's

arguments, and for the reasons set forth below, the Court concludes that the Employee Defendants have demonstrated a probable entitlement to such relief under *Grand Jury*.

First, the Court turns to ATG's contention that *Grand Jury* only governs the conduct of attorneys, and therefore, "this Court may only utilize . . . *Grand Jury* to regulate an attorney's conduct by disqualifying him/her from accepting payment from a third-party payer" and may not use *Grand Jury* to dictate the conduct of a third-party payer, such as ATG. [10]  ATG Opp. Br. at p. 14. Although it is evident, as discussed at length above, that *Grand Jury* is grounded in principles of attorney conduct, the Court need look no further than the plain language of *Grand Jury* to conclude that its reach extends beyond attorneys to third-party payers. In fact, far from applying solely to attorneys, the sixth *Grand Jury* factor applies entirely to third-party payers. *See Grand Jury*, 200 N.J. at 496-97.

Under the sixth factor, third-party payers must meet certain conditions to be relieved of their duty to pay, and if a third-party payer ceases payment without first satisfying those conditions, the court provided a specific remedy available to litigants. *Id.* This remedy, in the form of a "summary action, for an order to show cause why the third-party payer should not be ordered to pay those fees and expenses" is asserted by the client against the third-party payer, and not against the attorney. *Id.* at 497. While ATG

---

[10] In a continuation of its argument that *Grand Jury* only applies to the conduct of attorneys and therefore cannot be used to state a claim against ATG, ATG claims that even the conduct of its previous attorney, Mr. Mulcahy, cannot be governed by New Jersey law because ATG and the Employee Defendants "explicitly agreed that [Mr. Mulcahy's] conduct would be governed by the California Rules of Professional Conduct and did not anticipate an action in New Jersey." ATG Opp. Br. at p. 14. Although this argument is wholly unavailing in light of the foregoing finding that *Grand Jury* extends to the conduct of third-party payers, the Court believes it necessary to note at this juncture that although ATG and the Employee Defendants may not have anticipated that this litigation would be conducted in New Jersey, when Plaintiff filed its Complaint in this Court ATG continued to retain Mr. Mulcahy as its counsel, and Mr. Mulcahy filed a motion for leave to appear *pro hac vice* before this Court, which was granted on April 20, 2015. *See* Dkt. Nos. 47, 55. By virtue of ATG's decision to continue with Mr. Mulcahy as its counsel and through the admission of Mr. Mulcahy to this Court *pro hac vice*, Mr. Mulcahy, and any other counsel appearing *pro hac vice* before this Court became subject to Local Civil Rule 103.1, which states that "[t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of members of the bar admitted to practice in this Court . . . ." L. Civ. R. 103.1(a). Accordingly, although the parties may have initially agreed that Mr. Mulcahy's conduct would be governed by California's Rules of Professional Conduct, when Mr. Mulcahy was admitted to practice before this Court in order to continue his representation of ATG and the Employee Defendants, he became subject to the New Jersey Rules of Professional Conduct.

is correct in its assertion that Rules of Professional Conduct govern the behavior of attorneys and do not apply to litigants, the decision of the New Jersey Supreme Court in *Grand Jury* clearly reaches beyond an attorney's professional conduct to govern the conduct of third-party payers and creates a remedy to be asserted against a third-party party, such as ATG, for deviation from that prescribed conduct. Accordingly, the Court finds that ATG, as a third-party payer, is subject to the requirements of *Grand Jury*.

Next, the Court addresses what appears to be ATG's overarching contention in opposition to the relief sought by the Employee Defendants: the lack of any formal agreement between ATG and the Employee Defendants wherein ATG agreed to incur responsibility for the Employee Defendants' legal fees and costs in connection with this matter. According to ATG, the Employee Defendants "have not, and cannot produce any written agreement by ATG to pay for the [Employee] Defendants' attorneys' fees." ATG. Opp. Br. at p. 20. The Employee Defendants acknowledge the lack of a written contract with ATG but argue that the relief sought under *Grand Jury* does not require the existence of a formal contract. The Court agrees.

