**Michael S. Stein, Esq. (MS-3248)**
**J. John Kim, Esq. (JK-1979)**
**PASHMAN STEIN WALDER HAYDEN, P.C.**
Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601
(201) 488-8200
*Attorneys for Defendants Sophia C.*
*Galleher and Matthew Kim*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAXLITE, INC., a New Jersey Corporation, f/k/a SK AMERICA, INC., d/b/a MAXLITE,<br><br>           Plaintiff,<br><br>v.<br><br>ATG ELECTRONICS, INC., JAMES D. STEEDLY, SOPHIA C. GALLEHER and MATTHEW KIM,<br><br>           Defendants. | Civil Action No.  2:15-CV-01116-SDW-SCM |

### EMPLOYEE DEFENDANTS' FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FINDINGS OF FACT..............................................................................................7

General Background ..........................................................................................7

ATG Recruits  the Employee Defendants, With Full Knowledge of Their ..........8

Non-Compete Agreements, and Promises to Defend Them from MaxLite..........8

When MaxLite Threatened to Sue, and Subsequently Sued ATG and the
Employee Defendants, ATG Confirmed Its Promise to Protect the Employee ...16

Defendants, and Hired Counsel to Represent All Parties Collectively ...............16

The Evidence Demonstrates that ATG Committed to Paying the Employee
Defendants' Legal Fees and Did Pay a Substantial Portion of those Fees..........20

As the Litigation Proceeded, the Legal Fees .....................................................35

Grew and ATG Faced Mounting Pressure From..................................................35

Banks and the SBA While Trying to Finance a New Building...........................35

Ni Sees an Opportunity to Get Out of the Lawsuit,...........................................43

Relieving the Financial Pressure on ATG, and Hatches a....................................43

Plan to Cease Paying the Employee Defendants' Legal Fees .............................43

ATG Fires All Three Employee Defendants Approximately...............................51

Six Months Into Their Employment for the Concocted and ...............................51

Farcical Reason that their Work Performance Was Poor ....................................51

Post Termination, Mulcahy Withdraws and the Employee..................................64

Defendants are Forced to Find New Counsel to Represent Them ......................64

CONCLUSIONS OF LAW ....................................................................................69

i

A.   The Supreme Court's Pronouncement in *In re Grand Jury* ........................69

B.   The Third-Party Payer Relationship Initially Established with the Mulcahy Firm was in Compliance with *Grand Jury* (Factors 1-5) ..................................76

C.   The Evidence at Trial Established That ATG Committed to Pay the Employee Defendants' Legal Fees, Thus Triggering an Obligation to Seek Leave to Discontinue its Payment Obligation under *Grand Jury* (Factor 6) ....86

D.   The Issues in this Proceeding Have Already been Adjudicated in the Arbitration Between Mulcahy and ATG; Those Findings Have Preclusive Effect, or, at Minimum Should Inform this Court's Decision.........................104

E.   This Court Should Use its Inherent Authority to Sanction ATG for Failing to Disclose the Existence of the Arbitration Decision Four Years Ago..........121

CONCLUSION ....................................................................................................126

The Employee Defendants respectfully submit the below proposed Findings of Fact and Conclusions of Law following the bench trial that was held on August 8, 2022, August 30, 2022, and September 27, 2022.

## **INTRODUCTION**

After more than seven years of litigation – in a case that under State law was supposed to  have been resolved by way of an expedited summary proceeding – the testimonial and documentary evidence presented at the hearing confirmed what was clear from the beginning – that ATG Electronics, Inc. (ATG) committed to being a third-party payer of the Employee Defendants' legal fees in connection with the MaxLite litigation. Over the years, ATG has shifted its story, first claiming that its promise of litigation funding to the Employee Defendants was tied to their productivity and continued employment, then changing course to contend that it undertook no commitment to pay the Employee Defendants' legal fees whatsoever, and, when confronted with those irreconcilable positions at trial, shifting gears to argue that it paid the legal fees because of a "moral obligation" to help the Employees. Irrespective of labels and characterizations, all roads lead to one inescapable conclusion – ATG unequivocally undertook a funding obligation.

The testimony at the hearing reveals that ATG hired the Employee Defendants knowing that they had signed non-competition agreements with MaxLite, but nevertheless encouraged them to leave MaxLite for ATG and

1

promised to protect them in the event MaxLite sued, which it did.  Nick Ni, president of ATG, personally paid for a New Jersey attorney to review the MaxLite noncompete agreements, and believing that they were unenforceable in California, promised each of the Employee Defendants to protect and defend them, and to pay for all litigation costs should MaxLite sue. When that litigation ensued, Ni, on behalf of ATG, reiterated its commitment to cover the cost of litigation and directed the retention of attorney James Mulcahy to represent ATG and the Employee Defendants as a collective group.

The Employee Defendants and Mr. Mulcahy all consistently testified that ATG committed to paying legal fees on behalf of all parties. Mr. Mulcahy, the only disinterested witness at this hearing, testified, "it was my understanding that ATG was paying my fees to represent the three individuals and ATG"; that Ni "made it very clear that he was going to be undertaking the cost of defense for everyone because he had hired these people and told them that he was going to see to it that this issue was taken care of by paying the fees" and that he would not have undertaken the joint representation had it not been for ATG's commitment to fund the lawsuit because he understood that the Employee Defendants had no means to pay for his services.

In furtherance of its promises, ATG paid over $90,000 to the Mulcahy firm over the course of five months and, at each juncture, even when financial pressure

of its lenders began to mount, continued to reassure the Employee Defendants and Mulcahy that it would follow through with its funding commitment. As late as June 3, 2015, two weeks before terminating the Employee Defendants, Ni confirmed that ATG would pay the legal fees for the Employees and stated he would "find ways to ways to cover them in the coming months."

Despites its promises, when ATG believed that it could get dismissed from the MaxLite lawsuit on jurisdictional grounds, but might still be liable to pay the Employee Defendants' legal fees in New Jersey, it hatched a plan to get out from underneath its funding obligation by firing the individuals for the pretextual reason that their performance was inadequate. ATG wants this Court to believe that it fired three individuals at the same time for the same grounds of non-productivity at a time when ATG's lenders were breathing down its neck and it could not afford to show litigation fees on its books and when it believed it could be dismissed from the MaxLite lawsuit. The mere suggestion smacks of incredibility. To be sure, Mulcahy testified that just one day before he fired the Employees, Ni expressed concern that if ATG won the jurisdiction motion, Ni could still be responsible for paying their legal fees and asked "[w]hat if I fired the individuals? If they're no longer employed by me, then maybe I wouldn't have to pay their fees anymore and they would be on their own."

As further evidence that the termination was a mere pretext, ATG failed to offer a single piece of documentary evidence to substantiate its position, despite the naked assertion that numerous emails existed regarding the Employees' absence from the office and poor work performance (none of which were ever produced). Hard as ATG tried over the years to concoct a legitimate reason for the termination, Ni was forced to admit on cross-examination that he fired the employees to gain an advantage in the MaxLite litigation; to "ease the lawsuit pressure", "help with the settlement" and "get financial relief" from the mounting legal bills. ATG's unilateral discontinuation of funding is precisely what the Supreme Court of New Jersey sought to prohibit.

Our State's highest Court implemented protections and safeguards for clients who have  relied on third-parties' promise of litigation funding to ensure that payers do not interfere with the attorney-client relationship, use their purse strings to direct strategy, or leave clients stranded in the midst of litigation by unilaterally cutting off funding. *See In the Matter of the State Grand Jury Investigation*, 200 N.J. 481 (2009) (*Grand Jury*).  Recognizing that third-party payers may have interests that differ from those of the client - including an interest in minimizing the cost of the litigation – the Court in *Grand Jury* set forth the unequivocal rule that "[o]nce an employer commits to paying the legal fees and expenses of its employees, it scrupulously must honor that commitment" and "if the employer

wishes to discontinue paying the legal fees and expenses of . . . it may only do so by leave of court."  200 N.J. at 498-99.

The overwhelming evidence described at length below makes crystal clear that, as a matter of fact, ATG committed to being a third-party payer of the Employee Defendants' legal fees in connection with the MaxLite litigation. As a matter of law, as explained in this submission, the fact that ATG did not expressly commit to fund the MaxLite litigation in perpetuity or unconditionally, or make that agreement in writing, or consent to a specific attorney (Pashman Stein) is of no consequence.  *Grand Jury* does not impose any such requirements.

In fact, an employer's conditional payment of an employee's legal fees contingent upon productivity and continued employment – as ATG has sought to argue here – has the potential of creating the very conflict that *Grand Jury* was designed to eliminate by "dividing an attorney's loyalty between his client and his client's employer who will pay for the services," *Grand Jury*, 200 N.J. at 492. This Court has already expressed doubt that ATG's position is consistent with *Grand Jury* in this regard, noting that "it is not clear to the Court that In re Grand Jury would permit ATG to cease paying legal fees because ATG fired Employee Defendants." The Court's rejection of ATG's "payment of fees conditioned upon productivity/employment" theory is likely the catapult to its newly revised "payment of legal fees was a moral obligation" story.

5

Much like there is no requirement of a conditional versus an unconditional obligation, nothing in *Grand Jury* requires a third-party payer arrangement, including information relating to court leave to discontinue payment, to be in writing in order to be enforceable. Indeed, the retainer in *Grand Jury* itself contained no such language. If such a requirement were imposed, the mandates of *Grand Jury* would be applicable only in the rare instances where the third-party payer already agreed to do that which *Grand Jury* requires.  It simply is illogical.

Last but not least, the payer's selection of a specific attorney is not a prerequisite to trigger *Grand Jury*'s protections. Indeed, the Court explicitly stated that "no [] limitations on the choice of counsel should be communicated or imposed on the employee/client" by a third-party payer. *Grand Jury,* 200 N.J. at 497. As such, ATG need not have specifically agreed to pay Pashman Stein's fees. It committed to pay Mulcahy's fees and then fired the employees causing a conflict of interest in Mulcahy's continued representation of the joint parties, thereby rendering the Employee Defendants in need of new counsel. ATG cannot create an irreconcilable conflict that prompts the withdrawal of the attorney to which it agreed only to later declare that its funding obligation ceases because it never expressly agreed to the new nonconflicted counsel. Such a position would eradicate the protections of *Grand Jury*  and would  render the Supreme Court's decision a nullity. If this Court finds that ATG made a commitment to pay the

Employee Defendants' legal fees, it follows then, that ATG should "scrupulously honor that commitment," irrespective of the Employees' choice of counsel, until such time that ATG seeks leave to cease funding and can demonstrate good cause why its obligation should terminate, which it has not done here.

## FINDINGS OF FACT

### General Background

1.      Yaxi ("Nick") Ni is the founder and president of Defendant ATG Electronics Inc. ("ATG") (Ni Testimony 9/27/2022 Trial Tr. at 415:3-5.)  He started ATG in 2001 to manufacture and import LED lighting into the United States.  (*Id.* at 415:8-10.)  ATG is headquartered in California.  (*Id.* at 416:24-417:2.)

2.      Former Defendant James Steedly[1] began working at Plaintiff MaxLite Inc.'s ("MaxLite") New Jersey office as an engineer in 2009.  (ATG Exhibit ("ATG Exh.") 13 (9/16/2015 Employee Defendants' Verified Cross-Claim) ¶ 13.) His primary responsibilities were to evaluate the products of MaxLite suppliers and potential suppliers for quality and performance.  (*Id.*)

3.      Defendant Sophie Galleher began working in MaxLite's New Jersey office in May 2012 when she was 24 years old; it was her first job out of college.

---

[1]      The Court granted Pashman Stein Walder Hayden P.C.'s motion to withdraw as counsel for James Steedly on September 19, 2018 (Docket #234).

(Galleher Testimony 8/8/2022 Trial Tr. at 39:18-23; ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 20.)  She was initially hired as a business development analyst, later promoted to management associate, but was classified by MaxLite as an administrative assistant.  (Galleher Testimony 8/8/2022 Trial Tr. at 39:18-40:12.)  Ms. Galleher served as an assistant to MaxLite management, and her job duties included researching and updating marketing trends and acting as a liaison between various departments.  (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 21.)

4.      Defendant Matthew Kim began working at MaxLite in July 2013 as part of its sales team.  (Kim Testimony 8/30/2022 Trial Tr. at 316:24-24; 317:17-19.)  He was employed by the MaxLite New Jersey office but worked from home in Georgia.  (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 24.)

5.      MaxLite was also in the LED lighting business, with overlapping product lines and types of products.  (Galleher Testimony 8/8/2022 Trial Tr. at 42:2-43:7.)

**ATG Recruits  the Employee Defendants, With Full Knowledge of Their Non-Compete Agreements, and Promises to Defend Them from MaxLite**

6.      From sometime after March 2013, ATG, through Ni and former ATG president Art Tapia, began soliciting and recruiting former Defendant James Steedly and another MaxLite employee, David Wyatt, to come work for ATG. (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶¶ 13-14.)

8

7.      Over the next few months, Ni met with Steedly and Wyatt several

times, and Ni eventually offered Steedly employment at ATG, with promises of

profit sharing.  (Ni Testimony 9/27/2022 Trial Tr. at 444:16-23; ATG Exh. 13

(Employee Defendants' Verified Cross-Claim) ¶ 14.):

> Compensation wise, your base salary will be no less than you currently get, you will get paid for any new product that sells well, also for patents you may file on behalf of the company.

> Share percentage wise, my Chinese partner, who put down the cash for the new factory, and who has the connection to arrange bank loans for work capital, will take about 1/3 of the total, I will take another 1/3, our team members will take 1/3.  You and the sales guy you bring in will be top among the team part. This is what I have in mind right now, it will need to go through legal process as we get ready to sell

> I was in computer business in the 1990s in Bay Area, I saw many small start up companies went public and every body involved made a lot of money.  I will take ATG to that path, riding this powerful wave of LED light. I hope you can do it together with me.

(Employee Defendants' Exhibit ("ED Exh.") 1 (May 3, 2013 email from Ni

to Steedly and Wyatt).)

8.      Ni again offered "partnership" and becoming "original shareholders"

to Steedly and Wyatt if they would  leave MaxLite and join ATG:

> If you guys join me, handling US product and sales, I focus on handling supply side, we can make the company to the $50 million range and take it to NASDAQ in a few years. As original share holders, we can gain real financial freedom.  We can package good assests, like factories and land, into this to make it happen quicker.

> I saw similar oportunities in the computer business in the 1990s but did not quite make it;  today I look back and regret much of that.

> I will make it in this LED lighting business,.  I see you guys as very good partners for this business.  Let's think on it and see if a good arrangement can be made, and we act on it when we all see time is right.

(ED Exh. 2 (Aug. 4, 2013 email from Ni to Steedly and Wyatt).)

9.      During the meetings, Steedly and Wyatt expressed concerns over the non-compete provisions in their MaxLite contracts.  (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 14.)  Ni emailed Steedly and Wyatt to have their contract reviewed:

> Please have yor contract checked out;  making the move at end of 2013 or beginning of next year would be great timing.

(ED Exh. 3 (Aug. 11, 2013 email from Ni to Steedly and Wyatt).)

10.     Ni paid to have the MaxLite non-compete employment agreement reviewed by New Jersey attorney John Brink (Employee Defendants' Verified Cross-Claim ¶ 15):

> I am having a check mailed to your address today, lets get the opinion from the New Jersey lawyers first.

(ED Exh. 4 (Aug. 22, 2013 email from Ni to Wyatt and Steedly).)
Ni was eager to review the New Jersey attorney's opinion:

> Did John Brink finish review your contract?  Can you please forward me his findings?

(*Id.* (Sept. 3, 2013 email from Ni to Wyatt and Steedly).)

11.     At trial, Ni confirmed that he paid for the review of the MaxLite non-compete by the New Jersey attorney using $1,500 of "my personal money from my pocket."  (Ni Testimony 9/27/2022 Trial Tr. at 446:16-17; 450:5-11.)  Ni also

10

acknowledged that he reviewed and "saw the actual attorney's opinion" and that

his impression of it was that the non-competes in the MaxLite contracts were

unenforceable.  (*Id*. at 450:12-18.)

> Q.   But your impression is that it would not prevent them from joining;
>      correct?
>
> A.   Yes.
>
> Q.   And your understanding, sir, at the time, was that these kind of
>      restrictive covenants could not be enforced in California; isn't that
>      right?
>
> A.   Yes.
>
> Q.   And you and Mr. Wyatt and Mr. Steedly, you wanted to make sure
>      that that would be true under New Jersey law, as well, and that's why
>      you had a New Jersey attorney check it out; correct?
>
> A.   Yes.

(*Id.* at 451:22-45:8.)

12.     Over the course of their meetings, Steedly expressed concern that

MaxLite was known to have sued or threatened to sue former employees; Ni

assured him that ATG was in business "for the long haul," that their "partnership"

would be a "long-term relationship" and that in any potential dispute with

MaxLite, ATG would fully protect him "through to the end."  (ATG Exh. 13

(Employee Defendants' Verified Cross-Claim) ¶ 18.)

13.     Ultimately satisfied with the review of the MaxLite non-compete

agreements, on October 10, 2014, Ni sent Steedly an employment offer.  (ED Exh.

6 (10/10/2014 email from Ni to Steedly).)  Steedly, relying on Ni's promises that

ATG would provide full legal protection in the event of any dispute with MaxLite,

11

agreed to leave MaxLite to go work for ATG.  (ATG Exh. 13 (Employee

Defendants' Verified Cross-Claim) ¶ 19.)

14.     Defendant Sophie Galleher came to learn of ATG in September 2014

through Art Tapia, who told her that she would be a "great fit" for ATG.  (Galleher

Testimony 8/8/2022 Trial Tr. at 42:8-16.)  Tapia set up a meeting between

Galleher and Ni, which was followed by several lengthy meetings and several

phone calls.  (*Id.* at 42:12-22.)

15.     Ni was fully aware of the non-compete provisions in the MaxLite

contracts, including in Ms. Galleher's own, and they had "extensive conversations"

about the restrictive covenants.  (*Id.* at 44:10-25; 46:13-47:2.)  Galleher told Ni

that MaxLite takes the restrictive covenants "seriously" and that made her

"nervous about joining ATG."  (*Id.*)  In response, Ni indicated that he knew about

the risks and would protect her if necessary:

> A.     . . . . And Nick, he assured me that it wouldn't be an issue.  And then
>        in fact he told me – when I showed him my contract, he goes: Don't
>        worry, I've already had this reviewed.  I paid for an attorney to review
>        it.  This won't be an issue.  If there is ever a problem, ATG will take
>        care of you and defend you.

(*Id.* at 45:1-6; *see also* 47:3-9.)

16.     Galleher testified that while Ni's assurances were not put into writing,

he made "multiple, multiple verbal assurances" over many meetings and

discussions and that she believed him.  (*Id.* at 51:21-52:20.)

Q.   I'd like to understand whether . . . you thought about it or whether there were any discussions about whether to memorialize those representations or not.

A.   Yeah.  To me it felt like Nick was giving some assurances of this. You know, these two-hour lunches, these long conversations over the phone, that the assurances seemed so clear that it almost seemed not as necessary because he said it multiple times: Non-competes aren't enforceable in California.  He said, "This isn't going to be an issue, and if it is, we will defend you," and those assurances were so strong to me.  And he was simultaneously recruiting me with all the other enticing ideas.  I really trusted him at that moment, so it didn't really seem so necessary.

(*Id.* at 52:3-20.)

17.   Galleher testified in no uncertain terms that she relied on Ni's promises to protect her and pay legal fees should MaxLite sue and that she "would not have joined ATG if not for those promises." (*Id.* at 45:12-14; 46:6-11.)

18.   Ni offered Galleher employment as ATG's Director of Sales and Marketing in October 2014, which Galleher ultimately accepted.  (ED Exh. 7 (10/4/2014 email from Ni to Galleher).)

19.   Defendant Matthew Kim was recruited by ATG starting in November 2014.  (Kim Testimony 8/30/2022 Trial Tr. at 318:21-319:9.)  Towards the end of November, ATG flew Kim to their office in California for several days to recruit him and meet with Ni.  (*Id.* at 319:10-17.)  ATG paid for the flight and hotel expenses.  (*Id.* at 319:18-320:2.)

13

20.    Kim's first meeting with Ni lasted over two hours, and they discussed, among other things, ATG's business, Ni's future plans, Kim's experience and sales ideology, and Kim's MaxLite contract.  (*Id.* at 320:5-18.)

21.    Kim was concerned about the non-compete provisions in his MaxLite contract and raised his concern to Ni.  (*Id.* at 320:17-18; 321:25-4.)  Ni responded that "his attorneys had reviewed the same contract in the past, that it was something that he's not concerned with" but Kim "insisted on sending him a copy anyway, just to be sure."  (*Id.* at 322:15-21.)  Ni testified that he understood Kim was "concerned about his non-compete with MaxLite."  (Ni Testimony 9/27/2022 Trial Tr. at 453:2-5.)

22.    Ni assured Kim about the non-compete, saying "Don't worry," "It's not a big deal," and "It's not something to be concerned about."  (Kim Testimony 8/30/2022 Trial Tr. at 322:22-25.)

23.    Ni promised Kim that if MaxLite "took legal action" ATG would pay the costs to defend him:

> A.    Yes.  During that conversation I had – again, I had raised concern about the contract I had with MaxLite.  He reiterated that it was not a concern and that if any legal action were to arise that he would take care of it and that it's not something that we should be concerned about, that him and ATG would be paying for all of it.

(*Id.* 326:12-17.)

24.    Kim emailed a copy of his "non-compete" agreement to Ni:

Nick -

As discussed, here is a copy of my current non-compete agreement. I will send you my notes tomorrow in a follow up email.

Have a great night!

Matt

(ED Exh. 8 (12/6/2014 email from Kim to Ni); *see also* Kim Testimony 8/30/2022 Trial Tr. at 323:1-25.)

25.     Ni did not respond specifically to that email, as he had "iterated prior that he had already seen it and it's not a concern" because "[h]e thought that it was unenforceable and that it's not something that would get us into any sort of trouble or kind of hurdle that he wouldn't be able to kind of take care of." (*Id.* at 324:5-17.)

26.     Ultimately, Ni offered Kim a job at ATG as senior national accounts manager which Kim accepted. (ED Exh. 9 (12/19/2014 email from Ni to Kim); Kim Testimony 8/30/2022 Trial Tr. at 326:18-327:6.) Kim was not looking for another job when ATG contacted him. (*Id.* at 327:17-20.)

27.     At trial, Kim testified he would not have left his job at MaxLite without Ni's promise that ATG would protect him and pay his legal fees if MaxLite sued:

> Q.     So given your non-compete, would you have agreed to leave MaxLite to work for ATG without Mr. Ni's promises that ATG would protect and cover your legal fees – protect and pay for your legal fees?

