**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____

MAXLITE, INC., a New Jersey
Corporation, f/k/a SK
AMERICA, INC., d/b/a             **CIVIL ACTION NUMBER:**
MAXLITE,
                                 **2:15-cv-1116-JMV**
     Plaintiff,
                                 **Opinion Read**
          vs.

ATG ELECTRONICS, INC., JAMES
D. STEEDLY, SOPHIA C.
GALLEHER, and MATTHEW KIM,

     Defendants.
_____

     **Frank R. Lautenberg Post Office and Courthouse
     Two Federal Square
     Newark, New Jersey   07102
     December 21, 2022**

**B E F O R E:**           **THE HONORABLE JOHN MICHAEL VAZQUEZ,
                           UNITED STATES DISTRICT COURT JUDGE**

     **** ALL PARTIES PRESENT VIA ZOOM CONFERENCE ****

**A P P E A R A N C E S:**

     JASINSKI, P.C. BY:
     ROBERT PHILIP MANETTA, ESQ.
     2 Hance Avenue
     3rd Floor
     Tinton Falls, New Jersey   07724

          appeared on behalf of the Plaintiff;


          Lisa A. Larsen, RPR, RMR, CRR, FCRR
               Official Court Reporter
          Lisa_Larsen@njd.uscourts.gov
                 (973)776-7741

     **Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.**

1    **A P P E A R A N C E S:** (Cont'd.)

2         PASHMAN STEIN WALDER HAYDEN, P.C., BY:
         MICHAEL S. STEIN, ESQ.
3         J. JOHN KIM, ESQ.
         Court Plaza South
4         21 Main Street, Suite 200
         Hackensack, NJ  07601

5
              appeared on behalf of the Employee Defendants; and
6
     **A L S O   P R E S E N T:**
7
         Kelly Purcaro, Esq., MaxLite, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS held via Zoom videoconference, before The

2           HONORABLE JOHN MICHAEL VAZQUEZ, United States District

3           Court Judge, on December 21, 2022.)

4          THE COURT:  Good morning, we're on the record in the

5     matter of *MaxLite, Inc. vs. ATG, Inc., James Steedly, Sophia*

6     *Galleher, and Matthew Kim*.  The civil number in this case is

7     15-1116.

8          Can I please have appearances.

9          MR. STEIN:  Your Honor, Michael Stein, John Kim here on

10    behalf of the employee defendants.  There are others from my

11    office, Ms. Byalik, Mr. Levy, who are listening in because

12    they spent some time working on the matter.

13         THE COURT:  Okay.

14         MR. MANETTA:  Good morning, Your Honor, Robert Manetta

15    from Jasinski representing ATG Electronics.

16         THE COURT:  Good morning.

17         MS. PURCARO:  Good morning, Kelly Purcaro on behalf of

18    MaxLite.

19         THE COURT:  Good morning, counsel.

20         We're here today focused on a particular issue, which

21    is whether the New Jersey Supreme Court's decision in

22    *In re: The State Grand Jury Investigation* at 983 A.2d 1097 of

23    2009, whether that decision, which I'll refer to as "*In re:*

24    *Grand Jury,*" requires ATG to pay the counsel fees for

25    Ms. Galleher and Kim, who I will refer to collectively as the

1   "employee defendants."  I will also include within that

2   definition where appropriate Mr. Steedly.

3        We've had several days of hearings on this issue.

4   Those days are reflected in the docket at Docket Entry 463,

5   467, 468, and 473.  The parties then submitted post-hearing

6   briefing, which I have reviewed, at Docket Entry 480, 481,

7   486, and 487.

8        First, I want to review the factual findings that I'm

9   making, then I will review the relevant requirements of *In re:*

10  *Grand Jury*, and then I'll do a legal analysis.

11       As to the factual background, MaxLite is in the

12  lighting business and sells, among other things, LED lights.

13  MaxLite is headquartered in New Jersey.

14       ATG is headquartered in California and is also in the

15  LED lighting business.  ATG was started in 2001 by Yaxis,

16  Y-A-X-I-S, Ni, who has gone by Nick Ni in these proceedings.

17       As to the employees, Mr. Steedly began working with

18  MaxLite as an engineer in 2009 in New Jersey, Ms. Galleher

19  began working with MaxLite in May of 2012 in New Jersey, and

20  Mr. Kim began working with MaxLite in July of 2013 in sales.

21  Mr. Kim was part of the New Jersey office but worked from home

22  in Georgia.

23       The employee defendants had employment contracts with

24  MaxLite, generally referred to as the proprietary information

25  agreement.  The parties are familiar with the terms of the

1   agreement, but essentially there were, among other things, a

2   one-year non-compete provision and a one-year non-solicitation

3   provision should any of the employee defendants leave MaxLite.

4   The contract also had a New Jersey choice of law and

5   New Jersey venue provision.

6        In approximately March of 2013, Mr. Ni and a former ATG

7   president Art Tapia began communicating with Mr. Steedly and

8   another MaxLite employee David Wyatt, W-Y-A-T-T, about

9   potentially working with ATG.  During the meetings,

10  Mr. Steedly and Mr. Wyatt expressed concerns over the

11  non-compete provisions in their MaxLite contracts.