*Grand Jury* neither states that the existence of a formal written contract is a prerequisite to obtain the relief provided for therein nor makes any mention of requirements which must be met for the formation of an enforceable agreement between a litigant and a third-party payer in this context. Rather, the court refers to the agreement between the litigant and the third-party payer as an "obligation" or a "commitment." *Grand Jury*, 200 N.J. at 496, 498. While there is no written contract between ATG and the Employee Defendants memorializing the Employee Defendants' right to indemnification, ATG acknowledges that it did indeed agree to bear at least some level of responsibility for the legal costs incurred by the Employee Defendants as a result of their departure from MaxLite and MaxLite's subsequent legal action but contends that the commitment it made is not enforceable.

ATG argues that the commitment made to the Employee Defendants is not enforceable because the enforceability of such an obligation requires the third-party payer to agree to incur an "unconditional responsibility" for the payment of the litigant's fees. ATG Opp. Br. at p. 20 (citing *Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A. v. City of Atl. City*, 2014 WL 8630664, at *20 (N.J. Super. Ct. App. Div. Apr. 21, 2015). *Levine*, which ATG relies on in support of its assertion that a third-party payer must enter into an unconditional agreement for payment in order to be bound by *Grand Jury*, involved a dispute arising out of a statement in a memorandum of understanding between a city and certain employees thereof stating that the city would provide the employees with legal counsel in the defense of charges filed against them in the performance of their official duties. *Levine*, 2014 WL 8630664, at *1. The city's payment of the employees' attorneys' fees was subject to the city's approval and to other applicable ordinances and state statutes. *Id.* at *2.

When the city ceased payments to a law firm representing certain city employees based upon the law firm's purported lack of compliance with the required conditions, the firm filed suit against the city alleging that the city had failed to pay the legal fees for representations it had authorized. *Id.* at *3. In seeking payment of the legal fees the firm claimed had been incurred on behalf of the employees as authorized by the city, the law firm moved for the immediate payment of the outstanding fees under *Grand Jury*. The court denied the law firm's request for relief under *Grand Jury* because "unlike the private agreements that formed the basis for the Court's decision in [*Grand Jury*]," which did not include any preconditions for the payment of attorneys' fees under those agreements, the law firm's "entitlement to payment was arguably conditioned upon compliance with multiple laws and procedures, none of which were satisfied." *Id.* at *20.

Based upon the decision of the court in *Levine*, ATG argues that it bears no responsibility for the Employee Defendants' legal costs because it made no "unconditional agreement" to incur that

responsibility. ATG. Opp. Br. at p. 20. Instead of making an unconditional commitment to the Employee Defendants, ATG claims that its payment obligation was "connected with the [Employee] Defendants' continued employment with ATG" and because the Employee Defendants are no longer employed by ATG, "the condition of payment is no longer satisfied." *Id.* However, the court in *Grand Jury* explicitly stated that a divergence in the interests of the third-party payer and the litigant does not provide sufficient cause for the discontinuation of the third-party payer's funding obligations. *See Grand Jury*, 200 N.J. at 496-97 (stating "the fact that the lawyer and the client have elected to pursue a course of conduct deemed in the client's best interests but disadvantageous to the third-party payer shall not be sufficient reason to discontinue the funding."). Accordingly, rather than weigh against the Employee Defendants' request for relief, ATG's argument weighs in the Employee Defendants' favor and represents an acknowledgment by ATG that the commitment it made to the Employee Defendants was improperly conditioned upon a continued alignment of its interests with those of the Employee Defendants.

ATG made offers of employment to the Employee Defendants bearing full awareness that the acceptance of its offers could constitute a breach of the Agreement between the Employee Defendants and MaxLite and ATG assured the Employee Defendants that it would be financially responsible for defending against any lawsuit brought by MaxLite. When MaxLite instituted the anticipated lawsuit against ATG and the Employee Defendants, ATG reiterated its commitment to cover the cost of litigation, directed the retention of Mr. Mulcahy to represent ATG and the Employee Defendants, and continuously paid the invoices submitted by Mr. Mulcahy without issue. However, when the legal costs began to mount, becoming a concern for ATG's investors, ATG terminated the Employee Defendants based upon a belief that doing so would minimize ATG's exposure and lead to a more favorable outcome for ATG in this litigation.