A.    No, I wouldn't have switched companies, especially to someone that's considered a competitor, without that sort of assurance.

(*Id.* at 328:3-9.)

28.    Based on exhibits and testimony, the Hon. Joseph R. Brisco (Ret.) in his Amended Final Arbitration Award ("Arb. Award"), dated May 10, 2018, found that "the evidence clearly establishes that Mr. Ni did, in fact, solicit the Employees. And Mr. Ni hired the Employees with knowledge that their employment contracts with Maxlite, Inc. contained non-compete clauses. Nevertheless, he went forward with the hires because he obtained an opinion from an attorney that the non-compete clauses were unenforceable in California."  (ED Exh. 33 (Arb. Award citing exhibits and the testimony of Nick Ni).)

**When MaxLite Threatened to Sue, and Subsequently Sued ATG and the Employee Defendants, ATG Confirmed Its Promise to Protect the Employee Defendants, and Hired Counsel to Represent All Parties Collectively**

29.    On or around February 9, 2015, Steedly, Galleher, and Kim all received "Cease and Desist" letters from MaxLite demanding that they terminate their positions with ATG by February 12, 2015.  (ED Exh. 88 (2/10/2015 email chain attaching Cease and Desist letter); ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 29.)  A Cease and Desist letter was sent to ATG also, but Ni never saw it.  (ED Exh. 33 (Arb. Award citing testimony of Nick Ni).)

30.    Upon receiving these letters, Galleher immediately contacted Ni. (Galleher Testimony 8/8/2022 Trial Tr. at 55:1-4.)  They discussed the possibility

16

of litigation, and Galleher stated to Ni: "Nick, this could be very expensive.  You know, I'm not prepared to move forward."  (*Id.* at 55:5-8.)  Ni responded, "Don't worry, you're doing an excellent job.  I just want you to stay focused on work.  ATG will take care of everything.  Just focus on work and ATG will handle the lawsuit."  (*Id.* at 55:11-14.)

31.     Galleher testified: "I think maybe – I would not have continued to stay with ATG past the cease and desist letter without that promise.  I would not have engaged in – gone forward to stay with ATG after I received the cease and desist letter."  (*Id.* at 55:15-22.)

32.     On February 9, Galleher forwarded the cease and desist letters to California attorney James Mulcahy,[2] to see if he could assist ATG and the Employee Defendants.  (*Id.* at 57:7-25.)  Ni directed Galleher to call him and hire Mulcahy to handle the matter:

> Sophie,
>
> Give me a call to discuss this.  We should have Jim help us get this handled.
>
> Nick

(ED Exh. 10, 37 (2/9/2015 email from Ni to Galleher).)

---

[2]     Galleher had met Mulchay through a referral from her father, an attorney, using a boutique lawyer network, and had met with him briefly in October 201 for a 15-minute free of charge consultation about her MaxLite contract.  (Galleher Testimony 8/8/2022 Trial Tr. at 57:11-59:7; *see also* Mulcahy Testimony 8/29/2022 Trial Tr. at 165:25-169:13.)

33.   In her email to Mulcahy, which copied Ni, Galleher wanted to know how to proceed in response to the cease and desist letters and stated, "the issue is time sensitive, so we are looking to set something up relatively quickly. However, Nick and I would also like to arrange a meeting with you to go over some other in-house matters . . . ."  (ED Exh. 37.)

34.   That same day, on February 9, 2015, Mulcahy, copying Ni, responded to Galleher and laid out his thoughts on the MaxLite letters, including the possibility of filing a "preemptive action for declaratory relief" in California.  (*Id.*) Less than an hour later, Galleher responded, thanking Mulcahy for his "detailed consideration" and stating, "I will discuss with Nick, and we will call you to review our options."  (*Id.*)  During the call, Galleher said "You know, this is litigation. It could be expensive" and they discussed fees and the cost of litigation. (Galleher Testimony 8/8/2022 Trial Tr. at 64:18-19.)  Ni repeated his promise to defend and pay legal costs:

Q.   What did he say in response to your expressed concern?

A.   Yeah. Nick said, "You know, don't worry. This isn't an issue. ATG will take care of this. Just go ahead and work with Nick [sic] and we will – ATG will cover the bills, we'll cover all the legal costs," and that was made very clear. I think, to reiterate, I was very concerned about it in that phone call because I was aware of the risks of litigation, and at that point we saw an opportunity to not get involved with litigation and maybe take a different path. So when Nick told us he would – that ATG would take care of it, you know, I felt that we were safe moving forward.

(Galleher Testimony 8/8/2022 Trial Tr. at 64:20-65:6.)

35.     On February 11, 2015, Mulcahy set up a conference call for all the
Employee Defendants and Ni.  (ED Exh. 11 (2/11/2015 email from Mulcahy to
Galleher and Ni).)  Ni responded with an email to Galleher, Steedly, and Kim,
stating:

> Sophie,
>
> Please go ahead work with Jim McIcahy, I am sure he can get this handled properly for us, this
> kind of thing happens a lot.
>
> Nick

(*Id.*)

36.     Galleher understood Ni's email to mean that she "should work on
behalf of ATG with Jim Mulcahy, that we should move forward with pursuing one
of those strategies that Mulcahy had previously outlined in his e-mail and that Nick
was directing me to do that."  (Galleher Testimony 8/8/2022 Trial Tr. at 69:3-15.)

37.     Ni directed Galleher to be ATG's point of contact with Mulcahy
regarding the litigation.  (*Id.* at 71:24-72:8 ("He really directed me to handle it,
handle – on behalf of ATG to handle a lot of the communications. So I was at that
point kind of a liaison for ATG."); *see also* 83:10-17.)  At all times, Galleher was
taking direction from Ni.  (*Id.* at 72:3-4; Mulcahy Testimony 8/29/2022 Trial Tr. at

175:9-18 ("The answer is that I understood that Mr. Ni was calling the shots, but he also had designated Sophie Galleher as my point of contact, at least in the initial stages, until I met him.").)

38.     On or around February 12, 2015, Ni, Galleher, Kim, and Steedly received an engagement agreement and conflict waiver from the Mulcahy Firm, addressed to all of them, requesting a $5,000 retainer.  (ED Exh. 38 (2/12/2015 email from Mulcahy firm to Galleher attaching engagement agreement and conflict waiver letter).)  Each of the Employee Defendants executed the engagement agreement and conflict waiver, and ATG officer Eric Cai signed each on behalf of ATG.  (Galleher Testimony 8/8/2022 Trial Tr. at 76:2-17.)

**The Evidence Demonstrates that ATG Committed to Paying the Employee Defendants' Legal Fees and Did Pay a Substantial Portion of those Fees**

39.     The engagement agreement did not specify who would be paying the legal fees.  (*Id.* at 76:18-19; ED Exh. 38.)  However, Ms. Galleher's testimony made clear that her understanding was always that ATG would be paying the legal bills on behalf of everyone, based on what Ni had told her:

> Q.     Did you have any discussions with Mr. Mulcahy, with or without Mr. Ni present, where the issue of who would be paying fees was discussed? And I'm in the time period before the engagement letter was sent.

> A.     Yeah. Jim and I had conversations that ATG would be paying the bills.  We did not have extensive discussions about billing because, you know, **I was under the impression that Nick was paying. That's what Nick had conveyed to me**.

20

(Galleher Testimony 8/8/2022 Trial Tr. at 73:4-12 (emphasis added).)

40.     Mulcahy's testimony corroborated Galleher's understanding:

Q.     And at the time that you were retained, did you have an understanding of who was responsible for paying your legal fees?

A.     Yes, I did.

Q.     And if you don't mind, tell the Court what your understanding was and how you came to have that understanding

A.     **It was my understanding that ATG was paying my fees to represent the three individuals and ATG**. It was very clear to me that the individuals were not going to be paying my bill because they didn't have the money for it.

       Number two, it was my understanding because **Mr. Ni**, you know, at a later point I think in -- when I first met with him, **made it very clear that he was going to be undertaking the cost of defense for everyone because he had hired these people and told them that he was going to see to it that this issue was taken care of by paying the fees and retaining a lawyer, me in this case**.

(Mulcahy Testimony 8/29/2022 Trial Tr. at 176:7-23 (emphasis added).)

41.     Mulcahy further elaborated that he would not have agreed to take this

case if the Employee Defendants, rather than ATG, was responsible for paying the

legal fees:

Q.     If you thought that the employee defendants were responsible for paying your fees and not ATG, would you have taken the case?

A.     I would not have taken the case because they were not responsible for making the payments on my fees. When I say "not responsible," I mean I knew that they didn't have any money and they told me that they didn't, and I would not have taken the case if I needed to rely on them.

(*Id*. at 178:3-10.)

21

42.     Mulcahy's testimony was clear that ATG had committed to paying the

Employee Defendants' legal fees:

> Q.     At the time of your receipt of this e-mail, did it remain your understanding that Mr. Ni was committed to paying the attorney's fees for ATG and the individual defendants?
>
> [Objection and colloquy omitted]
>
> Q.     [The Court]: Mr. Stein, can you rephrase the question, please.
>
> Q.     [Mr. Stein] . . . . Was it your understanding that ATG had committed to paying all the legal fees in connection with the MaxLite dispute . . . and if so, explain the basis for that understanding.
>
> [Objection and colloquy omitted]
>
> A.     Yes, that was my understanding. The bases for my understanding are as follows:
>
>> Number one, **there were e-mails confirming the fact that Ni was going to be responsible for all of the litigation expenses, including my fees**. And I remember him saying in his e-mails that, "Don't worry. I'm going to see to it that Jim takes care of everything."
>>
>> And this is another e-mail where he is confirming that he is going to pay the ATG fees and he's also saying that he's going to pay for the individuals. But in addition to that, that's what Galleher told me when she first came, "That's what Ni told me when we were talking about the bills."
>>
>> I said to him that it's going to get very expensive, and he never talked about the individuals as opposed to ATG. Instead **what he had said was, "I'm gonna get caught up with your bills and I will be paying all of the bills because I am the one who is responsible for the costs**."
>
> (*Id.* at 192:14-194:11 (emphasis added).)

43.     Mulcahy affirmed the entirety of his prior certification, dated October

29, 2015, submitted in this case, which stated in relevant part that "**my**

**understanding has always been that ATG had agreed that it 'would be**

**subsidizing the legal fees and costs of this litigation for itself and the**

**Individual [Employee] Defendants**.'"  (Mulcahy Testimony 8/29/2022 Trial Tr.

at 233:24-234:11 (emphasis added); ED Exh. 89 ¶ 4.)

44.    Kim's testimony likewise corroborates the understanding by all

parties that ATG committed to paying the legal fees.

> Q.    And in signing this engagement agreement, **was it your understanding that ATG would be paying all the costs on your behalf?**
>
> **A.    That was my understanding at that time.**
>
> **Q.    Is that based on what Mr. Ni told you?**
>
> **A.    That is based on what Mr. Ni had told me. I had no reason to believe otherwise**.
>
> Q.    And did anyone from Mr. Mulcahy's law firm ever ask you personally for any payment of attorney's fees at any time?
>
> A.    No, they never asked me nor did they ever imply.
>
> (Kim Testimony 8/30/2022 Trial Tr. at 335:1-10 (emphasis added).)

45.    Even Ni's own testimony on cross-examination, inconsistent as it was,

admitted several times that ATG was going to pay the Employee Defendants' legal

fees as long as they were "productive."

> Q.    By sending this, you were expressing that as long as they did their work at ATG you would continue paying their legal bills?
>
> A.    We would have continued to help them. We have been helping.
>
> Q.    When you say "help," you mean paying their legal bills; correct?
>
> A.    It's part of it.
>
> Q.    That's a part of it, did you say sir?
>
> A.    It's part of their legal bills we have been helping pay.

(Ni Testimony 9/27/2022 Trial Tr. 461:1-10.)

Q.      Does this refresh your recollection that your intent was to pay their legal fees if they were productive at their jobs?

A.      I would have continued to help them out.

Q.      When you say "help them out," again, sir, you do mean pay their legal fees; correct?

A.      Yes, pay Mulcahy.

(*Id.* at 465:22-466:2.)

46.      Ni took the same position during the arbitration against Mulcahy, with the arbitrator finding: "Even Mr. Ni himself testified that he was going to pay the legal fees as long as the Employees were productive. (Testimony of Mr. Ni.)" (Exh. 33 at 7 (Arb. Award); *see also* Mulcahy Testimony 8/29/2022 Trial Tr. at 180:9-23 ("Q. And were you present when Mr. Ni gave his testimony at the arbitration? A. Yes, indeed I was. Q. And does this accurately reflect Mr. Ni's testimony at the arbitration? A. I believe – the answer is yes, I recall that he took that position.").)

47.      That ATG at the very least committed to paying the legal fees so long as the Employee Defendants were productive – was consistent with the record documentary evidence presented at trial.  On cross-examination, Ni was confronted with ATG's initial Opposition to the Employee Defendants' Order to Show Cause, dated October 16, 2015 (pg. 20), which stated:

The exhibits produced by the individual defendants make clear that ATG's gratuitous **payment was always connected with the individual defendant's continued employment with ATG**.

24

\*\*\*

The individual defendants **no longer work for ATG, and therefore the condition of payment is no longer satisfied**.

(Ni Testimony 9/27/2022 Trial Tr. 457:18-458:8 (emphasis added).)

Ni could not explain this written position identifying the payment of fees as conditioned on continued employment with ATG, which stood in direct contrast to his contrary position that ATG made "no commitment" to pay fees whatsoever, giving responses that this Court found "not exactly responsive." (*Id.* at 458:9-459:7.)

48.    Ultimately, Ni could not reconcile the contrasting positions, and he simply admitted that ATG could no longer afford to pay the legal fees:

Q.    So, Mr. Ni, I'm asking you why it says this.

A.    Work for ATG or not work for ATG, we just couldn't afford continue to help.

Q.    Do you have anything else to say to explain this statement, sir?

A.    We just couldn't afford [to] help anymore.

(*Id.* at 459:9-14.)

49.    Ni was confronted with his prior deposition testimony, which also contradicted his position at trial that ATG made no commitment whatsoever to pay legal fees:

Q.    My question is: Here in your deposition testimony under – which is your sworn testimony under the penalty of perjury, sir, you [said]:

> They are no longer working for ATG. ATG has no obligation to pay their legal bill. You say: Once they are no longer working for ATG, we would have no obligation.

> So your position is that when they're not working for ATG, ATG would no longer have an obligation to pay their legal bills; isn't that correct, sir?

A.     This would be more like a moral obligation to my understanding. From day one we didn't have obligation; just help them.

Q.     Did you say it was a moral obligation, sir?

A.     Yes, it's more like – morally, I feel bad. These are poor employees. They live paycheck to paycheck. This is massive lawsuit and huge legal bills they couldn't afford . . . so I helped them out.

(*Id.* at 467:6-24.)

50.     Unable to explain his prior deposition testimony – using his own words – about ATG's "obligation to pay their legal bill" being extinguished once "they are no longer working for ATG," Ni instead attempted to characterize the "obligation" (for the very first time during this 7-year-old litigation) as a "moral obligation."  (*Id.*)  Ni testified several times that he "felt bad" for the Employee Defendants, and that they were "poor people" – but beyond that, could give no further explanation as to why he had described ATG's payment of legal fees as an "obligation" during his deposition.  (*Id.* at 467:25-469:25.)

51.     Mulcahy agreed that ATG had undertaken an obligation to pay the legal fees, but disputed that the obligation was conditioned on continued employment with ATG (in conformity with Galleher's and Kim's testimony):

A.     It was accurate in that **Mr. Ni made very clear to me that he was going to pay the legal fees for the employees. He never qualified**

26

**that by saying only if they were productive. He never said that. He simply said: I hired these people, I knew there was a potential for a problem, and I'm going to cover their fees**. There are a number of e-mails that came my way where he suggested that they need not worry because he was going to have me handle everything and he would be taking care of the cost.

(Mulcahy Testimony 8/29/2022 Trial Tr. at 182:4-14 (emphasis added).)

52.    Consistent with ATG's promise to fund the litigation, it is undisputed that "ATG paid Mulcahy's initial retainer fee on behalf of ATG and all of the employee defendants."  (Ni Testimony 9/27/2022 Trial Tr. at 454:10-13; *see also* Mulcahy Testimony 8/29/2022 Trial Tr. at 184:10-13 (ATG paid the initial retainer).)

53.    On or around February 17, 2015, the Employee Defendants learned from Mulcahy that on February 12, 2015, one day prior to Mulcahy's filing of his Complaint in California, MaxLite had won the race to the courthouse and filed a Verified Complaint for Specific Performance, in the District of New Jersey, naming ATG, Galleher, Kim and Steedly as defendants.  (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 35; Galleher Testimony 8/8/2022 Trial Tr. 78:11-79:2.)

54.    The following day, Galleher conveyed the news to Ni in an email, stating "I spoke to Jim yesterday. Unfortunately MaxLite filed a lawsuit in New Jersey right after they sent us letters. . . . This is not worst case, but it does make matters a bit more complicated and time consuming because now we have to argue

27

for jurisdiction."  (ED Exh. 14 (2/18/2015 email from Galleher to Ni).)  Ni's

response was:

> **Nick Ni**
>
> To Sophie Galleher
>
> Sophie,
>
> Let's work with Jim to get this handled.
>
> I will talk to you on this later today.

(*Id.*)

55.     Galleher, upon receiving this email, understood it to mean that "Nick

was directing me to go take care of the litigation, you know, with his and ATG'

support to move forward, that MaxLite had filed a lawsuit and . . . now that we

were defendants that ATG was continuing to direct me to move forward."

(Galleher Testimony 8/8/2022 Trial Tr. at 83:7-17.)  At trial, Galleher testified that

she would have considered leaving ATG at that time based on MaxLite's lawsuit,

but stayed relying on ATG's promises to defend her:

> Q.     When you say MaxLite was seeking specific performance, if you
>        recall, can you elaborate so that we all understand what you mean by
>        that?
>
> A.     Yeah, so what Mr. Mulcahy had conveyed to me was at that point the
>        primary issue was the fact that we were employed with ATG. So if we
>        were going to -- if MaxLite won, we would have to stop working at
>        ATG. That was sort of the -- you know, we could basically leave ATG
>        and that wouldn't be an issue. . . .

> Q.     Let me ask you this: At this point in time did you consider leaving ATG as a consequence of having received these threatening letters and then a lawsuit?
>
> A.     If Nick had not conveyed to me that ATG was supporting the lawsuit, I think I would have taken a different strategy than, you know -- if it had been any sort of messaging that ATG was not the one funding the lawsuit, I wouldn't have – I would have considered different options.
>
> Q.     Like what options –
>
> A.     Like I would have considered not working at ATG anymore. I would have considered leaving ATG at that time.

(*Id.* at 84:1-22.)

56.     Galleher testified that she and Ni spoke per Ni's email and he repeated, in sum and substance, "Let's just go ahead, get this handled, ATG has it covered, and he continued to direct me to work with Jim to respond to the lawsuit."

(*Id.* at 85:7-10.)

57.     The next day, February 19, 2015, Ni sent an email to all the Employee Defendants:

| Nickn | | |
|---|---|---|
| To sophieg@atgelectronics.com, jamess, 'Matt Kim' | | 2015-02-19 09:28  Show Detail |

Sophie, James, Matt,

Please don't worry about this lawsuit thing, this kind of thing happens everyday, Maxlite just wants to make it difficult for you, they know they will not get anywhere - the laws are just not on their side.

Jim Mulcahy will have this handled for us, no big deal, we should not be distracted from what we do.

(ED Exh. 15 (2/19/2015 email from Ni to Galleher, Kim, and Steedly).)

58.    Galleher understood this email as "a further iteration of what he had previously said to me on the phone, just a follow up, now also including James and Matt into the conversation, again reassuring us that ATG would handle everything and that we should just continue to work forward and move forward." (Galleher Testimony 8/8/2022 Trial Tr. at 86:1-7.) 8/

59.    Kim had a similar understanding of what the email meant: "It's reiterating kind of the same theme we've had throughout the entire month, which is 'Don't worry about it. We're taking care of it. You need to focus on your job so we're taking care of all the legal side of it,' to not worry about it." (Kim Testimony 8/30/2022 Trial Tr. at 337:2-7.)

60.    Kim responded to Ni's email that same day, stating:

**Matt Kim**
To Nickn, sophieg@atgelectronics.com, jamess

Nick -

**Thanks for your support in this matter.**

**Happy new year!**

(ED Exh. 17 (2/19/2015 email from Kim to Ni).)

61.    Kim testified that his email was meant to convey his thanks to ATG for defending him and paying his legal costs: "So, I mean, he had reiterated several times that he was taking care of any potential legal repercussions, any legal fees,

30

anything that has to do with this case; and I was grateful that it's not something I had to worry about because you get sued, you kind of worry." (Kim Testimony 8/30/2022 Trial Tr. at 338:5-10.)

62.     Former defendant Steedly sent a similar response:

> **jamess@atgelectronics.com**
> To Nickn, sophieg, Matt Kim
>
> Nick
>
> thank you for all the support , i apreciate all that you are doing for us .

(ED Exh. 16 (2/19/2015 email from Steedly to Ni).)

63.     At trial Ni testified that he understood both Kim's and Steedly's email responses to mean that he was being thanked for paying their legal fees:

> Q.     You understood that the employees were thanking you, at least in part, for paying for their legal fees at the time; correct?
>
> A.     Yes. I was helping out.

(Ni Testimony 9/27/2022 Trial Tr. at 456:10-3.)

64.     Mulcahy's bills were addressed to Ni at ATG, and ATG paid those bills, on behalf of itself and the Employee Defendants: "In total, ATG paid legal fees to MLF [Mulcahy Law Firm] in 2015 on behalf of itself and the employees as follows: The initial retainer of $5,000.00, the April invoice for $8,688.00, a May payment of $40,000.00, a June payment of $15,000.00, an August payment of $2,500.00 and a September payment of $2,500.00 (ED Exh. 33 at 8 (Arb Award);

see also ED Exh. 27 (May 2015 Mulcahy invoice reflecting payments by ATG);

ED Exh. 28 (June 2015 Mulcahy invoice reflecting payments by ATG); ED Exh.

30 (July 2015 Mulcahy invoice reflecting payments by ATG).)  Additional

payments by ATG to Mulcahy are reflected in checks including $2,500.00 dated

July 20, 2015, $2,500.00 dated October 30, 2015, $2,500.00 dated November 30,

2015, $2,500.00 dated January 5, 2016, $2,500.00 dated January 28, 2016,

$2,500.00 dated February 26, 2016, and $2,500.00 dated March 24, 2016.  (ED

Exh. 78 (checks from ATG to the Mulcahy Law Firm).)