12       Around August of 2013, Mr. Ni paid for the non-compete

13  provisions to be reviewed by a New Jersey attorney by the name

14  of John Brink, B-R-I-N-K.  And then on approximately

15  October 14th of 2014 Mr. Ni sent Mr. Steedly an offer of

16  employment.

17       Mr. Steedly left MaxLite for ATG.  That I drew from the

18  verified cross-claim in which Mr. Steedly indicated that he

19  did so in reliance on Mr. Ni's promise that ATG would provide

20  legal protection if a dispute with MaxLite arose.

21       Turning now to Ms. Galleher and Mr. Kim, Ms. Galleher

22  learned of ATG in 2014 through Mr. Tapia.  Mr. Tapia set up a

23  meeting between Mr. Ni and Ms. Galleher, and in subsequent

24  meetings Ms. Galleher informed Mr. Ni that she was concerned

25  about the non-compete agreement in her contract with MaxLite.

1    Mr. Ni informed her that he was aware of the provision,

2 that he had paid for an attorney to review it, that it would

3 not be an issue, and that ATG would take care of her and

4 defend her if there was ever a problem with MaxLite.  Mr. Ni

5 made multiple assurances of the same nature to Ms. Galleher.

6    Ms. Galleher relied upon Mr. Ni's promises to defend

7 her against MaxLite if necessary and she would not have joined

8 ATG but for those promises or assurances.  In October of 2014,

9 Mr. Ni offered Ms. Galleher the position of ATG's director of

10 sales and marketing and Ms. Galleher ultimately accepted.

11    In approximately November of 2014, ATG started

12 recruiting Mr. Kim.  At the end of that month, Mr. Kim flew to

13 California to meet with Mr. Ni.  Mr. Kim expressed concern

14 about his non-compete with MaxLite.

15    Mr. Ni responded that his attorneys have reviewed the

16 provision in the past and that Mr. Ni was not concerned.

17 Mr. Ni informed Mr. Kim not to worry about the provision and

18 that if legal action arose with MaxLite ATG would pay for it.

19    Mr. Ni later offered Mr. Kim a job with ATG as a senior

20 national accounts manager, which Mr. Kim accepted.  Mr. Kim

21 resigned from MaxLite in approximately December of 2014 and

22 started with ATG the following month, January of 2015.

23    Like Ms. Galleher, Mr. Kim would not have left his job

24 with MaxLite and joined ATG without Mr. Ni's promise that ATG

25 would defend Mr. Kim and pay his legal fees.  Mr. Kim

1  similarly relied upon Mr. Ni's promises and assurances.

2       On or about February 9th of 2015, the employee

3  defendants, Mr. Steedly, Ms. Galleher, Mr. Kim, all received

4  cease and desist letters from MaxLite demanding that they

5  terminate their positions with ATG by February 12th, 2015.

6       Ms. Galleher informed Mr. Ni that litigation could be

7  expensive and that she was not prepared to move forward.

8  Mr. Ni responded that she, Ms. Galleher, should not worry,

9  that she should stay focused on her work, and that ATG would

10 handle any lawsuit.

11      Ms. Galleher indicated that she would not have stayed

12 on with ATG without Mr. Ni's promise.  Again, I find that

13 Ms. Galleher did rely upon Mr. Ni's promise to continue her

14 employment.

15      Ms. Galleher's father is an attorney.  She contacted

16 her father and he referred her to a California lawyer named

17 James Mulcahy.  Ms. Galleher forwarded the cease and desist

18 letters to Mulcahy and copied Mr. Ni.

19      Mr. Ni informed Ms. Galleher that they should hire

20 Mulcahy to handle the matter.  Mr. Mulcahy responded on

21 February 9th and discussed the possibility of filing a

22 preemptive action for declaratory relief in California.

23 Mr. Ni indicated that the expense of the litigation would not

24 be an issue and that ATG would cover the legal bills and

25 costs.

1          On February 11th Mr. Ni confirmed in an e-mail that

2    Ms. Galleher should hire Mr. Mulcahy.  Mr. Ni designated

3    Ms. Galleher to be the point of contact in the litigation.

4          On February 12th, Mr. Mulcahy sent to ATG,

5    Ms. Galleher, Mr. Kim, and Mr. Steedly an engagement letter

6    along with a conflict waiver.  The engagement letter requested

7    a $5,000 retainer.  Each employee executed both documents and

8    Eric Cai, C-A-I, Eric is E-R-I-C, signed on behalf of ATG.

9    ATG paid the $5,000 retainer.

10          The engagement letter reviews, among other things, the

11    scope of services, indicating, quote:  "We represent each

12    of you," meaning the employees, "and ATG in connection with

13    the filing of a lawsuit against MaxLite."

14          There's also discussions about day-to-day

15    communications, including billing matters, with Ms. Galleher.

16    Fee and payments were addressed globally as to "you" or "your"

17    as opposed to any individual client, and there was a

18    California choice of law clause.

19          The conflict waiver discussed joint representation and

20    indicated that it would be appropriate, "given the facts and

21    discussions with some of you."

22          The understanding at that point is that ATG and the

23    employees would be the potential plaintiffs in a preemptive

24    action and the parties, meaning the employee defendants and

25    ATG, agreed to waive actual potential conflicts and agreed to

1  joint representation.