The court's decision in *Grand Jury* is based upon an acknowledgment that an "organization's promise to pay [an employee's] bill . . . has the inherent risk of dividing an attorney's loyalty between his client and his client's employer who will pay for the services" and the procedure set forth therein is aimed at avoiding the resulting conflict of interest which arises when the interests of the organization responsible for payment become adverse to the interests of the employee receiving the benefit of that representation. *Grand Jury*, 200 N.J. at 492. ATG's undisputed actions in this respect and its assertion that its payment of the Employee Defendants' legal costs was conditioned upon their continued employment with ATG exemplifies the very circumstance *Grand Jury* is meant to prevent: a third-party payer's unilateral termination of an obligation to indemnify a litigant once the interests of the third-party payer and the litigant become inimical.

ATG hired the Employee Defendants and agreed to indemnify them when it appeared that the benefits of doing so would outweigh the possible legal exposure, and when that calculation proved to be incorrect and ATG's alignment with the Employee Defendants no longer benefitted ATG, ATG fired the Employee Defendants and discontinued payment of the legal costs for which it had assured the Employee Defendants it would accountable. In doing so, ATG created the irreconcilable conflict between itself and the Employee Defendants envisioned by the court in *Grand Jury*, requiring the withdrawal of Mr. Mulcahy from this matter and leaving the Employee Defendants without the protection promised by ATG.[11]

---

[11] ATG further argues that because it retained Mr. Mulcahy and never entered into any kind of arrangement with Pashman Stein, it cannot be responsible for any fees incurred by Pashman Stein in this matter. *See* ATG Supp. Br. at p. 3-4. Although the Court makes no finding regarding ATG's liability for Pashman Stein's fees or the reasonableness of the incurred fees asserted by Pashman Stein, the Court notes that ATG's termination of the Employee Defendants created an irreconcilable conflict barring Mr. Mulcahy's continued representation of ATG and the Employee Defendants. *See In re Garber,* 95 N.J. 597, 607, 472 A.2d 566 (1984) ("It is patently unethical for a lawyer in a legal proceeding to represent an individual whose interests are adverse to another party whom the lawyer represents in other matters, even if the two representations are not related.") (citations omitted)). In such a circumstance, when a third-party payer bears the responsibility for the payment of a litigant's legal costs and offers to retain counsel who may have a conflict by virtue of that counsel's relationship with the third-party payer, the litigant is not required to accept the conflicted counsel and may instead "seek their own counsel when

There are, to be sure, significant unanswered questions to be resolved and obstacles still to overcome for the Employee Defendants in pursuit of the relief they seek. However, it is clear from the undisputed facts that ATG did undertake some obligation and made some level of commitment to pay the Employee Defendants' legal fees in this matter, and that ATG, unilaterally and without seeking or obtaining the Court's leave, terminated that commitment when its interests were no longer aligned with the Employee Defendants. The extent of that commitment and the specific arrangement agreed to by ATG is clearly disputed but the Court is satisfied that in the context of the present Application the Employee Defendants have demonstrated a likelihood of success on the merits of their claims against ATG.

### ii. Irreparable Harm

The Employee Defendants argue that if the relief sought in the Application is denied, they will "certainly experience irreparable harm" because they will "be left with no counsel, and unable to proceed forward competently in this litigation." Emp. Def. Br. at p. 13. According to the Employee Defendants, being "forced to litigate, alone and without legal counsel . . . cannot be quantified in money damages, and would result in permanent harm . . . ." *Id.* at p. 15. In response, ATG asserts that the Employee Defendants "cannot legitimately claim irreparable harm" when a lengthy period of time has passed since the initial filing of the Application and the Employee Defendants' counsel continues to represent them.[12] ATG Supp. Br. at p. 1.

In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir. 1994) (quoting *Instant Airfreight Co. v. C.F. Airfreight, Inc.,* 882 F.2d 797,

---

[the third-party payer] . . . fail[s] to offer any acceptable representation, and [the third-party payer] is required to reimburse [the litigant] for reasonable attorneys' fees." *Kramer,* 371 N.J. Super. at 605.

[12] ATG's initial response to the Application did not address the question of irreparable harm. *See* ATG Opp. Br.