65.     In sum, **ATG paid Mulcahy over $90,000 in legal fees on behalf of

itself and the Employee Defendants, including payments continuing to be

made <u>after</u> the Employee Defendants' September 16, 2015 Order to Show

Cause, *where ATG took the position that it no longer had to pay the Employee

Defendants' legal fees*.  (*Id.*)**

66.     The testimony of virtually all the witnesses at trial all confirm that

ATG paid Mulcahy's monthly invoices, with no contribution expected nor received

from the Employee Defendants.  Mulcahy, when asked "to the extent you were

paid for the work you performed, who made the payments?" responded, "ATG

made the payments."  (Mulcahy Testimony 8/29/2015 Trial Tr. at 185:23-24.)

Mulcahy further testified:

> Q.     Did the employee defendants ever make any payment on your
>        invoices?

A.    No, they did not.

Q.    Did you ever ask them to?

A.    No, I didn't.

Q.    Did you ever expect them to pay any portion of your invoices?

A.    No, I did not.

(*Id.* at 187:15-22.)

67.    Mulcahy was asked about an email from Ni addressed to him dated

June 3, 2015, stating:

> Thanks for working with me on this, I will arrange to pay as fast as I can.  As I said in our meeting last week, we will pay ATG's part first, I will start sending you payment next week.
>
> Please allow me time for bills for the individuals, I will find ways to cover them in the coming months.

(ED Exh. 53 at 3-4.)

Notably, this email demonstrates that even as of June 2015, Ni was stating in

writing his intention of paying the Employee Defendants' legal costs "in the

coming months." (*Id.*)  About the email, Mulcahy testified as follows:

Q.    Did you ever separate out your time for ATG on the one hand and the individual defendants on the other?

A.    No, I never did. We never talked about the individuals as opposed to ATG. This is something he sent to me. The only discussion we had, and specifically on May 26th, was that we have a bill and ATG needs to pay it and it's going to be more expensive and I didn't want him to get behind on that. We didn't talk about a bill for the individuals as opposed to a bill for ATG. Everything was ATG.

(Mulcahy Testimony 8/29/2022 Trial Tr. at 191:17-25.)

68.     Kim's testimony was corroborative:

    A.     I have never paid any amount. I don't believe I've seen a bill.

    Q.     As far as you know, who was footing the bill?

    A.     ATG had been paying the bill.

    Q.     You said – did you just testify, sir, that you never received any invoices from the Mulcahy firm?

    A.     I don't recall ever receiving any invoice or request of payment.

(Kim Transcript 8/30/2022 Trial Tr. 338:18-25.)

69.     Galleher's testimony was also corroborative:

    Q.     Did anyone from ATG ever ask you to contribute to any retainer to the Mulcahy firm?

    A.     No. I mean, it was the exact opposite. It was just that – you know, Nick kept saying that ATG will handle this. There's no indication that there was gonna be a separation of fees. It was just: We'll take care of this, forward it to accounting. And then I don't think I really saw many bills after that, you know, that initial communication about billing.

    Q.     Did anyone from the Mulcahy firm ever ask you or leave you with an impression that it expected you to contribute in any way to its legal fees?

    A.     No one from the -- Mulcahy and no one at his firm ever expressed that I was directly responsible for legal fees. I mean, I was 27 years old, I think. I wasn't gonna be paying the high legal fees.

    Q.     And who did Mulcahy send his invoices to, if you recall?

    A.     I don't think -- I think he sent them just directly to ATG accounting. I might have received an early on invoice but I wasn't receiving invoices and I think probably to Anna or someone else in accounting. I'm not sure how they ended up working that out after the initial retainer was sent.

(Galleher Testimony 8/8/2022 Trial Tr. at 87:21-88:17.)

34

70.    Galleher further testified that at no point, even after her termination,

did Mulcahy ever seek payment from the Employee Defendants.  (*Id.* at 124:8-13.)

71.    Finally, even Ni's own testimony is corroborative:

>    Q.    And you admit also that when ATG paid Mr. Mulcahy's legal
>          bills, that each time it paid its legal bills, ATG paid on behalf of
>          itself and all the employee defendants, as well; correct?
>
>    A.    Yes.

(Ni Testimony 9/27/2022 Trial Tr. at 454:14-18.)[3]

**As the Litigation Proceeded, the Legal Fees**
**Grew and ATG Faced Mounting Pressure From**
**Banks and the SBA While Trying to Finance a New Building**

72.    As the litigation against MaxLite proceeded, ATG's legal fees

mounted and Ni, feeling financial pressure from banks while trying to obtain

financing for ATG's new building, emailed Galleher on April 21, 205:

>    Do you have an update for the lawsuit?
>
>    Jim's bill is over $70k now? Please tell him we will pay early next month.  We are working with a
>    bank to finance our new building, and need to show them a balance as high as possible, like over
>    a million dollars.

(ED Exh. 21 (4/21/2015 email from Ni to Galleher) *see also* ED Exh. 40

(4/17/2015 email from Galleher to the Mulcahy Firm (asking if the bill can be paid

---

[3]    Ni later bizarrely and inconsistently claimed that ATG sometimes paid only its own
portion of Mulcahy's bill, and that some of Mulcahy's invoices separated out charges to each
Employee Defendant and were sent separately to them. However, he could not identify any such
invoices nor explain why they were not produced or given to his lawyers during this litigation.
(*Id.* at 463:2-464:23.)

by credit card or delayed until May because "[w]e are in the middle of attempting to extend the credit line to purchase a new building, so we are trying to keep the amount in our account as high as possible.").)

73.    Galleher testified that she learned of these "financing issues" around April 2015.  (Galleher testimony 8/8/2022 Trial Tr. at 92:10-17.)  In response to Ni's email, Galleher updated Ni on the lawsuit.  (*Id.* at 92:18-93:1.)  Ni's reply was "Don't worry, this isn't an issue. This is just a financing issue but ATG had – we have you covered, we have funds. The lawsuit isn't going to be an issue" and Galleher did not have the impression that Ni was re-thinking his promise to fund the litigation.  (*Id.* at 93:2-94:24.)

74.    On May 10, 2015, Ni emailed Galleher again:

Tomorrow, Monday, I would like to get together with you for an update on the lawsuit with Maxlite, and I need to talk to Jim on our strategy moving forward.

I understand Jim's bill is bigger than we expected and it is beoming a substantial investment on ATG's part, we need to evaulate our options before we go on.

I have talked to James and Matt over the weekend, I assured them as long as you guys are productive, the lawsuit is nothing, we will fight it.

(ED Exh. 22 (5/10/205 email from Ni to Galleher).)

75.    Galleher testified that she met with Ni about the lawsuit after receiving this email, and that it was the first time "there was any sort of discussion about the size of the bills."  (Galleher Testimony 8/8/2022 Trial Tr. at 97:17-98:7.)

Nonetheless, Ni assured Galleher that "ATG had a lot of funding from investors" and expressed, "yeah, it's a little bit bigger but don't worry, it's not an issue, we'll take care of it. You guys are doing an excellent job, we continue to support you." (*Id.* at 98:1-18.)

76.     Concerning Ni's emailed comment that "as long as you guys are productive, the lawsuit is nothing, we will fight it" – Galleher testified:

> Q.     Prior to this date, had Mr. Ni ever told you or left you with an impression that his funding of the litigation was conditioned on you being productive?

> A.     No, there was never any sort of discussion about the link between productivity and Nick's commitment to funding the lawsuit.

> Q.     Up until this point in time, had anyone at ATG ever expressed any concerns about your work performance or productivity?

> A.     No. It was -- maybe I'm reiterating a little bit but it was basically the opposite in that, you know, while I was having all these conversations with Nick he continued to tell me how -- for me in particular, I mean, James and Matt can speak to what their conversations with him were, but he continued to tell me how he was very impressed with my business acumen and the way that I was handling a lot of the day-to-day operations at ATG and navigating -- you know, navigating the environment there. And then, including this meeting afterwards, he again said -- he's like: You're doing an excellent job. You've been doing an excellent job at ATG.

> Q.     Is it your testimony that this e-mail represents the first time that Mr. Ni introduced the concept of productivity when talking about providing you with support?

> A.     Yeah, this is the first time that there was ever any kind of link between productivity and then our continued – our legal strategy and continued support for the lawsuit.

(*Id.* at 98:25-100:1.)

77.     Galleher elaborated that while this was the first time Ni raised the concept of productivity, he assured her "that productivity is not an issue" and "you're doing a really great job." (*Id.* at 100:9-17.)

78.     Around that same time, on May 9, 2015, Kim and Ni had a lengthy phone conversation regarding the Light Fair show, sales and management issues, and the lawsuit. (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 51.) Ni said that the lawsuit was "not something we need to worry about, that he's taking care of it, and that we should just continue to work." (Kim Testimony 8/30/2022 Trial Tr. at 342:9-13.) Ni did not suggest or imply that the amount of legal fees were becoming a problem for him or ATG. (*Id.* at 343:6-21.)

79.     Mulcahy testified that starting in or around May or June 2015, Ni wanted more time to pay his legal bills because "he told me that he was working with a lender in connection with the development of a warehouse for his company, and he was explaining to me that he was going to be raising money . . . when he received the money, then he would be fully capable of paying my bill." (Mulcahy Testimony 8/29/2022 Trial Tr. at 194:22-195:9.) However, Mulcahy stressed that Ni "never said anything to me about not having the funds to pay." (*Id.* at 195:10-11.)

80.     Mulcahy testified that at a meeting with Ni on May 13, 2015, Ni asked him to "hold off invoicing him for some short period of time," and then sent an email that same date:

We appreciate that you work with me on my legal bills, I am in the process of getting financing to close the new office/warehouse building, banks are looking at my book right now.  I understand the April bill is big, can you please have your staff hold on to it until June?

I will start to arrange payment to the last bill.

Also Mark just called I told him you will send that letter to him very soon.

Thanks and talk to you soon.

    (*Id.* at 200:3-19; ED Exh. 44 at 2 (5/13/2015 email from Ni to Mulcahy).)

81.     Mulcahy explained Ni had "asked me if I would prepare a status report on the litigation and send it to his accountant . . . Mark."  (Mulcahy Testimony 8/29/2022 Trial Tr. at 200:20-201:7.)  Mulcahy sent a report as requested.  (*Id.* at 203:3-12.)

82.     On May 18, 2015, ATG's accountant, Mark Thomas, sent Mulcahy an email indicating that the lender bank was growing concerned about the cost of liability for the lawsuit:

The CDC/SBA lender is requesting a further analysis of the damages that may result if Maxlite were to prevail in its litigation with ATG and its three employees. In that regard can you address the worst case scenario as to damages as to the employees and as to ATG. Further, they have requested as to whether ATG or its employees would be responsible for Maxlite's legal fees should Maxlite prevail.

(ED Exh. 45 (5/18/2015 email from Thomas to Mulcahy).)

83.    Mulcahy then provided a supplemental report addressing the concerns

expressed in accountant Thomas's email.  (Mulcahy Testimony 8/29/2022 Trial Tr.

at 200:20-201:7; ED Exh. 47 (5/18/2015 Mulcahy follow-up report to Thomas

providing analysis of liability and exposure).)

84.    The following day, May 19, 2015, CPA Thomas emailed Galleher and

Ni, seeking information about the potential damages that MaxLite could win, based

on the gross compensation paid to the Employee Defendants:

> In connection with the Maxlite litigation and the assessment of the potential of damages as to ATG we need to determine the amount of gross compensation paid to each of the individual defendants while they were employed by Maxlite. Would you please provide to me the gross compensation paid to each of the individual defendants [James Steedly, Matthew Kim and yourself] by year of employment with Maxlite. Please also provide to me the beginning and end date of each of your employment periods with Maxlite. I do need this information promptly and appreciate your attention to this matter.

(ED Exh. 23 (5/19/2015 email from Thomas to Galleher).)

85.    Replying to both Thomas and Galleher, Ni responded:

> Sophie,
>
> Please help Mark out, the banks want to know what is ATG's worst exposure.
>
> I met with Jim this moring in his office for this and our plan moving forward, we pretty much confirmed what we have always believed, Maxlite has no case, we will prevail, Jim and I will work together on the legal bills as they come, but eventually we will make Maxlite pay, at least a good part of it.

(*Id.*)

86.     Galleher testified that this and other communications from around that time period indicated to her that "financing was becoming a bigger concern on Nick's mind" because "all these accountants were asking more information about the lawsuit" causing Ni to become "increasing interested in what the financial commitment of ATG would be." (Galleher Testimony 8/8/2022 Trial Tr. at 102:8-21.) However, despite these concerns, Galleher understood Ni's message that "we will prevail," "Jim and I will work together on the legal bills as they come" to mean that Ni was "reiterating again what he had really said all along, 'Don't worry, I'm working to pay all these bills. I'm working to ensure that we're moving forward,' and that he was working directly with Jim on any sort of outstanding issues for financing." (*Id.* at 102:22-103:11.)

87.     The pressure from the bank lender continued to build, with the SBA beginning to ask questions about ATG's potential exposure in the lawsuit as well as the cost of attorneys' fee, resulting in a May 29, 2015 email from the lender bank to ATG's accountant, and Ni seeking follow-up answers from Mulcahy:

**From:** Phil Mulder [mailto:pmulder@cdcloans.com]
**Sent:** Friday, May 29, 2015 1:42 PM
**To:** mcthomas@markcthomascpa.com
**Subject:** ATG

Mark: I left you a message about an hour ago. SBA has reviewed the file and is asking for some follow up items. We have addressed some of their questions but need your help on a few others. They are inquiring further regarding the pending lawsuit.

> 1.) Does the borrower have a contingency plan to absorb the worst case scenario loss on the lawsuit? If financing, what terms and debt service would be associated with a loan? Who would provide this loan? If paying cash, what is the source of the cash?
> 2.) SBA is requesting detailed, well supported projections for ATG Electronics for the next 12 months. Please provide.
> 3.) Please provide an estimate of both the borrower's and the Plaintiff's attoney fees. Does the worst case scenario of $926,343.15 include these attorney fees?
> 4.) Please provide documentation of what the Plaintiff is asking for in damages.

(ED Exh. 50 (5/29/2015 email from Phil Mulder to Thomas, forwarded by Ni to Mulcahy).)

88.      On or around June 10, 2015, Ni took Galleher and Steedly to lunch. (Galleher Testimony 8/8/2022 Trial Tr. at 105:3-10.)  At that lunch meeting, Ni "again reiterated that he was pleased with our performance" including fixing many products with quality control issues.  (*Id.* at 105:11-18.)  Ni also discussed the lawsuit and said that while it was becoming "a substantial investment on ATG's part," he assured them "ATG has money, don't worry about it."  (*Id.* at 105:23-106:1.)  Ni also indicated he had secured funding for "$20 million from investors in China but they didn't want to, you know, put that towards the lawsuit" – but nonetheless, ATG was committed to "fight it, we'll move ahead with this lawsuit."  (*Id.* at 106:2-7.)

42

89.     Galleher testified that Ni was in no way critical of any of their work performance, that "he was very laudatory" and that up through this point in time, June 10, 2015, no one at ATG, including Ni, had ever given an impression of dissatisfaction with any of the Employee Defendants' work performance.  (*Id.* at 106:8-24.)

**Ni Sees an Opportunity to Get Out of the Lawsuit,**
**Relieving the Financial Pressure on ATG, and Hatches a**
**Plan to Cease Paying the Employee Defendants' Legal Fees**

90.     With financial pressure mounting on Ni, he saw a development in the MaxLite litigation as an opportunity to attempt to get ATG out of the lawsuit, and stop paying legal fees, so that ATG could obtain the financing it was seeking.  On June 17, 2015 (one day before he fired the Employee Defendants), Ni emailed Mulcahy asking if he could "meet and discuss" "the new development in New Jersey."  (ED Exh. 57 at 2 (6/17/2015 email from Ni to Mulcahy).)  Accordingly, Ni and Mulcahy had a meeting at the Mulcahy Firm on June 17, 2015, about which Mulcahy testified:

> A.     The court -- the trial judge -- I'm sorry, I don't remember his name but the Court -- let me put it this way: We had filed motions to dismiss for lack of jurisdiction and we filed a motion on behalf of ATG and we filed motions on behalf of the individuals. It was fully briefed and we had oral arguments in New Jersey.
>
> The trial judge denied the motion to dismiss that we filed on behalf of the individuals but had reserved ruling on our motion to dismiss for lack of jurisdiction over ATG and the Court seemingly was telegraphing that we might have a basis to succeed on that motion. . . .

. . . . So the individuals were stuck in New Jersey. There was going to
be some discovery on jurisdiction only relating to ATG and at that
point we were thinking that perhaps the Court would grant the motion
to dismiss ATG for lack of jurisdiction.

And when we met, Mr. Ni was talking about the fact that the litigation
was expensive and he was now talking with me about the fact that we
**might get ATG out and he was very concerned because if ATG
won the motion to dismiss for lack of jurisdiction Ni would then
be responsible for paying for the individuals' fees in New Jersey
when he got out of -- when he got out of there**.

**He was very concerned about the fact that now he was going to
have to pay for the individuals, and if ATG got out, he didn't want
to have to incur those costs because he would be scot-free**.

*** 

Ni wanted to talk to me about the new development, which is that the
individuals are stuck in New Jersey but ATG might very well get out.
He wanted to talk about his thoughts at the time, and I recall them
very clearly.

(Mulcahy Testimony 8/29/2022 Trial Tr. at 207:20-210:8 (emphasis added).)

91.     Mulcahy further revealed:

A.      . . . . When we met in the office, I mentioned to you that he was
        interested in the idea that he might get out of New Jersey but
        the individuals would be there and he then would have to pay
        for all of their fees.

        He also said to me then, during that meeting, that he had the
        individual employees and **he was responsible for paying their
        fees** -- my fees in connection with their representation but he
        said -- as **sort of out loud talking to himself, he said, "What
        if I fired the individuals? If they're no longer employed by
        me, then maybe I wouldn't have to pay their fees anymore
        and they would be on their own**."

(*Id.* at 211:23-212:4 (emphasis added).)

44

92.     Ni takes the position that Mulcahy, at the meeting, "told him that he could fire the employees" while Mulcahy could continue to represent ATG.  (Ni Testimony 9/27/2022 Trial Tr. at 472:13-21.)  But Mulcahy vehemently denied this, testifying that he informed Ni in no uncertain terms that he was creating a conflict of interest, forcing Mulchy to withdraw as counsel:

> A.     I immediately said to him, "I am very, very concerned about what you just said. I have a fiduciary duty to all of the individuals and to ATG, because although ATG is paying my fees, I'm representing all four of these folks."
>
> I said, "If you fire these employees and stop paying their fees, as far as I'm concerned, I can no longer continue to represent ATG because, in my view, it would create a conflict of interest and I cannot under any circumstances be involved in that."
>
> I said, "If you do that, I'm going to be withdrawing from the case." He left the office without saying anything to me, but I learned what happened afterward.
>
> Q.     To your understanding or perception, did Mr. Ni have any -- during this discussion, what was his reaction when you told him that?
>
> A.     You know, he didn't really have much of a reaction. He just kinda said, oh, okay, and he left without saying anything to me. But he may -- he knew that I was very clear that he was responsible for their fees and if he fired them and stopped paying their fees, I'm out of the case entirely and I told him that.

(Mulcahy Testimony 8/29/2022 Trial Tr. at 212:9-16.)

93.     Unbeknownst at the time to Mulcahy, Ni was not worried about Mulcahy no longer representing ATG because he had already consulted with another attorney about firing the Employee Defendants and representing only

ATG.  (ED Exh. 33 at 13 (Arb. Award ("Ni had previously spoken to an attorney at

Best, Best & Krieger, about firing the employees")).)  Mulcahy explained:

> Q.    I guess my question for you is: If it was unbeknownst to you in the
>       summer of 2015 that Mr. Ni had previously consulted with another
>       law firm about firing the employees, how is it that you came to that
>       knowledge so that you were able to give the testimony you gave at the
>       arbitration?
>
> A.    I mentioned that after my conversation with Mr. Ni on the 17th of
>       June he left and he didn't have any reaction to what I said and that I
>       didn't know what he was going to do next. But I received a notice
>       within the next few days from a lawyer at Best, Best & Krieger and he
>       told me that he was now going to be representing ATG.
>
>       I then spoke with Mr. Ni about it later and I said, "You didn't tell me
>       that you had hired these lawyers." And he said, "Well, two things:
>       Number one, I was talking with them about whether or not it would
>       make sense to fire the employees and discontinue their pay -- paying
>       for their legal fees." "Number two," he said to me, "you told me that
>       you were going to withdraw and so I went forward with them."
>
>       And he then went on to tell me that he had been advised by Best, Best
>       & Krieger that **if he fired the employees he could stop paying their
>       fees**.

(Mulcahy Testimony 8/29/2022 Trial Tr. at 213:12-214:8 (emphasis

added).)[4]

---

[4]     Mulcahy's testimony is corroborated by his September 26, 2017 Declaration, submitted
in connection with his arbitration for fees against ATG, which states: "On July 1, 2015, I
received a telephone call from a lawyer named Thomas O'Connell. He told me that he was a
lawyer with the firm Best, Best, and Krieger ("BB&K") and that he and his firm had been
retained by ATG to replace me in the representation of ATG in the MaxLite litigation both here
in California and in New Jersey. Shortly thereafter, we signed attorney substitution forms that
Mr. O'Connell sent to us, and BB&K took over for us in this litigation. It was readily evident that
ATG did this because it was aware that by firing its Employees it created a conflict in my joint
representation of ATG and the Employees. For example, after retaining Mr. O'Connell and his
firm (BB&K) shortly after our meeting on June 17, 2015, Nick Ni did not tell me that he had
hired them to replace me either before or after doing so. Instead I learned about the change from
the new lawyers themselves. And, when I later spoke with Nick Ni and asked why he had not

94.     The documentary record supports Mulcahy's testimony, as

demonstrated by a July 2, 2015 email from Shari Amster, ATG's New Jersey local

counsel:

> I was contacted last night by Thomas O'connell, and this morning by Bob Brody (Brody and Associates). I was advised that O'connell is ATG's new California counsel and Brody is ATG's new local counsel. O'Connell stated that ATG would no longer pay for the individual defendants' representation. Brody requested that I sign a substitute of counsel ASAP that he will be forwarding to me shortly (Rule 26 Disclosures due tomorrow). Didn't want to sign anything until I got confirmation that you guys were aware of the situation.

(ED Exh. 62 (7/2/2015 email from Amster to Mulcahy).)