2       As to who was to pay the fees for Mr. Mulcahy,

3  Ms. Galleher understood that ATG would be paying for

4  Mr. Mulcahy's fees based on what Mr. Ni had said in the past.

5  Mr. Mulcahy similarly understood that ATG would be paying for

6  the legal fees and costs because Mr. Ni made it clear that he

7  was undertaking the cost of the defense because he had hired

8  the employee defendants.

9       Mr. Mulcahy added that he would not have taken the case

10  if the employees had been -- employee defendants had been

11  responsible for paying the fees and costs because Mr. Mulcahy

12  knew that they did not have the money to do so.

13       Mr. Mulcahy also said that Mr. Ni did not put any

14  conditions on ATG's continued payment of the employees' fees

15  and costs, such as the employees being productive or the

16  employees being employed by ATG.

17       Mr. Kim had a similar understanding that ATG would be

18  paying for the legal fees and costs based on what Mr. Ni had

19  told him.  During the hearing, Mr. Ni's position was that he

20  never promised to have ATG pay Mulcahy's fees and costs.  In

21  other words, that there was never a binding commitment for ATG

22  to do so.

23       Mr. Ni's position as to ATG's commitment has shifted

24  over time, including during the hearing itself.  For example,

25  on October 16th of 2015, in opposition to an Order to Show

1  Cause, ATG indicated that the payment of the fees and costs

2  was connected or contingent on continued employment with ATG.

3       Similarly, on September 27th of 2022 during the

4  hearing, Mr. Ni testified that once the individual employees

5  no longer worked for ATG, the condition of payment was no

6  longer satisfied.  Also during the hearing, Mr. Ni said that

7  ATG could no longer afford or could not afford to help the

8  employee defendants at a certain point during the litigation.

9       During his deposition testimony, Mr. Ni stated that ATG

10 never had an obligation to pay but had a, quote, moral

11 obligation, where he explained that the moral obligation was

12 that he felt bad because the employee defendants were poor,

13 meaning in relation to their financial condition; that they

14 were living paycheck to paycheck; that the employee defendants

15 could not afford the lawsuit or legal bills, so he decided to

16 help them out.

17      Although Mr. Mulcahy had contemplated filing a

18 preemptive declaratory action, which was in fact filed on

19 February 13th, the employee defendants learned on

20 February 17th that MaxLite had already filed the current

21 suit in this matter in this court on February 12th.

22      Ms. Galleher informed Mr. Ni right away, and Mr. Ni

23 said that he would work with Mulcahy to get the matter

24 handled.  Mr. Mulcahy also informed Ms. Galleher that MaxLite

25 was seeking specific performance; meaning for Ms. Galleher to

1  stop working for ATG along with the other employee defendants.

2  Ms. Galleher testified that she would have considered leaving

3  ATG at the time if Mr. Ni had not indicated that ATG was

4  going to fund the lawsuit.

5       In February of 2015, Mr. Ni also e-mailed the employee

6  defendants that they should not worry about the MaxLite

7  lawsuit, that it was not going anywhere, that Mulcahy would

8  handle it, and they should not be distracted from what they do

9  for ATG.

10       Ms. Galleher and Mr. Kim both stated that the e-mail

11  was consistent with what Mr. Ni had told them previously; that

12  is, to focus on their jobs and that ATG was going to take care

13  of the MaxLite lawsuit.

14       Mr. Mulcahy's bills for his representation were

15  addressed to ATG and ATG did pay the bills.  In addition to

16  the initial retainer, ultimately ATG paid over $90,000 to

17  Mulcahy.  I'm not referring to the later arbitration that

18  Mr. Mulcahy prevailed in.  I'm just talking about at the time.

19       For example -- these are just some examples of

20  payments:  An April invoice for $8,688, a May payment for

21  $40,000, a June payment of $15,000, and then numerous payments

22  of $2500 each at different months.  These payments started in

23  2015 at the beginning of the representation.

24       The employee defendants never paid payments to Mulcahy

25  and Mulcahy never billed them or sought payment from the

1    employee defendants.

2        On June 3rd of 2015, Ni e-mailed Mulcahy in reference

3    to the outstanding bills.  Mr. Ni indicated that he would pay

4    ATG's amounts first, starting with a payment the following

5    week, and asked for time as for the bills for the individual

6    defendants, indicating that Mr. Ni would find ways to cover

7    those costs in the coming months.

8        Mulcahy noted that he had never discussed with Ni

9    before this e-mail a distinction between ATG and the employee

10   defendants' bills.  Now, at the same time, that is in 2015,

11   ATG was also trying to obtain financing from banks and the SBA

12   for a new building.

13       Some of the evidence that overlaps as to this issue was

14   an April 21st, 2015, e-mail from Ni to Ms. Galleher indicating

15   the amount of Mulcahy's bill and also noting that that amount

16   would be paid the following month but noting that ATG was

17   working with a bank to finance a new building.  ATG needed to

18   show a balance as high as possible.

19       Mr. Ni reiterated to Ms. Galleher not to worry and that

20   ATG had her covered and that ATG also had this financing

21   issue.  Similarly, a May 10th, 2015, e-mail from Mr. Ni to

22   Ms. Galleher indicated discussing strategy and options going

23   forward with the lawsuit because Mr. Mulcahy's bill was higher

24   than expected.