801 (3d Cir. 1989)). The word "irreparable connotes that which cannot be repaired, retrieved, put down again, atoned for." *Id.* (citations omitted). However, "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable harm'" absent injunctive relief. *Hoxworth v. Blinder, Robinson & Co. Inc.,* 903 F.2d 186, 205 (3d Cir. 1990) (citing *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 225 (3d Cir. 1987)). Irreparable harm cannot be presumed, and "must be established as a separate element, independent of any showing of likelihood of success." *King Pharm. Inc. v. Sandoz, Inc.,* Civ. No. 08–5974, 2010 WL 1957640, at *5 (D.N.J. May 17, 2010) (citing *Winter v. Natural Resources Defense Counsel, Inc.,* 555 U.S. 7, 21–22 (2008)). Failure to establish irreparable injury automatically results in denial of a preliminary injunction. *Instant Airfreight Co.,* 882 F.2d at 800.

The Employee Defendants assert that the failure to receive defense costs resulting in the deprivation of counsel constitutes irreparable harm. "Fee disputes between attorneys and clients—or attorneys and third-party payors—are par for the course in high-stakes litigation, and the reasonableness of attorneys' fees is a frequently-tried issue" with easily quantifiable damages. *Stuckey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 15 CIV. 6639 CM, 2015 WL 5547441, at *11 (S.D.N.Y. Sept. 17, 2015). Because money damages are available to remedy the injury caused in such fee disputes, the injury is not irreparable and "no injunctive relief should be awarded . . . ." *Id.* (citing *Ford v. Reynolds,* 316 F.3d 351, 355 (2d Cir. 2003); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979)). However, while overdue counsel fees can later be quantified and reimbursed, a third-party payer's failure to comply with its obligations resulting in a litigant's immediate loss of counsel can, when certain circumstances are present, transform the resulting injury into one that is not quantifiable or compensable in money damages, leading to a finding of irreparable harm.

First, in recognition of "the important role in corporate governance in America" played by professional liability insurance policies, courts have found that when the right to indemnification for defense costs arises out of a professional liability insurance policy, "the failure to receive defense costs when they are due constitutes an immediate and direct injury. To hold otherwise would not provide insureds with protection from financial harm that insurance policies are presumed to give." *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 469 (S.D.N.Y. 2005) (citations omitted); *see also Wedtech Corp. v. Fed. Ins. Co.*, 740 F. Supp. 214, 221 (S.D.N.Y. 1990) (finding that a beneficiary of a professional liability policy suffers immediate and direct injury if the insurer does not reimburse the policyholder "as soon as the attorneys' fees are incurred"); *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 272 (S.D.N.Y. 2012) (stating that the failure to receive defense costs under a professional liability at the time they are incurred causes an injury "sufficient to satisfy the irreparable harm requirement") (citations omitted). However, a finding of irreparable harm in such situations is an exception to the rule that fee disputes can be quantified and compensated in money damages and applies only "in cases brought against recalcitrant insurers who are reluctant to reimburse insureds for their ongoing defense costs." *Stuckey*, 2015 WL 5547441, at *9. Because the Employee Defendants' claim for indemnification does not arise in the context of professional liability insurance, the foregoing authority, which is cited by the Employee Defendants in support of the Application, is inapplicable and does not support a finding irreparable harm.

Secondly, the Employee Defendants, citing to Delaware law, argue that their Application is analogous to situations in which a company fails to comply with an indemnification provision in its by-laws. Emp. Def. Br. at p. 14 (citing *Homestore, Inc. v. Tafeen*, 886 A.2d 502, 505 (Del. 2005)). The Employee Defendants are indeed correct that Delaware corporation law provides advancement and indemnification rights for officers, and that pursuant to Delaware's public policy, for those rights "to be

of any value to the executive or director, advancement must be made promptly, otherwise its benefit is forever lost because the failure to advance fees affects the counsel the director may choose and litigation strategy that the executive or director will be able to afford." *Tafeen*, 886 A.2d at 505 (citing Del. Code Ann. tit. 8, § 145). While the foregoing law may weigh in favor of a finding of irreparable harm were this matter pending in Delaware or otherwise governed by Delaware law, there has been no showing or suggestion that Delaware law has any bearing on this case and it therefore has no effect on the Court's consideration of the Application.