Mulcahy responded in conformity with his testimony:

> Shari:  I have been discussing with ATG the fact that it decided that it did not want to continue paying for the defense of the individuals.  I told ATG that I could not be involved in issues between ATG and the individuals because I represent everyone.  ATG apparently decided to terminate the employment of the individuals.  As a function of that, I presume, ATG retained another law firm to represent ATG going forward.  I spoke with O'Connell yesterday and he is going to substitute in for ATG.  We still represent the individuals, but that may change.  I will let you know.  Jim.

(*Id.*)

95.     Mulcahy testified that in a following conversation, Ni told him:

A.      But he made it clear to me that he was not going to pay for the -- my bills because he was told by his new lawyers that **if he paid my bills then it would look like he's admitting that he was responsible for the individuals, and they told him not to do that, and that's part of why I wasn't paid.**

(Mulcahy Testimony 8/29/2022 Trial Tr. at 216:8-13 (emphasis added).)

---

shown me the courtesy of telling me himself, Nick Ni responded 'You told me that if I fired the [Employees] then you could not represent ATG any longer.'" (ED Exh. 35 ¶ 39 (9/27/2017 Mulcahy Cert. for Arbitration).)

96.     In the face of overwhelming evidence, Ni admitted and agreed that his

primary reason for firing the Employee Defendants was to "help settle the lawsuit"

and to "relieve some financial pressure.":

Q.     Mr. Ni, isn't it true that you fired the employee defendants in hopes
       that the lawsuit would go away?

A.     **Yes. The understanding was that MaxLite demanding terminate
       employees, and if I let them go it would ease the lawsuit pressure,
       help in settlement**.

Q.     So your testimony here today, just so I'm clear, is that the reason you
       fired the employee defendants was because you thought it might make
       the lawsuit go away?

A.     It might help, yes.

Q.     That is your testimony, right, sir, that it would help it go away?

A.     **Yes, help settle the lawsuit**.

Q.     Mr. Ni, you testified earlier during your direct examination that the
       lawsuit was getting more and more expensive, more than you had
       expected, and you hoped that by firing the employee defendants ATG
       would also relieve some financial pressure, as well. Is that fair, sir?

A.     Yes. By that time the lawsuit pressure keeps mounting. Mr. Mulcahy
       keeps pushing for money. The way it went, there was like MaxLite
       were trying to put ATG out of business. In fact, some of those sales
       agent totals MaxLite went to put ATG out of business, so we felt the
       pressure.

Q.     So the answer is yes, just to confirm, sir, and make clear to me, the
       answer is yes, you were concerned about how expensive the litigation
       was getting and you fired the employee defendants in part to get
       financial relief?

A.     **To help ease the lawsuit**.

Q.     So the primary reason was to help ease the lawsuit and the secondary
       reason, then, was also to get some financial relief for the high cost of
       legal bills. Is that fair?

A.     **Yes, together**.

Q. In fact, ATG at the time was seeking to finance a new building through a bank; correct?

A. Yes, yes, by that time I think it was time.

(Ni Testimony 9/27/2022 Trial Tr. at 469:25-471:10 (emphasis added).)

97. Ni also admitted that this Court's finding of personal jurisdiction over the Employee Defendants, while temporarily not finding personal jurisdiction over ATG, led to him asking Mulcahy if he could terminate the employees and get out of paying their legal fees:

Q. Sir, do you recall that at some point the New Jersey court found that it had personal jurisdiction over the employee defendants, but it could not say that it had personal jurisdiction over ATG yet so there would have to be jurisdictional discovery? Do you recall something like that?

A. Yes. James Mulcahy told me he win the first battle.

Q. Isn't it true that you thought ATG might get out of the case on jurisdictional grounds, but the employee defendants could still be in the lawsuit?

A. Yes, at that time.

***

Q. Sir, you testified earlier on direct that you went to Mr. Mulcahy and asked him if ATG could stop paying the legal fees in the New Jersey case if it fired the employee defendants; right?

A. I went to his office many times in May and June. And there are many things that we talk about, can win, terminate the employees, he consulted me on that. The understanding was that I would terminate the employees and he would continue to represent ATG.

(*Id.* at 471:23-472:21.)

49

98.     The documentary record, including a complaint filed in California state court by ATG, confirmed that Ni specifically asked if Mulcahy if ATG could stop paying the Employee Defendants' legal fees by terminating their employment:

> Soon after ATG signed the Fee Agreement and Conflict Waiver, **it became clear that it could not afford to continue the employment of the Employees**. The Employees' productivity had become extremely low and they were taking a significant amount of time off work. Ni confided these concerns with Mulcahy on two separate occasions, **specifically asking whether ATG could be compelled to continue funding the Employees' legal defense in the MaxLite New Jersey action, even after ATG terminated their employment**.

> (ED Exh. 80 ¶ 18 (3/3/2017 Complaint filed by ATG against Mulcahy ).)

99.     When confronted with this document, Ni conceded that he had asked Mulcahy "whether or not ATG could be forced to keep paying the employees' legal fees in the New Jersey case, even after it fired them."  (Ni Testimony 9/27/2022 Trial Tr. at 473:3-18.)  Ni admitted under cross-examination that he was looking for a way to "get out of" paying the legal fees:

> Q.     So the answer is yes, **you were looking for a way to get out of paying the legal fees**?
>
> A.     **So, yes, I consult Mulcahy. He was still my lawyer. If I let the employees go, would they be able to compel ATG to pay their legal bill**. Mulcahy answered I don't know how.

> (*Id.* at 474:6-10 (emphasis added).)

100.    Ni persisted in claiming that ATG never had any obligation to pay the Employee Defendants' legal fees – "I didn't need to fire them to get out of paying, basically. Even though they continued to work, I'm not obligated to pay."  (*Id.* at

475:19-21.)  But Ni had no explanation as to why -- if ATG had no obligation in the first place -- he felt the need to ask Mulcahy if he could get out of paying the Employee Defendants' legal fees by firing them:

> Q.   But did you not acknowledge that you went to Mr. Mulcahy, your lawyer, and asked if you had to keep paying them in New Jersey, if you fired them?
>
> A.   I ask –
>
> **Q.   Why would you do that if you felt you had no obligation, sir?**
>
> A.   I ask – because I'm firing them, I ask my attorney if I fire them can they compel me to pay their legal fee. Mulcahy said no way.
>
> **Q.   Why would you ask him the question if you felt you had no obligation to begin with, then?**
>
> A.   Because legal fee was a big deal. It is important. If I fire them, I don't know what they're going to do.
>
> (*Id.* at 475:22-476:9 (emphasis added).)

**ATG Fires All Three Employee Defendants Approximately
Six Months Into Their Employment for the Concocted and
<u>Farcical Reason that their Work Performance Was Poor</u>**

101.   On June 18, 2015, Ni met with Galleher and Steedly and suddenly fired them, shifting his tone up till that point and claiming "[t]his isn't working out."  (Galleher Testimony 8/8/2022 Trial Tr. at 107:24-108:20.)  Galleher asked, "Well what about the lawsuit?" to which Ni replied, "Don't worry, it's gonna go away once you're – you know, once you're out of it, MaxLite will know they can't do anything against you, you're just regular people" and that "New Jersey doesn't have jurisdiction over ATG" so "Once we fire you, the lawsuit will go away."  (*Id.* at 108:21-109:3.)

51

102.     Galleher recalled that Ni said while he had secured investments and

backers in China, and that "You know, we have all this money. We're looking to

grow and put the money into something substantive, not into litigation." (*Id.* at

109:11-22.)  Ni expressed his view that "if he terminated us then the litigation

would go away and that it would be unlikely that – you know, this would reduce

the risk that ATG – they would find jurisdiction over ATG in New Jersey" and that

"the litigation will go away because we're terminating you and you'll no longer be

at ATG." (*Id.* at 109:23-110:10.)

103.     At that time, Ni expressed that he would pay all of Mulcahy's

outstanding fees, but that he refused to pay any more legal fees going forward:

> Q.     Did he say anything at this meeting about whether or not he would
> continue to pay legal fees on your behalf?

> A.     At this meeting he was more just saying that the lawsuit would go
> away. He said once -- he's like "I'll continue to pay." He's like "I'll
> handle Jim's bills. Don't worry, I'll handle Jim's bills, and then once
> you're out, the lawsuit will go away" but there wasn't -- we were still
> sort of processing through everything at that point of what we were
> discussing. But he did say he would pay all of Jim's bills and -- up to
> that point.

***

> A.     Yeah, so he said that he would pay, you know, the outstanding fees
> from Mulcahy's firm but he wasn't gonna continue to pay bills moving
> forward. Again going on because once we were fired he was like "The
> lawsuit will go away, the bills won't be too high."

(*Id.* at 110:18-111:12.)

52

104.  Ni told Galleher and Steedly that he wanted to "personally support" them, that he could not have them "on ATG's books" but that he would "personally pay for you at this point." (*Id.* at 111:13-16.) Ni wanted to find a way to work together again in the future, saying "You know, this lawsuit is just a little thing at this moment right now, but in the future once it's done, once you settle with MaxLite or in a year or two once your contract runs out, let's find a way to work together again in the future." (*Id.* at 111:17-21.)

105.  Galleher testified that she was "shocked," "upset," "pretty terrified," and felt "blind-sided." (*Id.* at 112:2-6.)

106.  Kim gave similar testimony.  He recalled that he was fired by Ni on the phone, that ATG would be sending him a severance package "worth two or three weeks of pay," and "that ATG would no longer or could not fund the litigation any longer, and that he was advised that if they fired us that the lawsuit itself would just go away." (Kim Testimony 8/30/2022 Trial Tr. at 344:22-345:3.) Ni told him that he "had been trying to purchase a building or something like that and there was investors" and he had to "get rid of this lawsuit in order for them to pursue kind of where they were going." (*Id.* at 345:4-10.)  This was the first time Kim had heard "about the potential repercussions of cost." (*Id.* at 345:11-13.)

107.  Ni also told Kim that he wanted to work with him in the future, "that hopefully we would be able to settle this thing out and that I could come back and

work with them as an independent contractor, still continue to do sales but not officially as a salaried member of ATG." (*Id.* at 345:14-19.)

108.   Kim also was surprised by his firing, testifying that he was "completely taken aback":

> A.   . . . . We had been told for six, seven months that this is not something to be concerned with; was that – from the beginning that if something were to arise that 'we would take care of it'; was told from the first day we received the cease and desist not to worry about it that we received our lawsuit, that we shouldn't worry about it.
>
> And seven months later to find out that we're fired, that the legal fees would no longer be paid, and that we're kind of out on our own, I mean, for lack of words, I was pretty pissed.

(*Id.* at 345:20-346:6.)

109.   Galleher, after speaking her father, asked Ni if he would consider not firing the Employee Defendants immediately, to possibly use their termination as a bargaining chip to settle with MaxLite.  (Galleher Testimony 8/8/2022 Trial Tr. at 113:12-16.)  Ni agreed, stating "I'll give you a maybe a week to settle" making the new termination date June 30.  (*Id.* at 113:17-21.)

110.   Towards the end of that period, Galleher spoke with Ni again who reiterated that he "just didn't want to have the cost of litigation on his books" and that he would "personally . . . pay to help you guys out," that he would "take care of Jim's fees[.]"  (*Id.* at 114:15-24.)  At that time, Ni offered: "Well, I'll give you $40,000 out of my own money for you guys to pursue settlement" but would make no "open-ended commitment to pay the fees."  (*Id.* at 115:1-4.)

111.   At that time, Ni offered Galleher and Steedly a severance agreement worth about two weeks' pay, "basically in exchange for ATG to – for us to say that, you know, ATG didn't have to a promise to pay our fees." (*Id.* at 115:5-11.) The severance agreement falsely stated that "Employee has informed employer that he wishes to resign his employment in lieu of termination." (ED Exh. 25 (6/30/2015 Severance Agreement signed by Ni).) Galleher was "upset because I felt like that statement, you know, mischaracterized my departure from the company." (Galleher Testimony 8/8/2022 Trial Tr. at 115:18-116:22.)

112.   The severance agreement contained the following provision:

> 10.    The release set forth in paragraph 9 above specifically includes a waiver of any and all claims and rights of EMPLOYEE against EMPLOYER, including any obligation on the part of EMPLOYER to indemnify, hold harmless, or provide EMPLOYEES with a defense, in regards to that certain litigation filed in the United Stated District Court for New Jersey, entitled *MaxLite, Inc. v. ATG Electronics, Inc., James D. Steedly, Sophia C. Galleher and Matthew Kim,* and bearing case number 2:15-CV-01116-SDW-SCM.

(ED Exh. 25 at ¶ 10 (6/30/2015 Severance Agreement signed by Ni).)

113.   Galleher understood this provision as an attempt by Ni to get her to release ATG from its commitment to pay her attorneys' fees:

A.    Yeah, for my -- when I read this severance agreement and in particular this provision and the -- what was it, the other provision, the second paragraph, that Nick wanted me to release him from his obligations and the promise that he had previously made to defend me in the litigation.

(Galleher Testimony 8/8/2022 Trial Tr. at 119:21-25.)

114.   As a carrot, ATG offered two weeks' pay plus a "promise for the $40,000 for settlement fees that he said he would pay personally."  (*Id.* at 120:1-9.) Galleher refused to sign the agreement because "I wasn't gonna sign away, you know, any claim – Nick was obligated to pay my fees in my understanding, and I wasn't gonna sign that away and be left without any sort of protection from ATG." (*Id.* at 120:20-25.)

115.   Kim received an identical severance agreement from Ni, emailed to him.  (Kim Testimony 8/30/2022 Trial Tr. at 347:13-348:11.) Kim also refused to sign the agreement, and testified that he was "upset" to receive it, noting that he could have stopped working at ATG when he received the cease-and-desist letter, or when MaxLite sued, but he did not because of ATG's commitment to defend him:

A.      Well, I'm not an expert on legalese or contracts, but you have a gut feeling of kind of when you're getting screwed, and when I received that agreement, I knew that if I signed it I'd be getting screwed.

***

We were convinced -- I was convinced that Nick Ni and ATG would support me, that they had honest intention in hiring me and bringing me over from MaxLite, that when he committed to pay for the legal fees and when he committed to take care of any potential legal problems that he meant it.

I had sat with him several times and he reiterated that; that he looked me in the eye and told me that; that I had changed my job, my career for him; that in January when the cease and desist came I could have ceased and desisted, but according to his recommendation and his counsel and his -- you know, that this is not a big deal; that I continued to work for him; that while we were sued we could have

56

turned back around but he again reiterated this is something that he's taking care of and not to worry about it and I did, only to come seven months later and just left out to hang. It's a lot.

It's upsetting. You feel betrayed, you feel taken advantage of. But also like what do you do next, you know.

(*Id.* at 349:7-350:10.)

116.   Kim testified that at no point during his conversations did Ni say or imply that his firing was job performance related, noting that Ni continued to say that he wanted to continue working together:

Q.   Mr. Kim, at any time during that phone call, did Mr. Ni say or suggest in any way that your firing was job performance related?

A.   No. There was no indication of poor performance. Again, reiterated by the fact that he wanted to continue to work together in a different capacity but just couldn't keep me employed due to the lawsuit.

(*Id.* at 346:7-13.)

117.   Galleher's testimony was corroborative, that Ni and no one else at ATG had ever expressed dissatisfaction with her work performance.  (Galleher Testimony 8/8/2022 Trial Tr. at 106:16-20.)  Ni told her that "the lawsuit would go away, and then we would work together again in the future."  (*Id.* at 111:22-24.)

118.   Mulcahy's testimony further corroborates that the Employee Defendants' firing was not job performance related, that this was a contrived excuse to justify their termination in an effort to stop paying legal fees and obtain a strategic advantage towards settling the lawsuit.  On June 19, 2015, Ni emailed Mulcahy:

I met with Sophie and James yesterday afternoon, told them they are not performing as their position would require, asked them to resign or will be terminated next Monday, June 22nd. They are understandably upset, and I told them they should talk to you first, since at this moment you are still their lawyer.

They will probably come to see you this morning.

I am thinking Maxlite may be willing to settle after the employees are no longer with ATG, if you can get them to settle with relatively small amount of money, say $30,000, or get them to start with that direction for the employees, I am willing to contribute some more money, just that I will not be able to pay until sometime in early 2016.

I feel really bad for the individuals being in that bad position.

> (ED Exh. 59 (6/19/2015 email from Ni to Mulcahy).)

119.   Mulcahy testified that he was "not happy" to hear that Ni had fired the Employee Defendants, that he did not make "decisions about what is right and what is wrong," but he refused to take any more part in working with Ni to settle the case.  (Mulcahy Testimony 8/29/2022 Trial Tr. at 219:8-220:19.)

120.   Mulcahy's reaction to the portion of the email stating that the Employee Defendants were "not performing as their position would require" was:

> A.   My first reaction was that that's kind of funny because Sophie was always touted by him as his lead person, sort of like operations manager, and she was always touted as someone who was highly professional and competent.
>
> My second reaction was, I know what he's doing here. **He's trying to come up with some excuse that he thinks might justify firing these folks** and I said, "Good luck to that. I'm out."

(*Id.* at 221:17-24 (emphasis added).)

121.   When asked, "In all of the in-person meetings, e-mail communications, phone calls that you had with Mr. Ni from the time of your retention in early 2015 until late June 2015 when you learned that he had fired them, had he ever communicated to you any dissatisfaction with any of the employee defendants' work?" Mulcahy's response was simply: "No." (*Id.* at 221:25-222:5.)

122.   Mulcahy was shown the Arbitration Award resulting from his arbitration with ATG and testified that he agreed with the arbitrator's finding that "Mr.'s Ni's claim that the employees were fired because they were unproductive" was a "ruse."  (*Id.* at 227:19-228:5; ED Exh. 33 at 20 (Arbitration Award).) Mulcahy pointed out that the Arbitrator sanctioned ATG and its lawyer $50,000 for asserting "false claims."  (Mulcahy Testimony 8/29/2022 Trial Tr. at 233:14-19.) Mulcahy endorsed the Arbitrator's conclusion that:

> This evidence establishes that Mr. Ni became concerned about the high cost of the Maxlite, Inc. litigation.  And despite his assurances to the Employees and his acknowledgement that he'd agreed to pay their legal fees, he fired them in order to avoid this obligation and perhaps, use the firing to help settle the case with Maxlite, Inc.

(*Id.* at 234:15-235:5; ED Exh. 33 at 14 (Arbitration Award).)

123.   Ni, while maintaining the position that he fired the Employee Defendants for job performance reasons, **on cross-examination admitted that he never informed Galleher or Kim about any poor job performance, never**

59

**issued any written warnings about their job performance, and did not have**

**any employee personnel files noting any poor job performance**.  (Ni Testimony

9/27/2022 Trial Tr. 482:19-483:22 (emphasis added).)  Ni claimed that there were

emails complaining about Steedly in existence, but could not identify them or

provide any reason why none had ever been produced in this case.  (*Id.* at 483:25-

484:9.)  When asked "isn't it true that . . . not a single piece of written evidence has

ever been produced indicating any kind of poor job performance?" Ni, was

evasive, then eventually responded "I don't know."  (*Id.* at 484:10-25.)

124.   Eric Cai, the general manager of ATG's California office, similarly

admitted on cross-examination that there was no "written evidence" of any reports

of "poor work performance" by the Employee Defendants.  (Cai Testimony

9/27/2022 Trial Tr. at 511:18-23.)  Cai claimed the existence of "clock-in, clock-

out" time reports (that presumably would have showed Steedly and Galleher

working fewer hours) but could not identify any and claimed that they were never

produced in this case because "I wasn't asked to produce anything."  (*Id*. at 512:3-

13.)  Cai also claimed that emails existed showing Steedly not being productive,

but again admitted that no such evidence had been produced: "No. Like I said, I

didn't request to produce anything on the performance."  (*Id*. at 513:4-7; 514:12-15

("No, I didn't produce any e-mails from them regarding their performance.").)

When shown a copy of the Arbitration Award, which found that no email evidence

of any poor work performance was produced at the hearing, Cai again stated: "I wasn't requested to produce anything." (*Id*. at 513:8-514:10; ED Exh. 33 (Arb. Award).)

125.    In trying to determine whether job performance was a **real reason** that the Employee Defendants were terminated – all at the same time – Ni was asked whether he would have **not terminated** one of the employees if their job performance had been exceptional; he would not answer the question:

> Q.    Okay. Let me ask you this, Mr. Ni: If one of them – if one of the employees had been an exceptional employee and had been performing their jobs very well, would you not have fired that one person?
>
> A.    I can't answer that. It didn't happen.
>
> Q.    Isn't it true that even if one of your employees, let's say Sophie Galleher, **let's say she had been performing her job really well, that you still would have fired her anyway because of the other reasons, getting out of the lawsuit and the high cost of legal fees? Isn't that true**?
>
> A.    **I can't answer.**

(*Id.* at 485:11-21 (emphasis added).)

126.    Confronted with impeaching deposition testimony where Ni previously said that he would not have kept any of the Employee Defendants employed even if their "job performance" was satisfactory because that would not have resolved the MaxLite litigation, Ni affirmed his prior answer and provided no further explanation:

Q.    I'm going to have brought up your deposition transcript, page 173. I'm going to direct your attention to line 24: (Reading.)

> Did you consider firing just James and Sophie and not Matthew, or just James and not Matthew and Sophie or anything like that.
>
> And your response is: Did I consider that option? I don't remember. **They came together and MaxLite demand we fire them all so we fire all of them**.
>
> Question: **Firing one of them wouldn't have solved the MaxLite problem; right?**
>
> Answer: **I believe so.**

Does that refresh your recollection, sir, that keeping Sophie Galleher, if she were performing her job well, that wouldn't have solved the entire MaxLite problem? You had to fire them all?

A.    **What I said, what is there already. That's what I said here.**

(*Id.* at 485:22-486:15 (emphasis added).)

127.    Ni was also confronted with his July 3, 2018 certification in

Opposition to the Employee Defendants' Summary Judgment motion in this case

(Docket # 214-2), which states, in relevant part:

> IV.   Termination of the Employee Defendants' Employment
>
> 53.   On June 18, 2015, ATG terminated the Employee Defendants, because their performance had been a disappointment. ATG did not terminate them to gain a tactical advantage in the lawsuit, but because ATG was unhappy with their performance. They were paid through June 30, 2015.

```
54.   I did not tell them that ATG was terminating them
because of the lawsuit; or that it had become too expensive and
prevented ATG from getting credit; that the investors did not
want me spending money on the lawsuit; or that the lawsuit would
go away if I fired them. At that time, I told them that I had no
responsibility for the legal fees that they had accrued or would
```

(*Id.* at 477:11-478:17.)