25       Mr. Ni also indicated that he spoke with Mr. Steedly

1  and Mr. Kim and that as long as, quote, "you guys are

2  productive, the lawsuit is nothing.  We will fight it."

3       Ms. Galleher testified that this was the first time

4  that Mr. Ni had said anything about the size of the bills or

5  the condition of remaining productive to continue to fight the

6  lawsuit.  Around the same time, Mr. Ni wrote to Mr. Kim -- I'm

7  sorry, had a telephone call with Mr. Kim indicating that the

8  lawsuit was not something to worry about and that Mr. Ni was

9  taking care of it.

10      Also around the same time, in May or June of 2015,

11 Mr. Ni told Mr. Mulcahy that Mr. Ni wanted more time to pay

12 legal bills because he needed to raise money as he was working

13 with a lender to build a new warehouse.

14      A similar e-mail on approximately May 13th of 2015 from

15 Mr. Ni to Mr. Mulcahy indicated that ATG was in the process of

16 getting the financing for this new office/warehouse building,

17 that the banks were looking at the books, that April's legal

18 bill was big, and asked if Mr. Mulcahy could hold it until

19 June and that Mr. Ni would also start to arrange payment on

20 the last bill.

21      Mr. Ni also asked Mr. Mulcahy to prepare a status

22 report on the litigation and to send it to ATG's accountant,

23 Mark Thomas, T-H-O-M-A-S.  On approximately May 18th of 2015,

24 Mr. Thomas sent an e-mail to Mr. Mulcahy indicating that the

25 lender wanted further analysis of the lawsuit, wanted a

1    worst-case scenario on damages, and who would be responsible

2    for payment, ATG or the employees?

3        There were other e-mails with Thomas and Ni, as well

4    as Mr. Ni and Ms. Galleher as to ATG's worst-case exposure,

5    further inquiries from the lender to Thomas, which Mr. Ni

6    forwarded to Mulcahy, again, about how the parties were

7    going to address a worst-case scenario.

8        On about June 10th of 2015, Mr. Ni had lunch with

9    Ms. Galleher and Mr. Steedly.  Mr. Ni indicated he was pleased

10   with their performance, that the lawsuit was becoming a

11   substantial investment but not to worry because ATG had the

12   money and would continue to fight and move ahead with the

13   lawsuit.  By "lawsuit," I'm referring to the MaxLite lawsuit.

14       On June 17th of 2015, shortly after the June 10th

15   meeting, Mr. Ni and Mr. Mulcahy met.  Mr. Ni expressed a

16   concern that, if ATG got out of the MaxLite case on a motion,

17   that ATG would still have to pay the costs and fees for the

18   employees.

19       Mr. Ni suggested that if he fired the employees he

20   would no longer be responsible for paying their bills.

21   Mr. Mulcahy replied, in substance and part, that if Mr. Ni did

22   so, Mr. Mulcahy would have to get out of the case because of

23   conflict of interest.

24       Mr. Ni admitted during the hearing that at this time he

25   was looking for a way to get out of paying the legal bills for

the employees.  Of course this admission was contradicted by

Mr. Ni's other testimony that he had no obligation to pay the

employees' fees in the first place.

At the time Mr. Ni met with Mr. Mulcahy in June of

2015, Mr. Ni had already spoken with another law firm about

firing the employee defendants and the new firm only

representing ATG.

On about July 2nd of 2015, Mr. Mulcahy's local counsel

in New Jersey informed Mr. Mulcahy that counsel had contacted

her indicating that ATG had both new California counsel and

new local counsel in New Jersey.

Mr. Mulcahy followed up with a conversation with

Mr. Ni.  Mr. Ni indicated that the new lawyers told him that

if he paid Mulcahy's bills it would look like Mr. Ni was

admitting that he or ATG was responsible for paying for the

employee defendants' legal fees.

Mr. Ni also admitted during the hearing that he thought

that if he fired the employee defendants it would help ease

pressure in the lawsuit with MaxLite and help in settlement of

the case.

In an action filed in California state court by ATG

against Mulcahy in 2017, ATG claimed that soon after signing

the agreement and waiver with Mulcahy the employee defendants'

productivity had become extremely low and that they were

taking off a significant amount of time from work.

1        On or about June 18th of 2015, Mr. Ni met with the

2   employee defendants.  Mr. Ni indicated that things were not

3   working out and that after the employee defendants were fired

4   the MaxLite suit would go away.  Mr. Ni also did not think

5   that MaxLite could obtain personal jurisdiction over ATG in

6   New Jersey.

7        Mr. Ni indicated that he would pay Mulcahy's

8   outstanding fees but no more going forward.  Mr. Ni also

9   indicated that once the lawsuit was over he would like to find

10  a way to work with the employee defendants in the future.

11       Mr. Ni offered a severance agreement of about

12  two weeks' pay but in exchange for a written agreement

13  indicating that ATG did not have to pay for the employee

14  defendants' legal fees in the MaxLite litigation.  That was

15  paragraph 10 of the proposed severance agreement.

16       Mr. Ni also said that he would give the employee

17  defendants an additional $40,000 to help settle the suit with

18  MaxLite.  Ms. Galleher and Mr. Kim said that prior to that

19  meeting no one at ATG had ever expressed displeasure with

20  their work.