Finally, such an injury may become irreparable where the movant is facing criminal charges or substantial civil liability and the underlying case for which the movant seeks reimbursement is at a critical juncture. *See Great Am. Ins. Co. v. Gross*, No. CIV.A. 305CV159, 2005 WL 1048752, at *4 (E.D. Va. May 3, 2005) (finding irreparable harm where third-party payer's failure to advance defense costs to movant facing "massive civil liability" would "cripple [the movant's] defense and leave them with no ability to defend their interests"); *Aleynikov v. Goldman Sachs Grp., Inc.*, No. CIV.NO. 12-5994 (KM), 2012 WL 6603397, at *1 (D.N.J. Dec. 14, 2012) (stating that a properly established imminent loss of counsel which will impair an applicant's ability to defend himself in a criminal case may constitute irreparable harm); *XL Specialty Ins. Co.*, 874 F. Supp. 2d at 273 (noting that a criminal defendant's loss of counsel "at a key moment" in the underlying matter "cannot be minimized"). When the movant is faced with the loss of their longstanding counsel at a critical or advanced stage of the underlying matter, the degree of harm caused is greater because that longstanding relationship is difficult, if not impossible, to replicate. *See Aleynikov,* 2012 WL 6603397, at *13 (noting that even if the petitioner were to be appointed new counsel, he would still suffer the loss of "counsel of his choice who are thoroughly familiar with this case and are best positioned to continue with his defense"); *XL Specialty Ins. Co.*, 874 F. Supp. 2d at 274-75 ("new counsel, starting from scratch in a highly complex matter, will

not have, and may not be able to quickly acquire, predecessor counsel's familiarity with [the case] . . . [n]or may such counsel be able to quickly replicate prior working relationships").

The predicament in which the Employee Defendants find themselves does not constitute irreparable harm pursuant to the foregoing authority. There are no existing or threatened criminal charges against the Employee Defendants, and while the Court does not attempt to minimize the civil liability they are facing, such liability is not "massive" and the claims in this matter and their underlying facts are not particularly complex. *See, e.g., Gross*, 2005 WL 1048752, at *4 (noting that the civil liability faced by the petitioners was "massive" where they were named as defendants in fifteen separate lawsuits alleging that they engaged in a conspiracy to hide the insolvent status of the subject companies). Plaintiff's claims against the Employee Defendants arise from the Employee Defendants' termination of their employment with Plaintiff and commencement of their employment with ATG in possible violation of the Agreement between the Employee Defendants and Plaintiff. While there is no doubt that the Employee Defendants, as well as any other civil litigant, would benefit greatly from the representation of counsel, the Employee Defendants appear to be competent professionals who are aware of the circumstances surrounding their departure from MaxLite and capable of presenting an argument as to why their actions in doing so did not violate the Agreement as well as any evidence in support of that argument.

Moreover, this matter is neither close to trial nor is it at any other "critical" period of litigation. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d at 669 (stating that underlying actions were at a "critical stage" where the class action trial was scheduled to begin within the month). While this case has been pending for some time, most of the pendency of this case has been consumed by motions related to personal jurisdiction and by the present Application. Although there was an initial scheduling order entered in this matter on June 15, 2015 [Dkt. No. 83], it appears that most, if not all, of the discovery

efforts undertaken by the parties have been focused on the question of personal jurisdiction and all other discovery has long been stayed pending the resolution of the Employee Defendants' Application. Because this case is still in its early stages, the possible withdrawal of Pashman Stein will not cause the Employee Defendants to suffer the injury inflicted upon litigants who are left without counsel at a pivotal moment.

Lastly, the withdrawal of Pashman Stein from this matter will not deprive the Employee Defendants of counsel bearing intimate familiarity or a longstanding history with the underlying claims in this matter. Pashman Stein only appeared in this matter upon the filing of the Application and the Notice of Limited Appearance filed by Pashman Stein explicitly states that their appearance is "solely for the purpose of filing and arguing [the Application]." Dkt. No. 109-2. Although Pashman Stein clearly has an intimate knowledge of the facts underlying the present Application, it does not appear that such knowledge necessarily extends to Plaintiff's underlying claims. Therefore, while the Court understands the Employee Defendants' desire to receive the benefit of Pashman Stein's unquestionably qualified representation in this matter, because there has been no argument or showing that Pashman Stein's representation is inimitable, Pashman Stein's possible withdrawal from this matter will not cause the Employee Defendants to suffer an irreparable injury.