128.   Ni admitted that nowhere in his certification (or accompanying counter-statement of material facts) was there any statement that the Employee Defendants were also fired to "get out of the lawsuit" or to "relieve financial pressure by stopping the payment of legal fees." (*Id.* at 479:17-22.)

129.   When it was pointed out that his certification deceptively implied that ATG did not terminate the Employee Defendants "because of the lawsuit; or that it had become too expensive and prevented ATG from getting credit; that the investors did not want me spending money on the lawsuit; or that the lawsuit would go away if I fired them" – Ni's response was that **he was not denying that those were true and real reasons for their firing, but only that** "I did not tell them all this. When I sat down with Sophie and James, I did not say all this." (*Id.* at 480:18-481:16.)

130.   Ni did not deny "that those were the real reasons," admitting that "If you terminate the employee, I would comply to MaxLite's demand and that would help the lawsuit, which was a big pressure at the time."  (*Id.* at 481:17-22.)

131.   Ni never reconciled the fact that his certification only listed a single reason the Employee Defendants had been terminated: "because ATG was unhappy with their performance," and not to "gain a tactical advantage in the lawsuit" – with his prior testimony admitting that significant reasons for their termination included to put ATG in a better settlement position (a tactical advantage) and to relieve the financial burden of paying legal fees.

**Post Termination, Mulcahy Withdraws and the Employee
<u>Defendants are Forced to Find New Counsel to Represent Them</u>**

132.   Based on conflicts of interests, on July 22, 2015, Mulcahy and the New Jersey local counsel who had been representing the Employee Defendants filed a joint motion to withdraw as counsel.  (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 71.)

133.   Galleher sought help from her father, a Colorado attorney, to find new counsel in New Jersey for the Employee Defendants, and they hired Pashman Stein, P.C., each paying $3,500 as an initial retainer. (Galleher Testimony 8/8/2022 Trial Tr. at 124:14-125:21; Kim Testimony 8/30/2022 Trial Tr. at 350:21-351:14.) Pashman Stein was originally hired to attempt to settle with MaxLite, but those

initial attempts failed.  (Galleher Testimony 8/8/2022 Trial Tr. at 125:22-126:7;

Kim Testimony 8/30/2022 Trial Tr. at 351:15-20.)  Subsequently, the scope of

Pashman Stein's services expanded to include attempting to get ATG to meet its

"obligations to pay our fees in the ongoing MaxLite litigation," for which the

Employee Defendants paid an additional retainer of $3,500 each.  (Galleher

Testimony 8/8/2022 Trial Tr. at 126:8-21; Kim Testimony 8/30/2022 Trial Tr. at

351:21-352:7.)

134.   Around mid-July 2015, Galleher informed Ni that she had retained

Pashman Stein.  (Galleher Testimony 8/8/2022 Trial Tr. at 126:22-127:4.)

Galleher asked if Ni would provide the Employee Defendants with the $40,000

that he had promised at the time of their termination to help "engage in more

effective settlement negotiations."  (*Id.* at 127:5-9.)  Ni responded that he would

not provide that money "unless we signed that severance agreement and relieved

him of the obligations and previous promise he had made to pay our fees."  (*Id.* at

127:10-15.)

135.   On August 17, 2015, Galleher sent Ni an email (copying Kim and

Steedly), requesting that he follow through on his promise and ATG's obligation to

fund their defense and pay their legal fees:

Dear Nick,

I write this email to you because, per your request at the time of our termination, Matt, James and I have retained New Jersey counsel and pursued settlement negotiations with MaxLite. We have made substantial progress but a deal is not yet certain and we still have a fair amount of work to do. The biggest obstacle we now face, frankly, is that we have no money and we are in desperate need of your promised funding. The three of us managed to scrape together $10,000 in order to front a retainer to our new NJ counsel, but that money has now been spent. To be blunt, our backs are against the wall and we really need you to deliver on funding, now. Without it, we will either have to accept a settlement offer that is even more restrictive and damaging than the demands made in the litigation, which we are not inclined to do, or come up with a plan B.

I am trying to be both respectful and diplomatic about this, but I need you to understand the severity of our situation. Our current litigation counsel – who I know (and appreciate that) you have paid, at least in part – has filed a motion to withdraw because of a conflict that, according to counsel, now exists between us and ATG. That counsel has ceased to perform any services on our behalf and, as a consequence, we are on the brink of default due to their lack of responsiveness. We are also, obviously, out of pocket the money we put down for the retainer for the New Jersey attorney, and, as we are unemployed, we do not have the financial means to continue funding any sort of settlement negotiations. Nick, we are left us in an extremely vulnerable position. We have to either accept a settlement agreement that will put us all out of work in the LED industry for the next 12 months, or to represent ourselves *pro se* in two federal lawsuits facing claims for attorney fees and damages that may ultimately force us into bankruptcy.

In short, we are out of options and we are out of time. We need you to follow through on the promises you made to us, both when you recruited and hired us and throughout this lawsuit. To be sure, from the time we (including ATG) received the Cease and Desist letters from MaxLite up until our termination, you assured us many times, in writing and orally, that both the contracts and the lawsuit were "not a big deal" and that ATG would support and cover us in the litigation.

Please let us know ASAP whether, now that we have been terminated, that support and cover will continue, in the form of continued litigation funding. Nick, we are at the critical moment, and we need your response quickly because deadlines are running.

> (*Id.* at 132:8-137:15; ED Exh. 29 (8/17/2015 email from Galleher to Ni).)

136.   Galleher explained what she was trying to convey:

A.   Yeah, you know, here I am really conveying to him that, you know, he had made these promises to us since we very first started working with him and throughout the litigation that if -- up until the point of our termination we relied on those promises, we relied on Nick, we trusted him.

He conveyed to us that he would protect us and defend us, and I wanted to articulate that to him because we felt -- I felt like he had betrayed our trust and put us in this extremely vulnerable position and was now trying to renege on these promises that was going to leave me in a multi-state, multi-litigation jurisdiction without no real support. I wanted him to understand that to the extent that maybe he couldn't understand it before.

(Galleher Testimony 8/8/2022 Trial Tr. at 137:1-15.)

137.   Galleher testified that she had her father review this email and received some editing and feedback from Pashman Stein and her father before she sent it, but she "drafted the substance on my own" and that she stood by the substance of the email.  (*Id.* at 132:24-133:4.)

138.   In response to this email, Ni called Galleher and said that "he couldn't have ATG be responsible for paying our legal fees moving forward."  (*Id.* at 139:3-8.)  Ni "essentially" said "You're an intelligent woman, you know, you're smart, you can handle this, you'll be able to do fine in the litigation on your own even without counsel" and further said that if the Employee Defendants wanted any more "financial support" from ATG, they would have to sign the severance agreement.  (*Id.* at 139:9-24.)  Galleher refused, realizing "that was just not a tenable option for me. I couldn't . . . foresee myself being in a litigation when the only last piece of any sort of bargaining power or protection that I had was Nick's commitment to pay the fees that he had promised to pay since the beginning."  (*Id.* at 139:25-140:6.)

67

139.    Galleher testified that post-termination, Mulcahy never contacted her seeking any payment of the outstanding legal fees.  (Galleher Testimony 8/8/2022 Trial Tr. at 124:8-13.) Kim similarly testified that in July or August 2015, he called the Mulcahy Firm and received confirmation that they were not seeking any contribution from him:

Q.    Do you recall if you ever spoke to anyone at the Mulcahy law firm about any outstanding legal fees after your firing?

A.    I did. I called the Mulcahy law firm because it was -- once ATG and Nick Ni said that they would no longer pay for the litigation, I was concerned that I would be racking up all kind of legal fees without my knowledge. I had no idea. So I spoke to them and I spoke to one of the attorneys, I believe his name was Kevin Adams, and he said that it was his understanding that we were not responsible at all for the legal fees and that ATG was to pay them.

(Kim Testimony 8/30/2022 Trial Tr. at 353:13-25.)

## CONCLUSIONS OF LAW

As demonstrated by way of testimonial and documentary evidence above, and discussed more fully below, ATG committed to being a third-party payer of the Employee Defendants' legal fees in connection with the MaxLite litigation and under *Grand Jury* must "scrupulously honor" that commitment.

**A.      The Supreme Court's Pronouncement in *In re Grand Jury***

In the seminal case *In the Matter of the State Grand Jury Investigation*, 200 N.J. 481 (2009) (*Grand Jury*), the New Jersey Supreme Court addressed issues concerning the propriety of third-party payer arrangements and issued guidelines under which clients' legal fees and expenses may be paid by third-parties. Not much law has been developed on the subject since the pronouncement in *Grand Jury*, so a detailed examination of the Court's decision in that case is imperative here.

*Grand Jury* involved a government investigation into whether the employer, a corporate contractor, had submitted fraudulent invoices for services allegedly rendered to a county government. The investigation focused on the contractor and three of its employees.  In light of that investigation, which sought testimony from the three employees, the company arranged to provide an attorney to those employees at its expense. *Id.* at 486. The company entered into four separate retainer agreements with four separate lawyers, three of whom were hired to represent the three employees. *Id.* Those retainer agreements specified that the company would be

69

responsible for the employees' attorneys' fees; that the attorney's sole professional obligation was to the employees; that the law firm was not required to disclose its legal strategy to the company nor would payment depend on such disclosure; that the law firm did not represent the company; that the payment of legal fees was not conditioned upon the law firm's cooperation with the company and that detailed invoices would be provided to employee, whereas the company would receive summary invoices that it would be responsible to pay. *Id.* at 487.

The State moved to disqualify the counsel retained by the company to represent the three employees, arguing that such representation violated the Rules of Professional Conduct (RPCs). *Id.* at 488. The trial court rejected the state's motion to disqualify, finding "nothing improper" about the arrangement and holding that "there's been no demonstration that there is even a conflict [and] even if there were, these employees have the right to waive that conflict" and that all parties have given informed consent. *Id.* at 489. The trial court further added that "that [the company] and the individual attorneys, prior to ending any relationship for payment, would have to make application to the Court"; it ordered "that before [the company] may cease paying any of the attorney's legal fees and costs, [the company] shall provide notice to the Court and all parties, and the Court shall conduct a hearing on the issue of whether [the company] may cease paying such legal fees and costs." *Id.* at 490.

On motion for leave to appeal to the Appellate Division and then the Supreme Court, the State argued that RPCs prohibited the arrangement because it created a *per se* conflict of interest. The Supreme Court rejected that argument. The Court noted that RPC 1.8(f) expressly contemplates the retention of an attorney whose services are paid for by a third party, provided that:

(1) the client gives informed consent;
(2) there is no interference with the lawyer's independence of professional judgment or with the lawyer-client relationship; and
(3) information relating to representation of a client is protected as required by RPC 1.6.

*Id.* at 493 (quoting RPC 1.8(f)).

Noting that RPC 1.8(f) "does not exist in a vacuum," the Court proceeded to discuss the two other relevant RPCs: RPC 1.7(a), which forbids a lawyer from representing a client "if the representation involves a concurrent conflict of interest" and RPC 5.4(c), which prohibits a lawyer from allowing a person who pays for his or her legal services to "direct or regulate the lawyer's professional judgment in rendering such legal services." *Id.* at 494. Then, harmonizing and synthesizing those three RPCs (1.7(a)(2), 1.8(f) and 5.4(c)), the Court offered guidance on when a lawyer may represent a client whose fees are being paid by a third party and concluded that the arrangement is appropriate if six conditions are met:

(1)    The informed consent of the client is secured;

71

(2)    The third-party payer is prohibited from, in any way, directing, regulating or interfering with the lawyer's professional judgment in representing his client;

(3)    There cannot be any current attorney-client relationship between the lawyer and third party payer;

(4)    The lawyer is prohibited from communication with the third-party payer concerning the substance of the representation;

(5)    The third-party payer shall process and pay all invoices within the regular course of its business, consistent with the manner, speed and frequency it pays its own counsel; and

(6)    Once a third-party payer commits to pay for the representation of another, the third-party payer shall not be relieved of its continuing obligation to pay without leave of court.

*Id.* at 495-96.  Applied to the factual circumstances in *Grand Jury*, the Court found the arrangement to be satisfactory; the company's retention and payment of counsel for its employees complied with the RPCS and, consequently, the Court upheld the denial of the State's motion to disqualify counsel. *Id.* at 499.

Although no court of which we are aware has yet had occasion to fully analyze and apply the six- condition analysis set forth in *Grand Jury*, the policy rationale underlying those conditions makes clear why the Supreme Court imposed those considerations and to what extent they play a role in this case.

The first four *Grand Jury* conditions emanate directly from the RPCs discussed above. Conditions (1) (informed consent), (2) (no payer interference) and (4) (no communication with payer about substance of representation) all stem from RPC 1.8(f) that "the client must give informed consent [and] the lawyer's

72

independent professional judgment and the lawyer-client relationship must be maintained sacrosanct." *See Id.* at 495. Condition (4) is further guided by RPC 5.4 prohibiting influence over the lawyer's professional judgment and that "no improper disclosures relating or referring to the representation can be made." *Id.* Condition 3 (no current attorney-client relationship) was imposed by the Supreme Court to assuage the concern that "there be no concurrent conflict of interest" between the client and a third-party payer, as prohibited by RPC 1.7(a)(2).

Those first four conditions, clearly, focus specifically on the propriety of a third-party payer arrangement from the perspective of attorneys' obligations to their clients. From that perspective, the Court analyzes and harmonizes the RPCs and, as part of that process, imposes conditions designed to eliminate the ethical problems that might otherwise arise for an attorney. Whether an attorney has a conflict of interest or fails to fulfill his undivided duty of loyalty to a client by sharing unauthorized information or by allowing a third party to dictate strategy, all implicate the ethical responsibilities and pitfalls of the lawyer. The last two conditions, by contrast, deal directly with the third-party payer. Condition 5 requires the payer to process and timely pay all invoices and Condition 6 provides that once a commitment to pay for the representation of another is undertaken, the payer can be relieved of that commitment only by way of a court order. *Id.* at 493. Recognizing the vulnerable position a client can face when a payer abruptly halts payments to an

73

attorney in the middle of a litigation, the Court in *Grand Jury* specifically called for a summary proceeding to adjudicate a clients' right to continued funding. *Id*. In addition, the Court explicitly held that a third-party payer can only be relieved of its obligation with leave of Court– that is by demonstrating good cause to the Court why its funding obligation should cease. *Id.* at 496-97.

The *Grand Jury* decision, thus, can be viewed as a two-pronged directive intended to govern the conduct of <u>both</u> attorneys and third-party payers. The first four conditions of *Grand Jury* seek to regulate attorney conduct – that is, ensuring that lawyers undertaking the representation do so without running afoul of the RPCs and do not find themselves in an ethical quandary. The last two conditions under *Grand Jury* are specifically applicable to third party payers and endeavor to ensure timely payment of the attorney's legal fees and, mindful that the interests between client and third party payer might diverge, instill protections designed to make it more difficult for a third party payer to cease funding in the midst of litigation. Indeed, at the inception of this case, in ruling upon the Employee Defendants' Order to Show Cause, Magistrate Judge Clark recognized the dichotomy created by the *Grand Jury* decision and the impracticality of a "literal application" of the six factors in this situation:

> Because *Grand Jury* is focused largely on determining the propriety of an attorney's representation of a client while accepting payment for that representation from a third party, the Court is left with little direction

regarding the application of *Grand Jury* to a situation, such as the present, where the question is not the prospective appropriateness of an attorneys' undertaking of such an arrangement, but rather a retrospective determination of the requirements which must be met for a third-party payer to be bound by such an arrangement.

*   *   *

However, because of the focus of the first four *Grand Jury* factors on the conduct of attorneys in third-party payer situations, it appears to the Court that a strict application of the six *Grand Jury* conditions to the facts of the present dispute is unlikely to be particularly illuminating in determining whether the Employee Defendants are entitled to the relief they seek. Thus, the Court must move beyond a literal application of the six *Grand Jury* factors to assess the merits of the Employee Defendants' claims against ATG

(R&R, p. 22).[5]

Applying the *Grand Jury* decision to the instant facts, the Employee Defendants respectfully submit that the Court need not engage in an analysis of all six *Grand Jury* factors here. As Judge Clark recognized, "[a]lthough it is evident…that *Grand Jury* is grounded in principles of attorney conduct…the sixth *Grand Jury* factor applies entirely to third-party payers." (R&R, p. 23 (citing *Grand Jury*, 200 N.J. at 496-97). And, as Judge Clark noted, the Court must "mov[e] beyond ATG's assertions regarding the technical compliance" with each of the *Grand Jury* factors given the unique facts here. The Court need only engage in the

---

[5]     In wholly adopting the Report & Recommendation issued by Judge Clark, this Court stated that it "finds no issues with Judge Clark's analysis of Grand Jury and its application to the facts of this case." (05/14/18 decision, Doc. 189, at p. 6).

inquiry surrounding the sixth factor – that is, determine whether the Employee Defendants entered a third-party payer arrangement such that leave of Court is required to cease that obligation. However, for sake of completeness and to dispel any notion that *Grand Jury* would somehow prohibit the third-party payer arrangement in this case, the Employee Defendants address the remaining factors below.

## B. The Third-Party Payer Relationship Initially Established with the Mulcahy Firm was in Compliance with *Grand Jury* (Factors 1-5)

### Factor 1: Informed Consent

"'Informed consent' is defined as the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." *Id.* at 495 (quoting *Tax Auth., Inc. v. Jackson Hewitt, Inc.,* 187 N.J. 4, 19 n. 2 (2006)). In *Grand Jury*, the company's letters to its employees stated that they did not have to use the assigned attorney and could hire their own attorney at their own expense. The Court held that that "take-it-or-leave-it" approach on its face failed to satisfy the requirement that the employee's acceptance of counsel be based on informed consent and was technically not in compliance with RPC 1.8(f)(1). Nevertheless, each of the three employees certified that they were satisfied with the counsel, so the Court concluded that arrangement was satisfactory. *Id.* at 497. Importantly (and to be discussed in more detail below),

the Court added the following caveat: "in the future, no such limitations on the choice of counsel should be communicated or imposed on the employee/client save for reasonable limitations on fees and expenses." *Id.*

Here, the Mulcahy Firm secured the informed consent of the Employee Defendants to the arrangement whereby ATG would be responsible for the fees and costs that he incurred on behalf of all of them, collectively, in this litigation. (*See* ED Exhs. 8 and 9) Although the retainer agreement did not explicitly so specify, each of the three employees, as well as Mr. Mulcahy himself, who was the attorney for all parties, all testified consistently that it was their understanding that ATG was going to be paying his legal fees bills. (Mulcahy Testimony, 8/29/2022 Trial Tr. 176:7-178:10; T182:4-10; Kim Testimony, 8/30/2022 Trial Tr. 338:18-25; Galleher Testimony 8/8/2022 Trial Tr. at 87:21-88:17). ATG paid the $5,000 retainer (9/27/2022 Trial Tr. at 454:10-13; 8/29/2022 Trial Tr. at 184:10-13), all of Mulcahy's invoices were sent to ATG's attention, and ATG paid them (ED Exhs. 27, 28, 30, 78); and no invoices were ever issued to the Employee Defendants even though Mr. Mulcahy communicated with and represented them. The evidence is clear that informed consent was obtained for a third-party payer arrangement here.

**Factor 2**: **Third-Party Interference with the Lawyer's Professional Judgment**

Citing to RPC 1.8(f)(2) and 5.4(c), the Court in *Grand Jury* stated that "the third-party payer is prohibited from, in any way, directing, regulating or interfering with the lawyer's professional judgment in representing his client."

Here, no evidence was presented at trial to demonstrate that, as a third-party payer, ATG had interfered with or sought to regulate Mulcahy's professional judgment. From February 2015 when Mulcahy was retained until mid-June 2015 when the Employee Defendants were terminated, all of the parties' interests were aligned. Indeed, it was the alignment of those interests that led Mulcahy to jointly represent ATG and the Employee Defendants in the MaxLite lawsuit in the first place. (*See* ED Exh. 9 (acknowledging that "your interests do not differ significantly and that joint representation is appropriate"). Up until that time, Sophie Galleher was the point of contact with Mulcahy, not Nick Ni/ATG. Ms. Galleher testified that Mr. Ni directed her to handle the litigation side on ATG's behalf and to be the liaison to work with Mulcahy regarding the MaxLite lawsuit. (Galleher Testimony, 8/8/2022 Trial Tr. 71:24-72:8; 83:10-17). Ni similarly admitted that Ms. Galleher was charged with communicating with Mulcahy about the lawsuit on behalf of the employees and ATG. (Ni Testimony, 9/27/2022 Trial Tr. 426:8-12 ("Sophie is the one who worked with Mulcahy. I was not in California. Sophie worked on behalf of the employees and on behalf of ATG")). The dynamics of the relationship here was such that, until the employees were terminated there was no attempted interference with or influence

78

by the third-party payer on the attorney's professional judgment, as contemplated by the Court in *Grand Jury*.[6]

**<u>Factors 3 and 4</u>: No current representation and prohibited communications**

The third and fourth factors in the *Grand Jury* analysis go hand-in-hand. The prohibition against a current attorney-client relationship with a third-party payer listed in Factor 3 reflects the Court's concern that a conflict of interest might arise from such representation, as the interests of the client and the third-party payer might be adverse. *See Grand Jury,* 200 N.J. at 496. Indeed, the Court in *Grand Jury* cited to case law holding "it is patently unethical for a lawyer in a legal proceeding to represent an individual whose interests are adverse to another party." *Id.* (quoting *In re Garber,* 95 N.J. 597, 607 (1984); also citing RPC 1.7). But here, no such conflict existed, until the employees were terminated, as ATG and the Employee Defendants' interests were 100% aligned in connection with the MaxLite litigation, and the defense and legal strategy was the same for the parties. As Mr. Mulcahy explained:

> There was no conflict here because everybody's interest is aligned with one another...Mr. Ni hired these folks with the knowledge that there was this issue about trade secrets and...and none of them were going to be testifying in a way that would adversely affect the other because they all had the same unified

---

[6]    The moment that such interference became imminent (in connection with the Employee Defendants' termination) and Mr. Mulcahy was put into a position of conflict, he withdrew from representation. *See* page 45, *supra*.

> defense to this case, so there was no -- at least at the outset when
> we signed this there was no conflict in my representation of all
> four of them because they were all in the same boat together.

(Mulcahy Testimony, 8/29/2022 Trial Tr. 251:20-252:6.)