21       It does seem uncontroverted that they, meaning the

22  employee defendants, had never been warned of any type of poor

23  work performance, there were never any issues reduced to

24  writing or any written warnings, and there's nothing in the

25  personnel files to reflect alleged poor performance by the

1  employee defendants.

2      On June 19th of 2015, Mr. Ni sent an e-mail to

3  Mr. Mulcahy.  He, Mr. Ni, indicated that he spoke with

4  Ms. Galleher and Mr. Steedly and that they were not performing

5  as required so that he asked -- Mr. Ni asked them to quit or

6  be terminated.

7      He then discussed whether MaxLite may be willing to

8  settle the MaxLite litigation after the employee defendants

9  were gone.  Mr. Mulcahy testified that Mr. Ni had never

10 mentioned poor performance before of the employee defendants

11 and that Mr. Ni was just trying to make an excuse to justify

12 firing the employee defendants.

13     Believing that he now had a conflict of interest due

14 to the employee defendants' termination, on approximately

15 July 22nd of 2015, Mr. Mulcahy filed a motion to withdraw as

16 counsel in this case.

17     Ms. Galleher's father put Ms. Galleher in touch with

18 the firm of Pashman Stein.  Each employee defendant, that

19 would have included Mr. Steedly at the beginning, paid

20 approximately $3500 as an initial retainer of a $10,000 total.

21     The Pashman Stein retainer indicated that the scope of

22 engagement was for a negotiated settlement as to the MaxLite

23 litigation and that they would revisit the scope of the

24 retainer if the settlement was unsuccessful.

25     The retainer refers to billing policies and discussed

1    hourly rates, project management, and other similar standards.

2    There's no discussion in the Pashman Stein retainer of a

3    third-party payor or of *In re: Grand Jury* or other similar

4    type of language.

5        During the hearing the parties indicated that there

6    was an expansion of Pashman Stein's services, including the

7    current issue before the Court, which is the cross-claim under

8    *In re: Grand Jury*, to have ATG meet the obligations to pay the

9    employee defendants' attorneys' fees in the MaxLite

10   litigation.  Ms. Galleher and Mr. Kim also indicated they paid

11   an additional retainer amount, as well.

12       Also, in July of 2015, there was a request of Mr. Ni --

13   I believe it was Ms. Galleher, not Mr. Kim, who asked if

14   Mr. Ni would provide the $40,000 as they had discussed at the

15   time of their -- when they were first notified that they would

16   probably be terminated.  Mr. Ni responded that he would if all

17   the employees signed a severance agreement -- the proposed

18   severance agreement.

19       I make the following findings as to these facts:

20       The employee defendants detrimentally relied on ATG's

21   promises that ATG would defend them if MaxLite took action at

22   the time the employee defendants decided to leave MaxLite and

23   join ATG.

24       I also find that the employee defendants detrimentally

25   relied on Mr. Ni's promises that ATG would defend them against

1   any MaxLite litigation after MaxLite sent the cease and desist

2   letters and that this also caused the employee defendants to

3   remain with ATG.

4          Just to be clear, there were two different reliances

5   and action result.  The first was the reliance on the promises

6   that caused the employee defendants to leave MaxLite and join

7   ATG in the first instance.

8          The second was the promises following the receipt of

9   the cease and desist letters which caused the employee

10  defendants to rely upon those promises and commitments and to

11  stay with ATG or remain with ATG.

12         I also find that Ni promised that ATG would pay

13  Mulcahy's fees and costs for ATG as well as the employee

14  defendants' in the MaxLite litigation.  I do acknowledge that

15  in Mulcahy's engagement agreement it can be read that all

16  parties, meaning ATG and the employee defendants individually,

17  could be responsible for the payment of the fees and costs.

18         However, I do find Ms. Galleher, Mr. Kim, and

19  Mr. Mulcahy credible when they indicate that ATG undertook to

20  pay.  Critically, I also find this is exactly what Mr. Ni

21  promised from the outset when he was recruiting the employee

22  defendants and also what he promised after the employee

23  defendants received the cease and desist letters.

24         To this end, even Mr. Ni acknowledged that the employee

25  defendants did not have the money to defend the suit.  So I do

1   not find that Mr. Ni could have reasonably believed that the

2   employee defendants were agreeing to undertake payment in

3   whole or in part of legal fees or costs when he himself

4   admitted that they did not have the wherewithal to do so.

5        I find Mr. Ni's explanations as to the reason for the

6   firing and to the type of commitment that he on behalf of ATG

7   made to the employee defendants not to be credible.

8        First, his explanations have been shifting.  There has

9   been the explanation that ATG never had the obligation in the

10  first instance to pay for the employee defendants' fees and

11  costs, that there was only a, quote, "moral obligation," which

12  had a unique definition to Mr. Ni about trying to help because

13  the employee defendants did not have the wherewithal.

14       There were indications that it was never conditioned on

15  performance.  Then there were indications by Mr. Ni that

16  it was always conditioned on continuing good performance.  So

17  his explanations have shifted over time and I do not find them

18  credible.