Even assuming, *arguendo*, that the Court were to find that the injury alleged by the Employee Defendants is irreparable, the entry of a preliminary injunction would remain improper because the infliction of such an injury has proved to be far from existing or imminent. *See Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) ("The requisite for injunctive relief has been characterized as a clear showing of *immediate* irreparable injury or a presently existing actual threat.") (emphasis added) (internal quotations omitted). The Application has been pending since September 16, 2015. The regrettable delay in the resolution of this matter has resulted from a multitude of factors as

discussed above and is not entirely attributable to the parties. Despite this significant passage of time, Pashman Stein has continued to represent the Employee Defendants in this matter and the alleged imminent and immediate harm in the form of the Employee Defendants being left without counsel has not come to pass. Accordingly, because the Court finds that the alleged harm has proved to not be imminent or immediate, the Employee Defendants have not demonstrated the requisite injury for a preliminary injunction.

In finding that the Employee Defendants have failed to demonstrate irreparable harm, the Court does not attempt to minimize or discount the difficult position in which they find themselves. If the denial of the present Application results in the withdrawal of Pashman Stein from this matter, and if the Employee Defendants are unable to retain alternative counsel, there is no doubt that proceeding in this litigation *pro se* will present a hardship. However, because there has been no showing of irreparable harm, the entry of a preliminary injunction would be improper. Instead, because the facts underlying the Employee Defendants' request for relief are undisputed, the Court will permit the filing of expedited dispositive motions on the Employee Defendants' Crossclaim once the Crossclaim is served and answered to allow for prompt disposition of the Employee Defendants' claims for indemnification. Such a procedure will allow the parties to receive a final determination on the issue of indemnification and prevent this matter from being further delayed or complicated by any additional prolonged disputes in this regard between ATG and the Employee Defendants.

Absent a demonstration of irreparable harm, no injunction shall issue. *See Instant Air Freight Co.*, 882 F.2d at 800 (a failure to demonstrate irreparable harm must necessarily result in the denial of a preliminary injunction) (citation omitted). Because the Employee Defendants have failed to establish irreparable harm, the Court need not address the remaining requirements for an injunction. *See AT&T v. Winback & Conserve Program,* 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994) (noting that "[the] latter two

34

factors should be taken into account only when they are relevant"); *Kongtcheu v. Secaucas Healthcare Ctr., LLC,* No. 13–1856, 2014 U.S. Dist. LEXIS 74151, at *6 (D.N.J. May 30, 2014) ("Because there is no irreparable harm absent a preliminary injunction, "[i]t is unnecessary for the Court to address the remaining factors in the injunctive relief analysis.") (quotation omitted).

Accordingly, because the Employee Defendants have failed to establish that a denial of the Application will result in irreparable harm, it is respectfully recommended that the Employee Defendants' request for a preliminary injunction be **DENIED** and that the parties promptly proceed to file dispositive motions on the Employee Defendants' Crossclaim.

## III.    CONCLUSION AND ORDER

In light of the foregoing, and the Court having considered this matter pursuant to Fed. R. Civ. P. 78;

**IT IS** on this 15th day of March, 2018,

**RECOMMENDED** that Defendants Sophia C. Galleher, Matthew Kim and James D. Steedly's Application for leave to amend their Answer to assert a crossclaim against Defendant ATG Electronics, Inc. and for a preliminary injunction pursuant to Fed. R. Civ. P. 65 against Defendant ATG Electronics, Inc. [Dkt. No. 109] be **GRANTED in part and DENIED and part**; and it is further

**RECOMMENDED** that Defendants Sophia C. Galleher, Matthew Kim and James D. Steedly's Application for leave to amend their Answer to assert a crossclaim against Defendant ATG Electronics, Inc. be **GRANTED**; and it is further

**RECOMMENDED** that Defendants Sophia C. Galleher, Matthew Kim and James D. Steedly's Application for a preliminary injunction pursuant to Fed. R. Civ. P. 65 against ATG Electronics, Inc. be **DENIED**; and it is further

**ORDERED** that pursuant to L. Civ. R. 72.1 and Fed. R. Civ. P. 72, objections to this Report & Recommendation shall be filed within fourteen (14) days after service hereof. Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. The Clerk of Court is directed to serve the parties with electronic notice upon filing this Report and Recommendation; and it is further

**ORDERED** that this Report & Recommendation shall remain under seal for fourteen (14) days during which time the parties may file a motion or motions to seal portions of this Report & Recommendation pursuant to Local Civil Rule 5.3.


s/James B. Clark, III
**HONORABLE JAMES B. CLARK, III**
**UNITED STATES MAGISTRATE JUDGE**