In any event, any potential conflict that might have existed or arisen in Mulcahy's representation of ATG and the Employee Defendants was waived by all parties (ED Exh. 9). The representation conflict waiver provided by Mulcahy's office expressly notified ATG and the Employee Defendants that a "conflict of interest is almost always a possibility where, as here, one law firm represents multiple parties with similar interests," (*id.* at p.1), and proceeded to list a number of potential situations where a conflict might arise (*id.* at p. 2). The waiver advised the parties to consider those potential conflicts and, if sufficiently satisfied that the Mulcahy firm could adequately represent all of their interests, they agree to waive such potential conflicts and consent to joint representation. (*Id.* at 1-3). The waiver further encouraged the parties to obtain independent legal advice regarding actual and potential conflicts and advised that if any party desired separate representation they would be free to do so. (*Id.* at 2-3).

The moment that a conflict arose – when Mr. Ni fired the employee defendants -- Mr. Mulcahy ceased his representation of all parties, as he was duty bound to do. Mr. Mulcahy testified about the meeting he had with Nick Ni wherein he was made to understand that Mr. Ni's actions might put him in a position of conflict and,

recognizing that position, he immediately told Mr. Ni he would have to withdraw

from representing ATG:

> He said, "What if I fired the individuals? If they're no longer employed
> by me, then maybe I wouldn't have to pay their fees anymore and they
> would be on their own." I immediately said to him, "I am very, very
> concerned about what you just said. I have a fiduciary duty to all of the
> individuals and to ATG, because although ATG is paying my fees, I'm
> representing all four of these folks. I said, "If you fire these employees
> and stop paying their fees, as far as I'm concerned, I can no longer
> continue to represent ATG because, in my view, it would create a
> conflict of interest and I cannot under any circumstances be involved in
> that." I said, "If you do that, I'm going to be withdrawing from the
> case." He left the office without saying anything to me, but I learned
> what happened afterward.

(8/29/2022 Tr. 212:5-16). The next day, when Mr. Mulcahy received an email from

Mr. Ni advising that he had fired the employee defendants, his reaction was as

follows: "[s]o I read the e-mail and I said to them [the Employee Defendants], 'I am

no longer going to represent ATG. I'm out of this case.'" (8/29/2022 Tr. 220:5-6).

This evidence establishes that no conflict as contemplated by the *Grand Jury*

Court occurred here. Although Ni's testimony sharply contradicted Mulcahy's – as

he claimed that Mulcahy told him he could not be compelled to pay the Employees'

legal fees if he fired them and otherwise generally gave him advice regarding the

Employees' termination (9/27/2022 Trial Tr. 435:1-9), that testimony is neither

credible nor relevant.

81

Mr. Mulcahy is a respected attorney practicing law for more than 40 years. He is a member of numerous federal, state, and local bar associations, the President of Los Angeles and Orange County chapters of the International Network of Boutique Law Firms, possesses top ratings by multiple legal networks (including Avvo, and Martindale-Hubbell) and has a long list of accolades and accomplishments to his name. *See* https://www.mulcahyllp.com/attorneys/james-m-mulcahy.html. Mr. Mulcahy has no involvement in this dispute and nothing to gain from his testimony. Mr. Ni on the other hand is not credible when he claims that a reputable attorney representing multiple defendants knowingly and purposely put himself into a position of conflict by providing legal advice to one client against the interests of another. Notably, during ATG's arbitration with Mulcahy, Judge Brisco found Mr. Ni to lack credibility, rejected all notions that Mulcahy had a conflict of interest, and found that Mulcahy "provided ATG and the Employees with exceptional, successful legal services, and acted professionally, ethically, and in the best interests of their clients throughout the representation." (ED Ex. 33, at p. 20).

In any event, by the time a conflict arose Ni made the decision to terminate the Employee Defendants, hired new counsel, and Mulcahy subsequently withdrew from the case. What is clear, however, is that <u>during</u> Mulcahy's joint representation of the parties, no conflicts of interests or potential conflicts of interested existed as contemplated by *Grand Jury*. The lack of any actual conflict, and the parties'

subsequent knowing and voluntary waiver of any potential conflict, adequately addresses the Court's concern in *Grand Jury* in imposing the third condition.

In a similar fashion, the factual circumstances here do not implicate the *Grand Jury* Court's concern in imposing the fourth factor that the lawyer is prohibited from communicating with the third-party payer regarding the substance of the representation. That condition stems directly from RPC 1.8(f)(3), *Grand Jury*, 200 N.J. at 496, which provides that "information relating to representation of a client is protected as required by RPC 1.6." RPC 1.6 (Confidentiality of Information), in turn, states "[a] lawyer shall not reveal information relating to representation of a client *unless the client consents after consultation…*" (emphasis added). The plain language of RPC 1.6, thus, permits disclosure of client confidences if the client consents. And here, the Employee Defendants certainly consented to the sharing of information with ATG, as all parties were jointly represented and had a joint defense agreement.

Mulcahy's retainer agreement included a conflict waiver that contained a section entitled "Agreement to Maintain the Attorney-Client Privilege and Not to Seek Disqualification of Counsel or Experts." (ED Exh. 9. at p. 3) That provision, in part, discusses the sharing of confidential information and developing a joint defense privilege between the parties. The parties agreed to maintain the attorney-client, work product, joint defense, and other privileges with respect to confidential

information that they share amongst each other and their attorneys, even if any party to the representation decides to retain separate counsel. So the Court's concern in *Grand Jury* about the sharing of information and confidences once again does not apply in a situation where, as here, those parties have common interests, the same defense, have waived any potential conflicts and asked for joint representation.[7]

## **Factor 5: Payment of invoices in the ordinary course**

---

[7]     In ruling upon the Employee Defendants' summary judgment motion, this Court noted that the two *Grand Jury* factors discussed above were not followed, but noted that "when Mulcahy undertook representation, it appears that ATG and the Employee Defendants expressly agreed to joint representation and also agreed that they had a common interest." This Court explained that "this presents a different factual scenario than that addressed by *In re Grand Jury*" and that "joint representation, joint defense agreements, and common interest agreements are permitted so long as the representation complies with the relevant law and ethical requirements." (SJ Opinion, Doc. 279, p.7).

    In New Jersey, the common interest privilege "permits disclosure of privileged material, attorney-client confidential communications or work product, to third parties without waiving any privilege" if the disclosure of information is "made due to actual or anticipated litigation for the purpose of furthering a common interest." *O'Boyle v. Borough of Longport*, 218 N.J. 168, 197, 199 (2014). The Supreme Court in *O'Boyle* stressed that the "common interest rule is designed to permit the free flow of information between or among counsel who represent clients with a commonality of purpose" and "offers all parties to the exchange the real possibility for better representation by making more information available to craft a position and inform decision-making in anticipation of or in the course of litigation." *Id.* at 197-98. The Court further stated that the interests need not be identical, only that the parties share a "common purpose." *Id.* at 199-200. Here, all of the communications between and among ATG, the Employee Defendants, and Mr. Mulcahy were due to anticipated litigation, followed by actual litigation from MaxLite, they had "common purpose" and were made in a manner to preserve confidentiality so as not to waive any privileges to third parties. Although all parties were clients of Mr. Mulcahy and during the relevant time period no one retained separate counsel, to the extent that any analysis of New Jersey's common-interest / joint defense privilege is necessary, the communications were protected.

Factor 5 discusses prompt and continued payment of the attorney's invoices; that the third-party payer should pay invoices consistent with the manner and frequency that it pays its own counsel. Once again, that factor is readily satisfied here. The evidence at trial established that ATG paid the initial retainer (9/27/2022 Trial Tr. at 454:10-13; 8/29/2022 Trial Tr. at 184:10-13) and then subsequently paid all of Mulcahy's invoices during the pendency of the proceedings (ED Exhs. Exh. 27, 28, 30, 78), until Mulcahy withdrew, at which point ATG ceased making payments. At that point, Mulcahy initiated a fee arbitration against ATG to enforce its payment obligation on behalf of ATG as well as the Employee Defendants. (ED Exh. 33) Significantly, ATG was awarded the full amount of its legal fees, representing Mulcahy's time expended for work on behalf of ATG as well as the Employee Defendants. (*See* ED Exh. 33) At no point were any invoices sent to the Employee Defendants (Mulcahy Testimony 8/29/2015 Trial Tr. at 185:23-24) nor was there ever any expectation from Mulcahy that the Employees pay any portion of the attorneys' fees (*Id.* at 187:15-22). Factor 5 under *Grand Jury* is, therefore also satisfied.

*       *       *

The *Grand Jury* factors discussed above illustrate no impropriety whatsoever in the third-party payer arrangement here. More importantly, however, as explained at length at pages 76-84, *supra*, those factors are geared toward assessing the

propriety of an attorney's undertaking of the representation in the first instance and concern potential ethical pitfalls for the lawyer; they are not relevant to the issue to be adjudicated here – whether ATG committed to pay the legal fees of the Employee Defendants and if so whether that obligation was extinguished either by the Employee Defendants' termination or their retention of Pashman Stein after the Mulcahy firm was forced to withdraw as counsel. As Judge Clark aptly noted, "strict application of the six *Grand Jury* conditions to the facts of the present dispute is unlikely to be particularly illuminating in the relief that the Employee Defendants seek." (R&R, p. 22). Indeed, the remedy sought in *Grand Jury* for failure to abide by those conditions was disqualification of the lawyer; here, the issue is not whether the attorney must be disqualified but whether the third party committed to the payment arrangement and must be bound by its obligation under the sixth *Grand Jury* factor. And although this proverbial square case does not fit within the round hole of the *Grand Jury* analysis, as discussed below, the evidence is clear that ATG bound itself to be a third-party payer of the Employee Defendants' legal fees such that leave of Court was required to cease that obligation.

### C. The Evidence at Trial Established That ATG Committed to Pay the Employee Defendants' Legal Fees, Thus Triggering an Obligation to Seek Leave to Discontinue its Payment Obligation under *Grand Jury* (Factor 6)

Factor Six – the only relevant inquiry here – focuses on whether the third party commits to payment, thus requiring leave of Court to discontinue the obligation. As

the Supreme Court held in *Grand Jury,* "once an employer commits to paying the legal fees and expenses of its employees, it scrupulously must honor that commitment." 200 N.J. 498. If a third-party payer fails to pay the legal fees when due, the appropriate remedy is a summary action for an order to show cause why the third-party should not be compelled to remit payment. *Id.* The Court stressed that a third-party payer's obligation to pay fees continues until it can persuade the court why that obligation should cease. Significantly, "[i]n such an application, the third-party payer shall bear the burden of proving that its obligation to continue to pay for the representation should cease [and] the fact that the lawyer and the client have elected to pursue a course of conduct deemed in the client's best interests but disadvantageous to the third-party payer shall not be sufficient reason to discontinue the third-party payer's continuing obligation of payment." *Id.* (emphasis added).

In so holding, the Court recognized that the attorney's decision-making process should be free from third-party interference and should not in any way be influenced by monetary incentives. Releasing a third-party payer from its obligation on the basis that it wants to pressure the client to settle, in essence, coerces the client and his or her attorneys into pursuing a course of action that may not be in the best interests of the client, thereby interfering with an attorney's independent professional judgment (Factor 2 above).

ATG never sought leave of Court to be relieved of its payment obligation in this case. Instead, ATG apparently takes the position that it never committed to be a third-party payer of the Employee Defendants' legal fees in the first instance. But the overwhelming evidence showed otherwise, as discussed in more detail below. As a preliminary matter, however, it bears clarification of what *Grand Jury* does and does not require in order to find the existence of a third-party payer obligation.

First, *Grand Jury* does not require the existence of a formal written contract or agreement. As Judge Clark previously recognized in the Report & Recommendation adopted by this Court, "*Grand Jury* neither states that the existence of a formal written contract is a prerequisite to obtain the relief provided for therein nor makes any mention of requirements which must be met for the formation of an enforceable agreement between a litigant and a third-party payer in this context." (R&R at 24.) The purpose of the *In re Grand Jury* mechanism is to prevent a third party payer from unethically influencing a litigation through the use of its purse-strings while at the same time preventing the disruption to litigation that occurs when funding is halted midstream. Those significant policy concerns were the reason that the Court placed the burden on the third-party payer who undertook the obligation of paying another's legal fees to make a showing why its obligation should cease. 200 N.J. at 496. Nothing in *Grand Jury* requires the existence of a formal agreement or contract and none of the conditions listed states that an

agreement to fund must be in writing.  *See, e.g., Pashman Stein v. Nostrum Lab'ys, Inc.,* No. A-1759-13T1, 2014 WL 5312535, at *3 (N.J. Super. Ct. App. Div. Oct. 20, 2014) (analyzing under *Grand Jury* agreement between law firm and third-party payer of client's legal fees even though "the retainer agreement does not advise … about condition six of the *Grand Jury* decision").

Second, and relatedly to the first, *Grand Jury*'s applicability is not contingent on there being an agreement between the attorney and a third-party payer specifying that the payer could discontinue funding only after obtaining leave of court.  If it were, *Grand Jury's* restrictions would apply only to the rare instances where the payer already agreed to do exactly that which *Grand Jury* requires.  The very decision in *Grand Jury* would not have been necessary if payers independently agreed to its directive.  Nowhere did the Supreme Court impose such a condition.  In fact, the retainer letter in *Grand Jury* itself did not state that the payer can discontinue funding only after obtaining leave of court. [8] *See also, e.g., Nostrum Labs*, supra, at *3 (finding *Grand Jury* applicable where agreement states, "You may, of course, terminate [plaintiff's] representation at any time for any reason.").

Third, *Grand Jury* does not require the payment commitment to have been expressed in terms of "conditional" or "unconditional." Conditional payment of a

---

[8] The Employee Defendants previously provided the Grand Jury retainer letter to the court. It is attached as Exhibit A to the Reply Certification of John Kim Cert in further support of the Employee Defendants' Order to Show Cause dated October 30, 2015 (Docket # 113).

client's legal fees, in fact, has the potential to create exactly the type of situation the *Grand Jury* Court sought to avoid. The court's decision in Grand Jury is based upon an acknowledgment that an "organization's promise to pay [here, an employee's] bill . . . has the inherent risk of dividing an attorney's loyalty between his client and his client's employer who will pay for the services," *Grand Jury*, 200 N.J. at 492, thus the reason the Court implemented those six factors – to avoid the conflict that might arise when the interests of the client (here, the employee) and third-party payer diverge.

ATG's allegation here – that its funding obligation was conditioned on performance and, ultimately, continued employment – would, if accepted by this Court, wholly undermine and gut the intent and purpose of the Grand Jury decision. To be clear, permitting the cessation of third party payer obligations to be triggered by nothing other than the termination of employees "exemplifies the very circumstance *Grand Jury* is meant to prevent," as Judge Clark previously recognized. (R&R, p.27) It creates a situation that would sanction "a third-party payer's unilateral termination of an obligation to indemnify a litigant once the interests of the third-party payer and the litigant become inimical." *Id.* But that is precisely the dynamic that the unanimous Court in Grand Jury intended to protect against. This Court has already expressed its understanding that ATG's position in this regard cannot be reconciled with the New Jersey Supreme Court's Grand Jury

opinion, noting that "it is not clear to the Court that In re Grand Jury would permit ATG to cease paying legal fees because ATG fired Employee Defendants." (SJ Decision, Doc. 279, at p. 8). The Court stated "if ATG is correct (that it could stop payment of legal fees because it fired the Employee Defendants), it would apparently create an unworkable loophole to the basic requirement of *In re Grand Juty*: third-party payers cannot stop paying legal fees without leave of the court." *Id.* at p. 8 fn. 6.

However, nothing in *Grand Jury* requires that the obligation to pay another's legal fees be unconditional or expressly stated in terms of a commitment in perpetuity. Instead, the Court's pronouncement is much simpler, and unequivocal: "[o]nce a third-party payer commits to pay for the representation of another, the third-party payer shall not be relieved of its continuing obligation to pay without the leave of court." *Id.* The inquiry, thus, is whether ATG undertook an obligation in some form to pay the Employee Defendants' legal fees in an anticipated litigation with MaxLite.

Fourth and finally, *Grand Jury* does not require the third-party payer to select a specific attorney for a client; the funding commitment applies irrespective of a client's choice of counsel. This point is crucial: **ATG need not have specifically agreed to pay Pashman Stein's fees. It is sufficient for ATG to have agreed to pay Mulcahy's fees; once that finding is made, the Employee Defendants'**

**change of counsel does not relieve ATG of its payment obligation; only a Court order in compliance with *Grand Jury* could extinguish the obligation**.

*Grand Jury* makes it clear that a payer cannot direct, regulate, or interfere with the attorney-client relationship. 200 N.J. at 495-96. Clients are entitled to select counsel of their choosing. Indeed, in *Grand Jury*, the Court disapproved of the arrangement created by the employer wherein it provided a designated attorney to its employees and otherwise advised that they are free to hire their own counsel, at their own cost. The Court stated that such a "take-it-or-leave-it" approach" does not comport with the requirement that the employee's acceptance of counsel be based on informed consent." 200 N.J. at 497. However, because the employees certified that they were satisfied with their attorney and sought to continue representation, the Court deemed the arrangement satisfactory. *Id.* The Court cautioned, however, that "in the future, **no such limitations on the choice of counsel should be communicated or imposed on the employee**/client save for reasonable limitations on fees and expenses." *Id.* (emphasis added).

Significantly, it was ATG's own actions that forced the Employee Defendants to retain new counsel in the first instance. ATG terminated the Employee Defendants, hired new counsel for itself, and failed to pay legal fees to Mulcahy. Mulcahy, in turn, could not take sides between clients and was put into a position of conflict from which he had to withdraw. As Judge Clark noted, "ATG created the

irreconcilable conflict between itself and the Employee Defendants envisioned by the court in *Grand Jury*, requiring the withdrawal of Mr. Mulcahy from this matter and leaving the Employee Defendants without the protection promised by ATG." (R&R, p. 27) Judge Clark further rightly stated that "[i]n such a circumstance, when a third-party payer bears the responsibility for the payment of a litigant's legal costs and offers to retain counsel who may have a conflict by virtue of that counsel's relationship with the third-party payer, the litigant is not required to accept the conflicted counsel and may instead "seek their own counsel when [the third-party payer] . . . fail[s] to offer any acceptable representation, and [the third-party payer] is required to reimburse [the litigant] for reasonable attorneys' fees." (R&R, p. 27-28 (quoting *Kramer*, 371 N.J. Super. at 605)). ATG cannot create a situation where counsel is forced to withdraw, forcing new counsel to be retained, and then complain that it did not approve of the new attorneys. As the Court in *Grand Jury* made clear, no limitations on choice of counsel should be imposed upon the client/employee by the employer/third-party payer. Consequently, if this Court finds that ATG made a commitment to pay the Employee Defendants' legal fees, it follows then, that ATG should "scrupulously honor that commitment" irrespective of the Employees' choice of counsel.

With the above considerations in mind, the testimony and documentary evidence adduced at trial confirms that ATG made a commitment to pay the

Employee Defendants' legal fees, thus triggering the mandate under *Grand Jury* requiring ATG to seek leave of Court in order to be relieved of its obligation.

ATG made offers of employment to the Employee Defendants with full awareness that the Employee Defendants signed noncompete agreements with MaxLite – an identical agreement that ATG paid a New Jersey attorney to review. ATG nevertheless hired the Employee Defendants and assured them that it would be financially responsible for defending them against any lawsuit brought by MaxLite:

- When recruiting Steedly and Wyatt, who expressed concerns about their non-competes with MaxLite, Ni personally paid to have the MaxLite non-compete agreement reviewed by New Jersey attorney. (ED Exh. 3-4; Ni Testimony 9/27/2022 Trial Tr. at 446:16-17; 450:5-18)

- When Galleher interviewed with Ni, she expressed concern about the MaxLite non competes. Over multiple meetings Ni assured Galleher that he would protect her should MaxLite sue. (Galleher Testimony 8/8/2022 Trial Tr. at 42:8-16; 44:10-25; 46:13-47:2; 45:1-6; 47:3-9; 51:21-52:20; 52:3-20)

- Similarly, when Kim raised concern about the non-compete provisions in his MaxLite contract, Ni advised he had the contracts reviewed and not to worry and that if ATG took legal action he would protect Kim. (Kim Testimony 8/30/2022 Trial Tr. at 318:21-319:9; 320:17-18; 321:25-4; 322:15-21; 322:22-25; 326:12-17; 324:5-17). Kim emailed his noncompete to Ni for further review. (ED Exh. 8). Ni admitted that Kim expressed concern about his noncompete (Ni Testimony 9/27/2022 Trial Tr. at 453:2-5).

- Ni assured the Employee Defendants that ATG was in business "for the long haul," that there "partnership" would be a "long-term relationship" and that in any potential dispute with MaxLite, ATG would protect them "through to the end." (ATG Exh. 13 (Employee Defendants' Verified Cross-Claim) ¶ 18.)

- Both Kim and Galleher testified they would not have joined ATG were it not for Ni's promises to protect and defend them if MaxLite took legal action.

(Galleher Testimony 8/8/2022 Trial Tr. 45:12-14; 46:6-11; Kim Testimony 8/30/2022 Trial Tr. 328:3-9.)

When MaxLite sent the cease-and-desist letters to ATG and the Employee Defendants, and subsequently instituted the anticipated lawsuit, ATG reiterated its commitment to cover the cost of litigation and directed the retention of Mr. Mulcahy to represent ATG and the Employees:

- Upon sharing with Ni the MaxLite cease and desist letters, Ni reiterated that "ATG will take care of everything", that "ATG would cover all legal costs" and "[j]ust focus on work and ATG will handle the lawsuit."  (Galleher Testimony 8/8/2022 Trial Tr. at 55:1-4; 64:20-65:6)

- The February, 2015, emails between Mr. Mulcahy and Sophie Galleher (all of which copied Mr. Ni) illustrates that Ms. Galleher kept Mr. Ni fully informed about the threatened legal action by Maxlite; that Mr. Ni gave her direction on how to handle it; that he wanted her to work with Jim Muclahy; and that he wanted Ms. Galleher to be the point of contact with Mr. Mulcahy. *See, e.g.,* (ED Exs. 10, 11, 13, 14 37; Galleher Testimony 8/8/2022 Trial Tr. 69:3-15; 71:24-72:8; 83:10-17; 72:3-4). Indeed, Mulcahy testified, "I understood that Mr. Ni was calling the shots, but he also had designated Sophie Galleher as my point of contact, at least in the initial stages, until I met him." (Mulcahy Testimony 8/29/2022 Trial Tr. at 175:9-18).