19       I also find that Mr. Ni's explanation that the employee

20  defendants were not performing well and that is the reason

21  that he terminated them is not credible.  There was no prior

22  evidence to support this allegation by Mr. Ni, and I find that

23  his reasoning was merely of subterfuge to fire the employee

24  defendants so that he could stop paying the fees for the

25  employee defendants and hopefully resolve the MaxLite case.

1          I do find that there were several other reasons that

2    the employee defendants were actually fired.  First, in an

3    effort to stop paying Mulcahy's fees by ATG on the mistaken

4    belief that it would end the MaxLite suit as to ATG.

5          I also find that the employee defendants were fired

6    because Mr. Ni had real concerns about the cost of the MaxLite

7    suit, particularly in light of the financing that ATG was

8    attempting to obtain for the new building.

9          Turning to the relevant law, *In re: Grand Jury*

10   indicated that its opinion applied regardless of the setting,

11   whether administrative, criminal, or civil; either as part of

12   an investigation during grand jury proceedings; or before,

13   during, and after trial.  Whether an attorney may be

14   compensated for his services by someone other than his client

15   is governed in large measure by RPC 1.8(f) and to a lesser

16   extent RPC 1.7(a) and RPC 5.4(c).

17         Of course those are the New Jersey's RPCs, the Rules of

18   Professional Conduct.

19         The background facts there were that a State

20   investigation was launched into whether a contractor had

21   submitted fraudulent invoices to a county government.  The

22   contractor, which was an entity, got counsel and also arranged

23   for four additional counsel:  Three to help individual

24   employees and then another counsel to represent all current

25   and former non-target employees.

1    The State moved to disqualify counsel who had been

2  retained by the company, arguing there was an inherent

3  conflict of interest.  After reviewing the relevant RPCs, the

4  Supreme Court of New Jersey found as follows:

5    A synthesis of RPCs 1.7(a)(2), 1.8(f), and 5.4(c)

6  yields a salutary yet practical principle.  A lawyer may

7  represent a client but accept payment directly or indirectly

8  from a third party provided each of the six conditions are

9  satisfied.  Those conditions are:

10    First:  The informed consent of the client is secured.

11  In this regard informed consent is defined as the agreement by

12  a person to a proposed course of conduct after the lawyer has

13  communicated adequate information and explanation about the

14  material risks of and reasonably available alternatives to

15  proposed course of conduct.

16    Now, in that case, I will note that the company, the

17  contractor, offered the employee defendants a lawyer or

18  indicated that the employee defendants -- I'm sorry.  They

19  were not defendants, they were subject to the grand jury

20  investigation -- or that the employees could get a lawyer at

21  their own expense.

22    Ultimately, the Supreme Court found that that's not

23  permissible, that the third-party payor could not do a "take

24  it or leave it" proposition.  But ultimately the Supreme Court

25  found no error at that point because all counsel that were

1    retained were experienced and the clients were happy with the

2    representation.

3         The Supreme Court also noted, however, that while a

4    third-party payor could not engage in a "take it or leave it"

5    proposition as far as specific counsel, the third-party payor

6    was able to put reasonable limitations on fees and expenses.

7         Number two:  The third-party payor is prohibited from

8    in any way directing, regulating, or interfering with a

9    lawyer's professional judgment in representing his client.

10        Number three:  There cannot be any current

11   attorney-client relationship between the lawyer and the

12   third-party payor.

13        Now, there the Supreme Court noted a case that it would

14   be unethical to represent a party who had interests that were

15   adverse to one another, which goes without saying.  But the

16   rule that they prescribed was that there cannot be any current

17   attorney-client relationship between a lawyer and a

18   third-party payor.

19        Number four:  The lawyer is prohibited from

20   communicating with a third-party payor concerning the

21   substance of the representation of his client.  The breadth of

22   this prohibition includes but is not limited to the careful

23   and conscientious redaction of all details from any billings

24   submitted to the third-party payor.

25        Number five:  The third-party payor shall process and

1   pay all such invoices within the regular course of its

2   business consistent with manner, speed, and frequency it pays

3   its own counsel.

4        And then, finally, number six:  Once a third-party

5   payor commits to pay for the representation of another, the

6   third-party payor shall not be relieved of its continuing

7   obligations to pay without leave of court brought on prior

8   written notice to the lawyer and the client.

9        In such an application the third-party payor can bear

10  the burden of proving that its obligations to continue to pay

11  for the representation should cease.  The fact that the lawyer

12  and the client have elected to pursue a course of conduct

13  deemed in the client's best interest but disadvantageous to

14  the third-party payor shall not be sufficient reason to

15  discontinue the third-party payor's continuing obligation of

16  payment.

17       If a third-party payor fails to pay an employee's legal

18  fees and expenses when due, then the employee should have a

19  right via summary action for an Order to Show Cause why the

20  third-party payor should not be ordered to pay those fees and

21  expenses.

22       The difficulty is that in federal court we do not have

23  access to the summary action as New Jersey courts do.

24       The following is my analysis of the facts in light of

25  the governing law:

1          The employee defendants argue that I do not need to

2     engage in an analysis of all six factors and that only the

3     sixth factor is critical in this case.  I would say that

4     "factors" may not be the appropriate term.  They seem to be

5     elements, by the New Jersey Supreme Court.  But in any event,

6     that's at Docket Entry 481 at pages 75 to 76.