- Those emails exchanges establish that Mr. Ni wanted Mulcahy to represent ATG and the employees as a group. To wit:

  o "Nick, the ATG owner, also wants to meet with you to discuss other legal housekeeping matters and determine how **we can work together."** (ED Exh. 37) (Emphasis added.)

  o **"[W]e** are looking for legal advice on how to handle the attached letter from Maxlite." (*Id.*) (emphasis added)

- o  "I **will discuss with Nick,** and **we** will call you to review our options." (*Id*.) (Emphasis added.)

- o  "Give me a call to discuss this. **We** should have Jim help us get this handled." (ED Exh. 10) (Emphasis added.)

- o  "Please go ahead and work with Jim Mclahy [sic], I am sure he can properly get this handled **for us.**" (ED Exh. 11) (emphasis added).

- o  "Jim Mulcahy will have this handled **for us**. No big deal, we should not be distracted from what **we** do." (ED Exh. 15) (emphasis added).

In furtherance of its promises, ATG paid the initial retainer to the Mulcahy firm and continued to make payments as the invoices became due. (Ni Testimony 9/27/2022 Trial Tr. at 454:10-13; Mulcahy Testimony 8/29/2022 Trial Tr. at 184:10-13; ED Exs. 27, 28, 30, 78. In sum, ATG paid over $90,000 to Mulcahy, which included payment for work performed on behalf of ATG and the Employee Defendants. All those invoices were sent to and paid by ATG and not the Employee Defendants. (*See id.; see also* Mulcahy Testimony 8/29/2015 Trial Tr. at 185:23-24; 187:15-22; Kim Transcript 8/30/2022 Trial Tr. 338:18-25; Galleher Testimony 8/8/2022 Trial Tr. at 87:21-88:17).

Even though all parties signed the retainer agreement and conflict waiver, it had always been the understanding of the Employee Defendants as well as Jim Mulcahy that ATG was responsible for the legal fees. Mr. Mulcahy would not have undertaken the joint representation had it not been for ATG's agreement to fund

96

the lawsuit; he understood that the Employee Defendants had no means to pay for

his services:

- Both Galleher and Kim testified that it was always her understanding that Ni would pay the legal bills. (Galleher Testimony 8/8/2022 Trial Tr. at 73:4-12; Kim Testimony 8/30/2022 Trial Tr. at 335:1-10)

- Mulcahy testified that "It was my understanding that ATG was paying my fees to represent the three individuals and ATG" and that Ni "made it very clear that he was going to be undertaking the cost of defense for everyone because he had hired these people and told them that he was going to see to it that this issue was taken care of by paying the fees." Mulcahy Testimony 8/29/2022 Trial Tr. at 176:7-23; 192:14-194:11; *see also* 182:4-14)

- Indeed, Mulcahy would not have agreed to take the case if the Employee Defendants were responsible for paying the legal fees because he knew they did not have the means to pay the bill. (*See Id.*; *see also Id.* at 178:3-10.)

- Nor would the Employee Defendants have continued to work for ATG past the cease and desist letter without Ni's promise of payment.  Galleher Testimony 8/8/2022 Trial Tr. 55:15-22)

- Both Kim and Galleher, as well as Mulcahy all testified that ATG paid the monthly legal invoices, with no contribution expected nor received from the Employee Defendants. (Mulcahy Testimony 8/29/2015 Trial Tr. at 185:23-24; 187:15-22; Kim Transcript 8/30/2022 Trial Tr. 338:18-25; Galleher Testimony 8/8/2022 Trial Tr. at 87:21-88:17)

- Ni even admitted at several points that ATG was going to pay the Employee Defendants' legal fees as long as they were "productive." Ni Testimony 9/27/2022 Trial Tr. 461:1-10; 465:22-466:2).

- When ATG subsequently failed to make payment on outstanding legal fees, Mulcahy initiated arbitration against ATG and did not seek payment from

the Employee Defendants; as Mulcahy explained the reason he did not
include the employees was "because they were not obligated to pay me, in
my view."  (Mulcahy Testimony 8/29/2022 Trial Tr. 165:12-17.)

The evidence at trial further demonstrates that for a number of months, ATG

continuously paid the invoices it had received from Mulcahy without issue, even

when the legal fees began to accumulate:

- Email from Ni stated, "Jim's bill is over $70k now?  Please tell him **we will
  pay early next month**" (ED Exh. 21)

- Email from Ni reaffirmed, "I need to talk to Jim on our strategy moving
  forward.  I understand Jim's bill is bigger than we expected and it is
  beoming [sic] a substantial investment on ATG's part, we need to evaluate
  [sic] our options before we go on.  I have talked to James and Matt over the
  weekend, I assured them as long as you guys are productive, **the lawsuit is
  nothing, we will fight it**" (ED Exh. 22) (emphasis added)

- Email from Ni promised "MaxLite has no case, we will prevail, **Jim and I
  will work together on the legal bills as they come**, but eventually we will
  make MaxLite pay, at least a good part of it" (ED Exh. 23) (emphasis
  added).

- As late at June 3, 2015, two weeks before terminating the Employee
  Defendants, Ni confirmed that ATG would pay the legal fees for the
  Employees. His email on this date to Mr. Mulcahy stated, "**Please allow me
  time for bills for the individuals, I will find ways to cover them in the
  coming months**." (ED Exh. 53, at 3-4) (emphasis added)

The evidence further demonstrated that when the legal costs began to mount,

it had become a concern for ATG and its investors. The emails introduced at trial

showed that Ni had begun feeling financial pressure from banks when attempting

to obtain financing for ATG's new building; there was a concern about the cost of

litigation on ATG's books. *See, e.g.,* ED Exhs. 21, 22, 23, 40, 44, 45, 47, 50. ATG

terminated the Employee Defendants based upon a belief that doing so would

minimize ATG's exposure and lead to a more favorable outcome for ATG in this

litigation. *See* Findings of Fact, at ¶ 96. Indeed, Ni flat out admitted that he fired

the employees to gain an advantage in the MaxLite litigation:

> Q. Mr. Ni, isn't it true that you fired the employee defendants in hopes
> that the lawsuit would go away?
>
> A. Yes. The understanding was that MaxLite demanding terminate
> employees, and **if I let them go it would ease the lawsuit pressure,
> help in settlement.**
>
> Q. That is your testimony, right, sir, that it would help it go away?
>
> A. **Yes, help settle the lawsuit**.
>
> Q. So the answer is yes, just to confirm, sir, and make clear to me, the
> answer is yes, you were concerned about how expensive the litigation
> was getting and **you fired the employee defendants in part to get
> financial relief?**
>
> A. **To help ease the lawsuit**.
>
> Q. So the **primary reason was to help ease the lawsuit and the
> secondary reason, then, was also to get some financial relief for the
> high cost of legal bills. Is that fair?**
>
> A. **Yes, together**.

(Ni Testimony, 9/27/2022 Trial Tr. 469:25-471:7) (emphasis added).

ATG purported to argue that the Employees' termination was due to their

poor work performance. However, aside from the sheer improbability that all three

employees were fired at the exact same time for the exact same reason, there was no evidence presented at trial to corroborate the self-serving statements of ATG's agents (Ni and Cai) that the Employees' terminations had anything to do with their work performance:

- ATG has not produced a single piece of paper in this litigation to demonstrate any issues with the Employees' work performance;

- ATG does not maintain any formal review process and therefore has no record of any issues raised with the Employees' productivity (9/27/2022 Trial Tr. 487:18-22);

- ATG never gave the Employee Defendants any warning prior to terminating them (Ni Testimony 9/27/2022 Trial Tr. 482:19-483:22; 487:7-15);

- Sophie Galleher testified that her productivity had never been raised as an issue and the termination came as a complete surprise. (Galleher Testimony 8/8/2022 Trial Tr. 107:24-112:6);

- Matthew Kim testified that no one at ATG had complained about his work performance. Much like Galleher, the termination had blindsided him and came as a shock. (Kim Testimony 8/30/2022 Trial Tr. at 344:22-346:6);

- Mulcahy testified that there had never been any indication that Ni was dissatisfied with the Employee Defendants' work performance. (Mulcahy Testimony 8/29/2022 Trial Tr. 221:25-222:5). Even Mulcahy believed that the firing was pretextual and that Ni was just "trying to come up with some excuse that he thinks might justify firing these folks." (Id. at 221:17-24);

- Ni claimed that there were numerous emails complaining about James Steedly's work performance; that he was unavailable during work hours and that ATG had time cards to substantiate his absence. Yet, not

a single one of those documents were ever produced in this case, and Ni could not explain why. (Ni Testimony, 9/27/2022 Trial Tr. at 484:23-485:5).

- Eric Cai testified that there were many issues with respect to the Employees' work performance and claimed that ATG had emails to documents to confirm that the Employees were not productive. (Cai Testimony 9/27/2022 Trial Tr. at 511:18-514:15.) Yet, as Cai confessed, not a single one of those emails were produced in this litigation. (*Id.*) Significantly, Mr. Cai gave the same testimony at the arbitration over the fee dispute between Mulcahy and ATG in 2018 and the arbitrator similarly noted that those emails had not been produced. (ED Exh. 33.)  And yet, in the intervening *four years*, ATG has not sought to find and turn over those alleged emails.

All of the documentary emails and all of the testimony, including the testimony of Ni himself, confirm that the real reason ATG fired the Employee Defendants was in an attempt to gain leverage in settlements with MaxLite and had nothing to do with their performance. *See* Findings of Fact, ¶¶ 72-100.

In the end, the overwhelming evidence shows that ATG undertook an obligation to pay legal fees on behalf of the Employee Defendants in connection with the MaxLite litigation. ATG's efforts to argue to the contrary are unavailing. Throughout his testimony, Nick Ni purported to explain that although he paid some of Mulcahy's fees on behalf of the Employee Defendants, he never committed to any such payment and was doing so out of the goodness of his heart because the employees were "poor", "had no money," and "lived paycheck to paycheck." (9/27/2022 Trial Tr. 434:5-7; 456:10-457:6; 467:16-468:22). His own actions,

however, undermine that assertion. For example, prior to terminating the Employee Defendants, Ni specifically asked Mulcahy whether ATG could be bound to pay the Employees' legal fees if he fired them. (ED Exh. 80 ¶ 18; ED Exh. 57; *see* Mulcahy Testimony 8/29/2022 Trial Tr. at 207:20-210:8; 211:23-212:4) Ni subsequently offered the Employee Defendants $40,000 out of pocket to help settle the MaxLite litigation. (Galleher Testimony 8/8/2022 Trial Tr. 115:1-4.) Moreover, after they had been terminated, Ni wanted the Employee Defendants to sign a severance agreement that mischaracterized the Employees' departure from ATG as a "resign[ation]" and purported to remove ATG's liability in connection with payment of the Employee Defendants' attorneys' fees. (ED Exh. 25; Galleher Testimony 8/8/2022 Trial Tr. at 115:18-116:22; 119:21-25; Kim Testimony 8/30/2022 Trial Tr. at 347:13-348:11; 349:7-350:10). If Ni truly believed that ATG undertook no commitment whatsoever to fund the litigation on behalf of the Employee Defendants, he certainly did not act like it, in trying to get out from underneath the payment obligation.

Moreover, Ni's assertion that ATG undertook no commitment to pay legal fees also does not comport with his simultaneous contention that ATG would keep paying those fees so long as the Employees were "productive." Emails were introduced at trial demonstrating that ATG agreed to pay the Employees' fees so long as they were doing their job and performing well. (Ni Testimony 9/27/2022 Trial Tr. 461:1-10; 465:22-466:2; ED Exh. 33, at 7; Mulcahy Testimony 8/29/2022

Trial Tr. at 180:9-23; *see also* Findings of Fact, *supra*, at ¶¶ 47-50.) It simply defies logic for ATG to argue, on one hand, that it undertook no obligation whatsoever to pay litigation costs, and on the other to repeatedly assure the Employees that their legal fees would be covered so long as they are productive.

The totality of the evidence adduced at trial establishes that Mr. Ni hired the Employee Defendants knowing that litigation might be forthcoming, promised to protect and defend them against MaxLite, paid legal fees for a number of months for all parties that were jointly represented by Mulcahy, and when he became concerned about the high cost of the Maxlite litigation, he abandoned the assurances to the Employee Defendants and fired them in order to avoid his payment obligation and in an effort to use the termination to help settle the case with MaxLite.

Under *Grand Jury*, there is more than sufficient evidence here to establish a third-party payer relationship. And contrary to ATG's position, its payment obligation is not extinguished by the Employee Defendants' termination or by their change of counsel. ATG created a situation where Mulcahy became conflicted and was forced to withdraw, leaving the Employee Defendants scrambling to find new counsel in the middle of a contentious litigation with a well-funded adversary like MaxLite – the very circumstances that *Grand Jury* sought to prevent. After abandoning the Employee Defendants and cutting off funding without leave of Court, in contravention to the mandates of *Grand Jury*, ATG now purports to argue

that it is not bound to pay their legal fees because it did not explicitly agree to retain PSWH and that the undersigned firm's representation of the Employee Defendants did not comply with the *Grand Jury* factors. The mere contention is absurd and would turn *Grand Jury* on its head. By that logic, rather than seek leave of Court, a third-party payer could extinguish its payment obligation by simply abandoning the client and cutting off funding, only to later argue that it never agreed to a client's newly retained attorney. That position would defeat the very purpose of the Supreme Court's decision, and ATG should not be permitted to benefit from its calculated decisions to terminate the Employee Defendants and cut off funding, decisions that were designed help ATG settle its dispute with Maxlite and put an end to its mounting fees, without any real regard for how those decisions would impact the Employee Defendants. ATG is, thus, bound to pay the Employee Defendants' legal fees until it can show good cause why its obligation should cease – relief that ATG has yet to seek from this Court.

**D. The Issues in this Proceeding Have Already been Adjudicated in the Arbitration Between Mulcahy and ATG; Those Findings Have Preclusive Effect, or, at Minimum Should Inform this Court's Decision**

As the Employee Defendants previously advised the Court, the precise claim that was the subject of the trial has already been adjudicated in another forum. Following the termination of the Employee Defendants, ATG refused to pay fees due and owing to the Mulcahy Law Firm. On February 12, 2017, Mulcahy initiated

an arbitration before the Judicial Arbitration and Mediation Service ("JAMS") in Orange County, California seeking payment of the outstanding amount in fees and costs incurred in defending ATG and the Employee Defendants in the MaxLite litigation. (Amended Demand for Arbitration), at ¶ 23 (ED Exh. 87). ATG, in turn, filed a lawsuit against The Mulcahy Law Firm in the Superior Court of California, County of Orange and alleged claims for fraudulent concealment, declaratory relief, restitution, and breach of fiduciary duty. *ATG Electronics, Inc. v. The Mulcahy Law Firm*, Docket No. 30-2017-00906469-CU-FR-CJC (Judge Ronald L. Bauer). In that lawsuit, ATG alleged many of the same facts that were in dispute in this case. It referred to "the responsible party for the Employees' legal defense costs moving forward" (ATG California Complaint), at ¶ 19 (ED Exh. 80), hiring new counsel for the New Jersey litigation (*Id.* at ¶ 20), the Employee Defendants' Order to Show Cause in this case, including the issue "discontinuing the funding of the Employees' legal defense" (*Id.* at ¶ 21), Mr. Mulcahy's certification submitted earlier in this case and the issue of "the very question of whether it could be required to pay for the Employees' legal fees after termination" (*Id.* at ¶ 22). Notably, in that complaint, ATG admitted that it "could not afford to continue the employment of the Employees" and that it asked its lawyer "whether ATG could

be compelled to continue funding the Employees' legal defense in the MaxLite New Jersey action, even after ATG terminated their employment." (*Id.* at ¶ 18)[9]

The Mulcahy Firm moved to compel arbitration pursuant to the arbitration clause in its engagement letter, which was granted. Mulcahy's amended arbitration demand described MaxLite's lawsuit and the work performed by Mulcahy on behalf of ATG and the Employee Defendants. The demand stated that Mulcahy spent 440 hours on ATG and the Employee Defendants' case, accumulated a legal bill in the amount of $187,415.53 (of which ATG had only paid $91,187) and that "Respondent [ATG], was obligated to pay this bill." (Amended Demand, at ¶ 19). Mulcahy did not name the Employee Defendants as parties in the arbitration or otherwise seek to collect any portion of his outstanding bills from them.

Following a four-day hearing, on May 10, 2018, the Hon. Joseph R. Brisco (Ret.),[10] found in favor of the Mulcahy Firm and against ATG on virtually every claim and defense raised in the parties' pleadings, and awarded the Mulcahy firm

---

[9]    Contrary to those sworn allegations, Mr. Ni's July 3, 2018 Certification, contrived to defeat summary judgment, claimed that "ATG did not terminate th[e Employee Defendants] to gain a tactical advantage in the lawsuit, or because "it had become too expensive" but because ATG was unhappy with their performance. (Docket No. 214-2 (Ni Decl.), at ¶¶ 53, 54) Ni admitted at trial, however, that he did, in fact, terminate the Employee Defendants because he thought it would help settle the MaxLite matter. *See* Findings of Fact ¶ 96.

[10]    Judge Brisco served 21 years as a judge with the San Bernardino County Superior Court. During that time, he served as Supervising Judge of the Civil Departments, Presiding Judge of the Appellate Division and, for several years, was assigned to hear all of the Writs of Mandate in the county. *See https://www.jamsadr.com/brisco/.*

$119,931.15 in legal fees, arbitration related expenses and sanctions. (ED Exh. 33) The arbitrator characterized the Mulcahy Firm's representation as "exceptional," "successful," and its fees "reasonable and extremely necessary" and found that "ATG, through [its president] Mr. Ni, has made this despicable effort to 'stiff' [Mulcahy]." (*Id.* at 20) Significantly, after considering a litany of documentary evidence, which consisted of more than 290 exhibits,[11] and listening to four days of testimony (including the testimony of Mr. Ni), Judge Brisco made a number of findings that bear directly on the claim that is now before this Court.

First, Judge Brisco found that ATG recruited, and hired the Employee Defendants with full knowledge of their non-compete agreements with MaxLite:

- "The evidence clearly establishes that Mr. Ni did, in fact, solicit the Employees" (*Id.* at 3);

- "Mr. Ni hired the Employees with knowledge that their employment contracts with Maxlite, Inc. contained non-compete clauses" (*Id.* at 3)

Second, Judge Brisco held that that ATG's president, Mr. Ni, was involved in and directed the litigation through Sophie Galleher:

- "Mr. Mulcahy believed from the beginning that Sophie was "the emissary regarding the flow of information regarding the litigation to Mr. Ni and the

---

[11]     Once the Employee Defendants learned about the arbitration award, they obtained copies of the exhibits used at the arbitration. Review of those exhibits confirm that a significant amount of the documents that the Employee Defendants introduced at the hearing were considered during the JAMS arbitration. In addition, ATG introduced into evidence copies of the Order to Show Cause papers filed in this case, as well as a number of other documents relevant to the instant dispute between ATG and the Employee Defendants.

other Employees. She constantly kept Mr. Ni informed of what was going on and he was the one 'calling the shots.'" (*Id.* at 5)

- "Sophie kept Mr. Ni fully informed about the threatened legal action by Maxlite, Inc., and [] Mr. Ni gave her direction on how to handle it" (*Id.* at 6)

- "Th[e] series of emails [introduced at the arbitration], and many more, together with Mr. Ni's own testimony establish that Sophie was the liasion for Mr. Ni and the other Employees regarding the Maxlite, Inc., and that Mr. Ni directed the litigation through her." (*Id.* at 5)

Third, and most significant for purposes of this case, Judge Brisco held that

Mr. Ni intended for the Mucahy Firm to represent both ATG and the Employee

Defendants and expressly agreed to pay for the Employee Defendants' legal fees:

- "Mr. Ni wanted MLF [Mulcahy Firm] to represent ATG and the employees as a group." (*Id.* at 6)

- "**ATG (Nick Ni) Agreed to Pay the Legal Fees of the Employees**." (*Id.*)

- "**Mr. Mulcahy believed that ATG and Mr. Ni would be responsible for payment of all legal fees**. Otherwise, he would not have taken the case because the Employees did not have any money to pay legal fees." (*Id.* at 7)

- "**Even Mr. Ni himself testified that he was going to pay the legal fees as long as the Employees were productive**." (*Id.*)

- "**[A]s late at June 3, 2015, Mr. Ni agreed to pay the legal fees for the Employees**." (*Id.*)

- "**This evidence, and much more, establishes that Mr. Ni promised to pay the legal fees, and actually paid a substantial sum toward the legal fees, before he stopped paying altogether**." (*Id.* at 8)

Last but not least, Judge Brisco explicitly rejected ATG's claim that the

Employee Defendants were terminated for performance reasons, finding that the

108

terminations had nothing to do with a purported lack of productivity but rather was

a strategic maneuver by ATG/Mr. Ni to avoid paying attorneys' fees and an

attempt to extract a favorable settlement position with Maxlite:

- "The[e] evidence establishes that Mr. Ni became concerned about the high cost of the Maxlite, Inc. litigation. And despite **his assurances to the Employees and his acknowledgement that he'd agreed to pay their legal fees, he fired them in order to avoid this obligation** and perhaps, use the firing to help settle the case with Maxlite, Inc." (p. 14)

- "ATG' s claims that MLF [Mulcahy Firm] acted unethically and in violation of the Rules of Professional Conduct are an insult. They are also as much a ruse as Mr. Ni's claim that the employees were fired because they were unproductive." (p. 20)

Judge Brisco awarded the Mulcahy firm its full fees, as well as arbitration

fees, arbitrator compensation and expenses and sanctions pursuant to California

statute jointly and severally against ATG and its counsel for bad faith tactics in

asserting affirmative defenses and a counterclaim that was unsupported by

evidence. (*Id.* at 21). The award was upheld by Superior Court of Orange County

and the California Court of Appeals. *ATG Elecs., Inc. v. Mulcahy L. Firm,* No.

G056931, 2020 WL 242210, at *7 (Cal. Ct. App. Jan. 16, 2020), reh'g denied (Feb.

4, 2020), review denied (Apr. 1, 2020).