7          I do note at the outset that while this is a civil case

8     it clearly is not dispositive as *In re: Grand Jury* clearly

9     indicated that its decision applies to all types of action;

10    criminal, civil, administrative; at all different stages of

11    the proceeding, pre-trial, trial, and the like, when a

12    third-party payor is involved.

13         I do note there are key factual differences between

14    this case and the *In re: Grand Jury* case.

15         First, when Mr. Mulcahy undertook representation here,

16    he was not subject to *In re: Grand Jury*.  Instead, he was

17    subject to the California ethics law.  At the time Mr. Mulcahy

18    undertook representation, ATG and the employee defendants were

19    unaware of MaxLite's suit in the District of New Jersey; so

20    it was not until Mr. Mulcahy and ATG and the employee

21    defendants all agreed that Mr. Mulcahy would represent them in

22    the District of New Jersey in the MaxLite suit that the *In re:*

23    *Grand Jury* opinion became relevant.

24         Now, Judge Clark noted this in his report and

25    recommendation, which I'll just refer to as his report and

1    recommendation of March 15th, 2018, at page 23 and also at

2    page 23, note 10, where:   (Reading.)

3         Although the parties agree that Mulcahy's

4         representation would be governed by the California

5         RPCs, once Mulcahy applied for pro hac vice

6         admission for the current case, he was subject to

7         New Jersey, our district, local civil rule of

8         103.1, which means, among other things, he was

9         subject to the New Jersey Rules of Professional

10        Conduct.

11        In this matter third requirement of *In re: Grand Jury*

12   was clearly violated; that is, Mulcahy could not have an

13   attorney-client relationship with ATG, third-party payor.  As

14   a result, the second and fourth requirements of *In re: Grand*

15   *Jury* could not be complied with.  Those prevent a third-party

16   payor from in any way directing, regulating, or interfering

17   with a lawyer's professional judgment in representing his

18   client and also that the lawyer was prohibited from

19   communicating with a third-party payor concerning the

20   substance of the representation of his client.

21        Once Mr. Mulcahy decided to undertake joint

22   representation of ATG and the employee defendants, he by

23   definition had to violate the second and fourth requirements

24   because ATG was also his client at the time.

25        I'm not faulting Mr. Mulcahy because, as I noted, when

he undertook the representation he was not doing so pursuant

to the New Jersey RPCs, but the fact of the matter is three of

the requirements of *In re: Grand Jury* were violated in this

case.

Now, I do not want to make my ruling too broad.  I

could envision a situation where an entity and employees have

separate counsel, that separate counsel is paid for by the

entity; but ultimately counsel for the entity, the third-party

payor, and the individual employees believe that a joint

defense agreement would be in the interest of all their

clients.

I could see such a situation, provided that appropriate

notice and disclosure be given to the clients and the clients

giving knowing consent to such a situation as, although not

technically complying with the requirements of *In re: Grand

Jury*, that the New Jersey Supreme Court nevertheless finds

that such a relationship is ethical and permissible.

Sometimes joint defense agreements are beneficial to

all, including the third-party payor and those for which he is

paying because they want to have a united defense.  However,

even with most joint defense agreements, there are provisions

on how a party can no longer participate in the joint defense

agreement and what are their rights and obligations as to

information shared during it.

But in this case there was joint representation by one

1   counsel.  Of course the obvious problem is presented here.

2   Any time you have joint representation of multiple parties by

3   one counsel, the potential for conflicts is much more readily

4   foreseeable.  In fact, it actually gives a trump card to any

5   one of the clients, whether it be the individual employees or

6   the entity.

7        All the client has to do is decide to take a materially

8   different view than the other clients being represented and an

9   actual conflict arises.  Here, of course, the one party was

10  ATG.

11       So there's a concern that based on the facts it could

12  be said that the third-party payor, the entity, ATG, had the

13  ability to manipulate the outcome by simply firing the

14  employee defendants.  That may be true in the specific facts

15  of this case, but in reality it gives a trump card to any one

16  of the clients.

17       Putting aside the particular facts of this case, once

18  an attorney undertakes joint representation, all parties can

19  act in complete good faith and nevertheless a conflict can

20  arise.  For example, discovery could reveal that one client is

21  more culpable than the others or that only one is culpable.

22       At that point the attorney is put in an untenable

23  position of trying to represent the culpable client and the

24  non-culpable clients.  At that point the conflict has arisen

25  and joint representation cannot continue.

1          I note that in the situation here it was readily

2     foreseeable.  While the parties agreed there was no actual

3     conflict at the time, the relief being sought by MaxLite was,

4     among other things, to have the employee defendants stop

5     working at ATG.  So the potential conflict, which is ATG and

6     the employees no longer working with them, was readily

7     foreseeable from the outset of this case.

8          Unless counsel has authority on which I am not aware,

9     once the attorney has an actual conflict, no court can force

10    the attorney to stay in the case.  Obviously, if the attorney

11    is no longer in the case because of a conflict, it presents a

12    valid reason to stop paying the attorney under *In re: Grand*

13    *Jury*.

14         Now, I understand that the employee defendants want me

15    to focus on factor six, but I have a few comments on that.

16         The employee defendants had other recourse in this

17    case.  If I'm looking solely at factor six, most obviously

18    they could have brought a breach of contract or a

19    quasi-contract such as promissory estoppel claim against ATG.