The Employee Defendants respectfully submit that Judge Brisco's factual

findings – specifically, that ATG committed to paying the Employee Defendants'

legal fees - must be given preclusive effect under the doctrine of res judicata.[12]

"Viewed as a tool of judicial administration, res judicata protects the prestige and

moral authority of court judgments and promotes efficient use of the courts by

requiring parties to bring all of their claims arising from a particular transaction in

a single lawsuit." *Orrick v. San Joaquin Cmty. Hosp.,* 73 Cal. Rptr. 2d 757, 764

(Ct. App.), *review granted and opinion superseded*, 959 P.2d 183 (Cal. 1998)

(quoting Shell, *Res Judicata and Collateral Estoppel Effects of Commercial*

*Arbitration* (1988) 35 UCLA L.Rev. 623, 641) California courts routinely

recognize that claim preclusion attaches to arbitration awards. *Id; see also*

*Thibodeau v. Crum,* 4 Cal. App. 4th 749 (1992) ("The doctrine of res judicata

---

[12] Pursuant to the Full faith and credit clause, 28 U.S.C. § 1738, "a federal court [must] refer to the preclusion law of the State in which the judgment was rendered." *Pittman v. La Fontaine*, 756 F. Supp. 834, 844 (D.N.J. 1991) (quoting *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 381 (1985)). "Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in courts of the State from which the judgments emerged." *Id.* (quoting *Kremer v. Chemical Construction Corp.,* 456 U.S. 461 (1982). "This rule applies when assessing both the issue preclusive and the claim preclusive effect of the prior state court judgment." *McNasby v. Crown Cork and Seal Co.,* 888 F.2d 270, 276 (3d Cir.1989). Since the ATG-Mulcahy arbitration took place in California, and was subsequently confirmed by a California court, the preclusion analysis here is governed by California law. But even under New Jersey law, the arbitrator's decision here would be given preclusive effect "so long as the party to be bound [here, ATG] had the opportunity to make its case in the arbitration," which it d*Id. See Habick v. Liberty Mut. Fire Ins. Co.*, 320 N.J. Super. 244, 257 (App. Div. 1999) (holding that PIP arbitration award collaterally estopped the insured from relitigating causation issues in arbitration of claim for uninsured motorist benefits); *see, e.g., Konieczny v. Micciche*, 305 N.J. Super. 375, 384–87 (App. Div. 1997 (finding that home purchaser suing home inspector in negligence is bound by facts previously found in arbitration against the builder under New Home Warranty & Builders' Registration Act, *N.J.S.A.* 46:3B–1 *et seq.*); *Dylnicky*, 2009 WL 2850744 (holding that findings made in arbitration against former employees had preclusive effect in subsequent litigation by those employees).

applies not only to judicial proceedings but also to arbitration proceedings");

*Sartor v. Superior Court* (1982) 136 Cal.App.3d 322, 327–328, 187 Cal.Rptr. 247

(confirmed private arbitration award in favor of architectural firm is res judicata

barring homeowner's identical causes of action against firm's employees); *see also*

Restatement (Second) Judgments, § 84) ("a valid and final award by arbitration has

the same effects under the rules of res judicata, subject to the same exceptions and

qualifications, as a judgment of a court"). Like in New Jersey, the public policy of

California favors arbitrations and "every reasonable intendment is indulged to give

effect to such proceedings." *Lehto v. Underground Constr. Co.* 69 Cal.App.3d 933,

939 (1977). "Once a valid award is made by the arbitrator, it is conclusive on

matters of fact and law and all matters in the award are thereafter res judicata." *Id.*

Res judicata, or claim preclusion, "prevents relitigation of the same cause of

action in a second suit between the same parties or parties in privity with them."

*Higashi*, 131 Cal. App. 4th at 573. Claim preclusion can be used both offensively

and defensively and can preclude defenses that relate to the same primary right as

an already-litigated cause of action (or vice-versa). *See Alpha Mech., Heating &*

*Air Conditioning, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 35 Cal. Rptr. 3d 496,

506 (Ct. App. 2005). Three elements must exist for res judicata (claim preclusion)

to apply: "'(1) the decision in the prior proceeding is final and on the merits; (2)

the present proceeding is on the same cause of action as the prior proceeding; and

(3) the parties in the present proceeding or parties in privity with them were parties to the prior proceeding.'"*Ass'n of Irritated Residents v. Dep't of Conservation*, 11 Cal. App. 5th 1202, 1219 (2017) (internal quotations omitted). Those elements are satisfied here.

First, there can be no dispute concerning the finality of judgment on the merits in the arbitration here. Judge Brisco issued a final judgment on the merits that ATG agreed to pay the legal fees not only for its own representation but also on behalf of the Employee Defendants. As a consequence of that crucial finding, the Mulcahy Firm was entitled to be paid the entirety of its outstanding invoices (for work performed on behalf of both ATG <u>and</u> the Employee Defendants) through the date it withdrew as counsel – which was *after* ATG terminated the Employee Defendants. Mulcahy's claim against ATG for payment of legal fees – premised upon ATG's commitment to fund the entire litigation (including on behalf of the Employee Defendants) was fully and finally resolved at arbitration. The arbitration award was subsequently confirmed and turned into a judgment and, following an unsuccessful appeal by ATG, was affirmed by the California Court of Appeals. Under California law, that is tantamount to a judgment of a court. Cal. Civ. Proc. Code, § 1287.4 ("If an award is confirmed, judgment shall be entered in conformity therewith. The judgment so entered has the same force and effect as, and is subject to all the provisions of law relating to, a judgment in a civil action of

the same jurisdictional classification; and it may be enforced like any other

judgment of the court in which it is entered, in an action of the same jurisdictional

classification.")

Second, the cause of action that is the subject of this lawsuit is the same as

that which was litigated in the arbitration for purposes of the res judicata analysis.

In determining whether two proceedings involve the same cause of action,

California courts employ the "primary right theory." *Alpha Mech., Heating & Air*

*Conditioning, Inc. v. Travelers Cas. & Sur. Co. of Am.,* 35 Cal. Rptr. 3d 496, 502

(Ct. App. 2005). Under that theory, "a "cause of action" is comprised of a "primary

right" of the plaintiff, a corresponding "primary duty" of the defendant, and a

wrongful act by the defendant constituting a breach of that duty. *Id.* In other words,

there must be "the invasion of one primary right [that] gives rise to a single cause

of action." *Brinton v. Bankers Pension Servs., Inc.,* 90 Cal. Rptr. 2d 469 (Ct. App.

1999). "The most salient characteristic of a primary right is that it is indivisible: the

violation of a single primary right gives rise to but a single cause of action."

*Mycogen Corp. v. Monsanto Co.,* 28 Cal. 4th 888, 904, 51 P.3d 297, 306–07

(2002). The primary right is "simply the plaintiff's right to be free from the

particular injury suffered… It must therefore be distinguished from the *legal theory*

on which liability for that injury is premised." *Id.* (emphasis in original). As such,

in the res judicata context, "[t]he existence of a cause of action is based on the

harm suffered, as opposed to the particular theory asserted by the litigant." *Brinton v. Bankers Pension Servs., Inc.*, 90 Cal. Rptr. 2d 469 (Ct. App. 1999).

The arbitration and the instant action involve the same "primary right"—that is, the right to have ATG follow through with its funding obligation, in its entirety. That payment commitment was ATG's "primary duty" and ATG's wrongful action in failing to remit payment for legal fees gave rise to a breach of that duty. Mulcahy's arbitration against ATG and the Employee Defendants' *Grand Jury* application here are both premised upon one "harm" that forms the basis of their respective claims – ATG's failure to uphold its obligation to pay all litigation costs (which included its own legal fees and those of the Employee Defendants).

Irrespective of how Mulcahy or the Employee Defendants' claims are characterized or what legal terminology attaches to the cause of action, at the core of both the arbitration and this proceeding is one common "harm" caused by ATG's refusal to uphold its funding commitment. *See, e.g., Boeken v. Philip Morris USA, Inc.,* 48 Cal. 4th 788, 792, 230 P.3d 342, 344 (2010) (holding that res judicata barred plaintiff's wrongful death action where primary right was the same as her former loss of consortium action). As a point of emphasis, necessarily included in Mulcahy's claim of entitlement to full reimbursement of fees by ATG is the claim that ATG committed to paying the Employee Defendants' fees as well as its own.

114

Third, the identity of the parties element is also satisfied. Judgments bind not only parties to a proceeding, but also "those persons 'in privity with' parties." *Armstrong v. Armstrong*, 544 P.2d 941 (Cal. 1976). In the context of res judicata, a judgment can be used against the actual party to that judgment or someone in privity with that party. *Grande v. Eisenhower Med. Ctr.*, 512 P.3d 73, 79 (2022). In the same vein, a party or his privy can benefit from the judgment and use it affirmatively. *Id.* Privity for res judicata purposes refers to "a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights." *Citizens for Open Access to Sand & Tide, Inc. v. Seadrift Ass'n*, 71 Cal. Rptr. 2d 77, 87–88 (Ct. App. 1998) (internal citations omitted).

The Supreme Court of California has recognized that "[p]rivity is not susceptible of a neat definition, and determination of whether it exists is not a cut-and-dried exercise;" it takes into consideration issues of fairness in binding non-parties, and requires close examination of the factual circumstances of each case." *Id.* (internal citations omitted). Whereas older decisions defined privity "in terms of a nonparty's acquisition of an interest in the subject matter of litigation," privity has evolved to a broader definition that has been described as "'such an identification in interest of one person with another as to represent the same legal rights" or "a relationship between the party to be estopped and the unsuccessful

party in the prior litigation which is 'sufficiently close' so as to justify" preclusion. *Grande*, 512 P.3d at 80-81 (citations omitted); *DKN Holdings LLC v. Faerber*, 352 P.3d 378, 388 (2015) (describing privity as "requir[ing] the sharing of 'an identity or community of interest,' with 'adequate representation' of that interest in the first suit, and circumstances such that the nonparty 'should reasonably have expected to be bound' by the first suit.").

Although the Employee Defendants were not parties to the arbitration proceeding, they were, for purposes of claim preclusion, "in privity" with Mulcahy in his quest to obtain legal fees from ATG. The Employee Defendants' and Mulcahy's interests in that regard were 100% aligned. ATG's agreement to fund the Employee Defendants' litigation expenses was central to Mr. Mulcahy's claim to recover the full amount of his outstanding legal fees, which included work performed for both ATG and the Employee Defendants. Mulcahy's retainer agreement was silent on the issue, so to obtain full recovery of its legal bills, the Mulcahy Firm had to prove that ATG agreed to be responsible for those fees.

Even though ATG and all three Employee Defendants signed the retainer agreement, Mulcahy did not view the Employee Defendants as obligors of legal fees. As Mulcahy testified at the arbitration, and again before this Court, it was always his understanding that ATG would be paying the legal fees for all parties involved. *See* Findings of Fact, at ¶¶ 40-42, 51, *supra.* To illustrate that

116

understanding and agreement, Mulcahy sent all bills to ATG and did not send a single bill to the Employee Defendants. *Id.* at ¶¶ 66, 68-70. Each invoice was addressed solely to Nick Ni, president of ATG, and sought payment only from ATG. *Id.* ATG paid Mulcahy's retainer at the inception of the litigation, and then paid Mulcahy's invoices for the months that followed up until the time of the Employee Defendants' termination. *Id.* at ¶¶ 64. And to be sure, Mulcahy did not name the Employee Defendants as parties in the arbitration but sought fees only from ATG because, in his view, the Employee Defendants "were not obligated to pay [him]." (Mulcahy Testimony 8/29/2022 Trial Tr. 165:12-17.) Those facts demonstrate that the Employee Defendants and Mulcahy had "such an identification in interest" that Mulcahy represented "the same legal rights" as the Employee Defendants had and acted as their "virtual representative" in the arbitration. *See DKN Holdings,* 352 P.3d at 388.

Whereas Mulcahy had a legitimate reason not to include the Employee Defendants as parties in the arbitration – given his understanding that only ATG was responsible for the fees – it begs the question why ATG failed to do so. At the time that the arbitration took place, the instant *Grand Jury* action was already underway and the case had progressed to summary judgment. Indeed, this action was referenced in ATG's papers to the California court and ATG even introduced the *Grand Jury* OTSC papers as exhibits into evidence at the arbitration. There

existed an overlapping identical claim in this case and in the arbitration concerning ATG's promise of litigation funding to the Employee Defendants.

Yet, ATG made a (presumably a strategic) decision not to bring the Employee Defendants into the arbitration and argue that as parties to Mulcahy's retainer, they are jointly liable for legal fees. It did not. And for one obvious reason – ATG knew that the Employees' claims and arguments in the arbitration would be identical to Mulcahy's and could only hurt its case. By keeping the Employee Defendants out of the arbitration, ATG tactically sought to have a second chance to argue that it undertook no funding commitment here if it lost in arbitration, which is what it is now doing.

Consider the following. What if ATG joined the Employee Defendants as parties to the arbitration, and following a hearing, the arbitrator determined that ATG did not agree to pay the Employees' legal fees and that the Employee Defendants were responsible for a portion of Mulcahy's fees. In that instance, ATG undoubtedly would have sought to use that arbitration as preclusive in this *Grand Jury* claim. With an arbitrator's finding that ATG made no promise to pay fees, ATG would have argued to this Court that no third-party payer arrangement could have existed and sought dismissal. The above hypothetical leads to this question: why should ATG be rewarded for strategically failing to include the Employee Defendants in the arbitration over a legal fee arrangement to which they

118

were parties and now be permitted to make the same arguments to this Court that Judge Brisco already rejected?

   If ATG's conduct – failing to bring a related claim – occurred in another setting, ATG would be precluded from having a second opportunity to do so because res judicata not only precludes relitigation of claims resolved in a prior action, it also precludes litigation of claims that *could have been but were not raised in a prior action. Franceschi v. Franchise Tax Bd.,* 1 Cal. App. 5th 247, 258–59 (2016) (emphasis added). As the California Supreme Court has stated, "The law abhors a multiplicity of actions.... [A] party cannot by negligence or design withhold issues and litigate them in successive actions; he may not split his demands or defenses; he may not submit his case in piecemeal fashion." *Id.*  Res judicata, thus, operates to bar not only matters that were actually decided but also matters "within the scope of the action, related to the subject-matter and relevant to the issues, so that it *could* have been raised," and if that is the case then "the judgment is conclusive [] despite the fact that it was not in fact expressly pleaded or otherwise urged." *Thibodeau v. Crum*, 4 Cal. App. 4th 749, 755 (1992) (plaintiffs' arbitrated claims for construction defects against general contractor precluded later action against subcontractor for cracks to driveway of which plaintiff was aware because "[t]here were no successive breaches of obligations owed the [plaintiffs], no separate and distinct torts, and no new rights accrued after

119

the first proceeding"); *see also, e.g Cameron v. Standard Pacific,* No. MSC13-02660, 2017 WL 1047136, at *1 (Cal.Super. Feb. 16, 2017) (barring claim against subcontractor where "[t]here was an opportunity to litigate those claims before the arbitrator" given "the same homeowner, the same home, and the same [claims]"); *Franceschi v. Franchise Tax Bd.,* 1 Cal. App. 5th 247, 258–59, 205 Cal. Rptr. 3d 75, 83–84 (2016) (barring claim that could have been but was brought in earlier proceeding, noting that "the doctrine of res judicata goes beyond the four corners of the operative pleading in the prior action" and considers issues related to the subject-matter that could have been raised).

ATG *could have* joined Employee Defendants to the arbitration and argued there, like it now does here, that ATG made no promises to provide funding and that the Employee Defendants are responsible for the fees incurred by Mulcahy, particularly fees Mulcahy incurred following the Employees' termination. Indeed, in the arbitration, ATG disputed all of Mulcahy's fees post-termination fees because its own attorney-client relationship with Mulcahy had ended. Judge Brisco, however, awarded fees to Mulcahy that included work performed on behalf of the Employee Defendants after their termination and after ATG was no longer a Mulcahy's client.  Knowing full well that the relief sought by the Employee Defendants in this *Grand Jury* action arises out of the same facts and transactions as Mulcahy's fee dispute, yet deliberately failing to have those issues resolved in

one forum, should preclude ATG from a second opportunity to obtain a different result, and Judge Brisco's findings should be deemed preclusive.

At minimum, even if this Court does not deem the findings in the arbitration preclusive as a matter of law, Judge Brisco's factual findings should nevertheless be considered and accorded substantial weight. Judge Brisco reviewed many of the same exhibits introduced at the hearing before this Court and heard testimony from two crucial witnesses – Nick Ni and James Mulcahy - on the same critical issue concerning whether ATG committed to paying the Employee Defendants' legal fees. Judge Brisco found Mr. Mulcahy to be credible, honorable, and to have provided excellent legal representation, whereas Mr. Ni was deemed untruthful and "despicable."  Judge Brisco rejected Ni's credibility, held that ATG did, in fact, commit to paying the defense costs in the MaxLite litigation and found Ni's nonproductivity reason for terminating the employees to be a "ruse." Given the overlapping issues in both matters, this Court should consider Judge Brisco's factual findings in rendering its decision.

**E. This Court Should Use its Inherent Authority to Sanction ATG for Failing to Disclose the Existence of the Arbitration Decision Four Years Ago**

Judge Brisco's decision in the ATG-Mulcahy JAMS arbitration was issued in June 2018 and for the last four years, ATG has neglected to disclose to this Court, to the Employee Defendants and, presumably, its own New Jersey counsel

121

the existence of this adverse decision, with preclusive significance, on the precise claim that is now before this Court. We only learned of it on July 14, 2022 when Michael Stein called Mr. Mulcahy to see if he would testify as a fact witness at the hearing and we immediately brought it to the Court's attention in a letter dated July 29, 2022 (docket # 457) preserving our right to address it now.

The timing of the arbitration decision speaks volumes as to ATG's motives. Judge Brisco's ruling was issued just one month before the Employee Defendants filed their summary judgment motion. And if the Court will recall, it was during the briefing of that Summary Judgment Motion that ATG, for the first time, injected disputed facts into the record by way of a self-serving unsupported declaration of Mr. Ni. Prior to that time, ATG did not dispute the underlying facts upon which the Employee Defendants sought relief in their initial Order to Show Cause. That lack of a disputed factual record was the reason the Court permitted the filing of expedited dispositive motions. (R&R, Docket Entry # 185, at 34 (holding that summary judgment motion could be filed "because the facts underlying the Employee Defendants' request for relief are undisputed.").

Based on the undisputed factual record as it existed at that time, on June 12, 2018, the Employee Defendants filed an expedited motion for Summary Judgment. In opposition to that motion, ATG inserted contrary facts into the record and, for the first time, took the position that it undertook no obligation whatsoever to pay

the Employee Defendants' legal fees.[13] ATG submitted a self-serving and unsupported declaration from its principal, Nick Ni, to support its position, and disingenuously argued that there remained disputed issues of fact as to whether ATG agreed to fund the Employee Defendants' legal expenses, citing the same evidence that Judge Brisco had expressly rejected just months earlier. This Court relied upon Ni's certification in finding disputed issues of fact and denying Defendants' motion for Summary Judgment. (Docket # 279.)

       ATG's failure to alert this Court to the Arbitration disposition and the fact that the issues of fact alleged by ATG in order to avoid summary judgment had already been adjudicated in another forum has caused this firm to incur hundreds of thousands of dollars in legal fees that might very well have been unnecessary. Put differently, given the state of the record and in particular the overwhelming evidence in the form of the numerous email correspondence and sworn statements from the Employee Defendants, a legitimate question arises concerning whether this Court still would have denied the Employee Defendants' motion for summary judgment had it been aware that the very facts asserted by Mr. Ni in his Declaration submitted in opposition to summary judgment had not only been

---

[13]     Up until that time, ATG's position was that it took on an obligation to pay legal fees but the obligation was conditioned upon the Employee Defendants' productivity and continued Employment. ATG presumably shifted gears and altered its theory after Judge Clark and this Court rejected that contention.

rejected by an arbitrator who had reviewed the same evidence and conducted a four

day plenary hearing, but had also resulted in the imposition of sanctions for the

frivolous nature of those factual allegations. As an additional and concurrent form

of relief, ATG should be made to bear the cost of those fees unnecessarily incurred

from the date the arbitration decision was rendered to the present and this Court

should exercise its inherent power to sanction ATG for its bad faith conduct.

*Goodyear Tire & Rubber Co. v. Haeger,* 581 U.S. 101 (2017) (stating that federal

courts have "inherent powers . . .to manage their own affairs so as to achieve the

orderly and expeditious disposition of cases, including sanctions in the form of an

"assessment of attorney's fees"… instructing a party that has acted in bad faith to

reimburse legal fees and costs incurred by the other side"); *In re Intel Corp.*

*Microprocessor Antitrust Litig.,* 562 F. Supp. 2d 606, 608 (D. Del. 2008)

(upholding Special Master's award of sanctions where litigant "acted in a willfully

vexatious manner taking frivolous and/or inconsistent litigation positions both

before and after the filing of the underlying discovery motion which were designed

to delay resolution of this action and resulted in a waste of judicial resources");

*Inst. for Motivational Living, Inc. v. Doulos Inst. for Strategic Consulting, Inc.*,

Civ. A. No. 03-4177, 110 F. App'x 283 (3d Cir. 2004) (finding that "the District

Court had inherent authority to impose [a] ... sanction" against a vexatious pro

se litigant"); *Republic of Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 74

(3d Cir. 1994) ("a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response").

Had this Court known prior to the Employee Defendants' Motion for Summary Judgment that after a four-day hearing, which included the testimony of Mr. Ni and Mr. Mulcahy, an arbitrator in another forum explicitly found that "**ATG (Nick Ni) Agreed to Pay the Legal Fees of the Employees**" (ED Exh. 33 at 7), the last four years of litigation could potentially have been spared. Judge Brisco explicitly rejected the identical argument that ATG makes before this Court – that the Employee Defendants were terminated for cause; he found the claim to be a "ruse" and held that

> The[e] evidence establishes that Mr. Ni became concerned about the high cost of the Maxlite, Inc. litigation. And despite **his assurances to the Employees and his acknowledgement that he'd agreed to pay their legal fees, he fired them in order to avoid this obligation** ..."
>
> (*Id.* at 14.)

ATG's failure to advise the Court of that development smacks of bad faith – the same bad faith that Judge Brisco found underlying ATG's frivolous claims against Mulcahy in that case and for which he imposed sanctions. This Court should do the same and, as an additional and concurrent form of relief, sanction ATG, in the form of attorneys' fees, incurred by the Employee Defendants, from the date that

125

the arbitration decision was handed down for having to defend against the same meritless claims that Judge Brisco had already rejected because of ATG's cunning and calculated failure to disclose the adverse authority in the hopes of a second bite at the apple.

## <u>CONCLUSION</u>

For the reasons set forth above, the Employee Defendants respectfully request that this Court find that ATG undertook an obligation to fund the MaxLite litigation on behalf of the Employee Defendants, and as a third-party payer of legal fees was required by *Grand Jury* to seek leave of Court to terminate its obligation. Because it has failed to do so, the Employee Defendants are entitled to all reasonable legal fees incurred in the MaxLite litigation.

**PASHMAN STEIN, P.C.**
Attorneys for Defendants,
**Sophia C. Galleher, and Matthew Kim**

Date: October 28, 2022        By:   /s/ Michael S. Stein
                                     MICHAEL S. STEIN

126