20         If I were the trier of fact, I would conclude, based on

21    the hearing, that there was a contract and there was a breach

22    by ATG or in the alternative that the employee defendants have

23    a valid promissory estoppel claim.  But those claims give ATG

24    the right to a trial by jury, so unless the parties agree to a

25    bench trial, I would not be the trier of fact.

1      Given that my factual findings rely on credibility

2  findings, I could not grant summary judgment, either.  The

3  jury would have to make that decision.

4      So while I do agree with Judge Clark's R and R that the

5  grand jury reaches to third-party payors, not just attorneys,

6  at the same time I cannot ignore the other five requirements

7  of *In re: Grand Jury*.  I have not seen any authority from the

8  New Jersey Supreme Court saying that those are factors as

9  opposed to requirements but also that the Court is free to

10 ignore them.

11     So I think the difficulty here with applying *In re:*

12 *Grand Jury* is evident by the actual facts.  Normally it would

13 be Mulcahy who would have the right to seek relief under *In*

14 *re: Grand Jury* because he was the employee defendants'

15 attorney at the time.  That would be the person going to court

16 to say they can't stop paying, meaning ATG.

17     We know that in lieu of seeking that relief, he

18 believed that he had a conflict and moved to get out of the

19 case.  And Pashman Stein has not shown me any cases in which

20 another attorney can start representation and at the first

21 time not even saying *In re: Grand Jury* but taking a retainer

22 from the client to settle the case without the knowledge or

23 consent of the third-party payor, here ATG.

24     Because, recall, even if a third-party payor could not

25 put a limitation on which attorney its employee could choose,

1   it can put a limitation on reasonable expenses and fees.  Even

2   if *In re: Grand Jury* were to extend to this case, it would at

3   most permit recovery of the hourly rates of the Mulcahy firm

4   because that's what ATG agreed to pay and then a reasonability

5   limit on top of that as to the hours actually spent.

6        Here the facts are that there was an initial retainer

7   of $10,000 paid by the employee defendants because Pashman

8   Stein was going to try to seek a potential quick settlement

9   with MaxLite.  Once that became untenable, the employee

10  defendants undertook to seek relief under *In re: Grand Jury*.

11       My concern is, here the federal rules clearly permit

12  pleading in the alternative.  I know that Pashman Stein is

13  aware of this, and I know that Pashman Stein expressly

14  indicated that it was not seeking relief under contract or

15  related theories.  I do not know why that decision was made.

16       Given this late stage of the proceedings, I'm not sure

17  that the employee defendants can make the requisite showing to

18  amend its pleadings.  But at the same time, it does seem to me

19  like the parties have conducted full discovery on the issue,

20  so now all that would have to be applied here are the relevant

21  legal principles which would have to be applied before a jury.

22       So while I am dismayed that there were not pleadings

23  in the alternative in the cross-claims -- and I note that

24  cross-claims are permissive under our rules.  That means

25  they're not subject to preclusion if you assert them.  Once

1  you assert cross-claims, you have to be thinking about claim

2  preclusion.  You have to be.

3       I'm concerned that the employee defendants could be

4  unfairly prejudiced because the appropriate cross-claims were

5  not asserted by counsel in this case.  They should have been

6  asserting breach of contract and promissory estoppel in this

7  case as an alternative method of pleading.

8       Because I don't necessarily see any unfair prejudice to

9  ATG, I am going to give the employee defendants leave -- I

10  don't know what the outcome is going to be, but I'm going to

11  give them leave to file a motion to amend their cross-claims

12  to add counts for contract and quasi-contract causes of

13  action.

14       Because I'm not privy to all of what's gone on in this

15  case, I'm not going to make a ruling on that.  I don't know if

16  ATG is going to be able to show some type of unfair prejudice

17  in relation to that motion.

18       But based on what I have before me now, it seems as

19  though the parties have taken full discovery -- factual

20  discovery on the issue.  Now it's just a question of molding

21  it to the appropriate legal theories.  In that case there

22  shouldn't be any unfair prejudice, and the employee defendants

23  can seek recourse under a traditional contract or

24  quasi-contract type of action.

25       So I will enter an order today consistent with this

1   opinion where I will deny relief under *In re: Grand Jury* for

2   the reasons stated.

3        I will give the employee defendants leave to seek to

4   amend their cross-claims, but I will not preclude ATG from

5   filing a motion opposing it.  We'll look at the facts and

6   circumstances to see if it would be appropriate to amend under

7   these circumstances.

8        I want to thank counsel.  It was a thoroughly briefed

9   and litigated issue, and I'll get the order out today.

10       Before I conclude, are there any questions or comments?

11       MR. MANETTA:  None from me.  Thank you, Your Honor.

12       MR. STEIN:  Thank you, Your Honor.

13       (Which were all the proceedings held in the

14        above-entitled matter on said date.)

15                      *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

1        **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

2

3        I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4    Reporter of the United States District Court for the District

5    of New Jersey, do hereby certify that the foregoing

6    proceedings are a true and accurate transcript from the

7    record of proceedings in the above-entitled matter.

8

9

10              */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

11              Official U.S. District Court Reporter ~

12                     District of New Jersey

13

14              DATED this December 30, 2022

15

16

17

18

19

20

21

22

23

24

25